

| 500 Fifth Avenue | | 1101 17th Street, NW |
| --- | --- | --- |
| 43rd Floor | | Suite 1006 |
| New York, NY 10110 | | Washington, DC 20036 |
| (212) 796-6330 | | (202) 470-0330 |

www.morvillolaw.com

EUGENE INGOGLIA
(212) 796-6341
EINGOGLIA@MORVILLOLAW.COM

May 10, 2016

**Via ECF**

The Honorable I. Leo Glasser
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re:** *United States v. Robert Bandfield, et al.*, No. 14-cr-00476

Dear Judge Glasser:

We write to summarize Mr. Bandfield's position, the legal framework, and the evidence elicited in connection with Mr. Bandfield's motion to suppress the fruits of the Belize Searches. We appreciate that the Court granted us a day of hearing in which to explore the issues related to this motion, and respectfully request that the Court grant Mr. Bandfield's motion by suppressing the evidence at issue.

**Procedural Summary**

Mr. Bandfield filed his pretrial motions in this matter on December 2, 2015. *See United States v. Bandfield*, 14-cr-476 (ILG), Dkt. No. 72. Among his requests for relief, Mr. Bandfield asked the Court to suppress the fruits of the Searches conducted at the Belizean offices of IPC and other corporate defendants on September 9, 2014 based on any one of several legal theories supporting the remedy of suppression. *See* Def. Mot. To Suppress, Dkt. No. 72, at 10-32.[1]

---

[1] In his motion papers, Mr. Bandfield articulated a Rule 16-based argument in support of his motion to suppress, noting that the Government had not produced documents, including the MLAT request itself, with which the defense could fully evaluate the U.S.'s conduct in relation to the Searches. The Government's production of 3500 material,

The Honorable I. Leo Glasser
May 10, 2016
Page 2

During oral argument on January 16, 2016, the Court ordered a hearing with respect to the issue of an "agency" or "virtual agency" relationship between the United States and Belize in carrying out the Belize Searches and whether—incidental to that relationship and the subsequent Belize Supreme Court ruling that the Searches were unconstitutional—the Belize Searches violated Mr. Bandfield's Fourth Amendment rights. *See United States v. Getto*, 729 F.3d 221, 230-32 (2d. Cir. 2013).

On April 22, 2016, the Court held a hearing and described its purpose as "to determine whether or not the foreign law enforcement agencies [i.e., Belizean law enforcement] became agents of the United States enforcement agencies, and whether or not, if there were some cooperation agreements between the two agencies, it was designed or intended to evade Fourth Amendment restrictions." *Bandfield*, 14-cr-476, Apr. 22, 2016 Hearing Tr. at 5:16-21 (the "Hearing Tr."). During the hearing, the Government called two witnesses: (1) Special Agent Thomas McGuire, the case agent on the investigation into the instant case; and (2) Special Agent Timothy Reid, who worked as a Regional Security Officer for the State Department at the U.S. Embassy in Belize. These agents were purportedly the best witnesses to provide testimony about the potential agency relationship and cooperation between Belizean and United States law enforcement leading up to and in connection with the Belize Searches. The Government also produced 3500 material and the parties exchanged exhibits in advance of the hearings, though the completeness of the Government's disclosures remains an outstanding question.

The evening before the hearing, the Government—in response to specific questions from defense counsel concerning certain of the 3500 material—indicated that it learned *that very day* there had been multiple meetings and points of contact between representatives of U.S. law enforcement and Belizean law enforcement prior to the submission of the U.S. MLAT request and the execution of the Belize Searches. Accordingly, the Government proposed a second hearing date at which to call other witnesses who were involved in these meetings and communications and to allow time to produce additional 3500 material.

After evaluating the additional 3500 material the Government produced, Mr. Bandfield concluded that a second hearing date is unnecessary and hereby submits this letter outlining evidence elicited through the April 22, 2016 hearing and a summary of this evidence within the applicable legal framework.

---

including email communications, in advance of the hearing on this matter makes clear the deficiencies in its Rule 16 production at the time Mr. Bandfield made his motion in December 2015.

The Honorable I. Leo Glasser
May 10, 2016
Page 3

**Summary of Legal Framework**

As discussed in Mr. Bandfield's memorandum of law in support of his pretrial motions, the Second Circuit recognizes two exceptions to the instruction against the application of the exclusionary rule to extraterritorial searches: the first—where conduct of foreign officials shocks the judicial conscience—is inapplicable here; the second concerns circumstances "where [U.S.] cooperation with foreign law enforcement officials may implicate constitutional restrictions," and is directly applicable here. *United States v. Vilar*, 2007 WL 1075041, *54 (S.D.N.Y. 2007); *see also United States v. Getto*, 729 F.3d 221, 230 (2d Cir. 2013).

The Second Circuit has expanded on the second exception: "[U]nder the 'constitutional restrictions' exception, 'constitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; *or* (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials.'" *Getto*, 729 F.3d 221, 230 (2d Cir. 2013) (internal citations omitted) (emphasis added); *see also Vilar*, 2007 WL 1075041, *54 (S.D.N.Y. 2007).

Importantly, the "constitutional restrictions" exception has two prongs that are presented in the disjunctive: *either* the existence of an agency relationship *or* where cooperation between nations is designed to evade constitutional requirements. Here, the conduct of U.S. law enforcement satisfies both of these prongs. Accordingly, and because the Belize Searches were declared unconstitutional by the Supreme Court of Belize, this Court should suppress the fruits of these illegal Searches.

*Agency relationship*

To establish that foreign law enforcement officials were acting as "virtual agents of the United States, American officials must play **some role** in controlling or directing the conduct of the **foreign parallel investigation**." *Getto*, 729 F.3d 221, 230 (2d Cir. 2013) (emphasis added). Importantly, this standard does not require that U.S. officials must have controlled the specific act in question—here the Searches—but instead requires that the U.S. have played *some role* in directing the foreign *investigation*. The court in *United States v. Vilar* found that a virtual agency relationship was established where United Kingdom officials sought a warrant solely because of a U.S. MLAT request, would not have sought a search warrant otherwise, and turned over seized materials directly to U.S. officials without making use of the fruits in their own jurisdiction. The court concluded that U.K. officials were acting as agents of the U.S. Government. *Vilar*, at *54 (internal citations omitted). The court, however, found that the foreign search complied with U.K. law and thus declined to suppress the fruits. But this secondary analysis has no bearing on the court's initial finding of an agency relationship.

3

The Honorable I. Leo Glasser
May 10, 2016
Page 4

The Government here has asserted its opinion that *United States v. Getto* practically overrules the court's basis for finding an agency relationship in *Vilar* based on the Second Circuit's finding that an MLAT request alone does not establish an agency relationship. First, *Getto* did not overrule *Vilar*; and second, *Getto* did not involve the same attempts by U.S. agents to manufacture the appearance of a parallel foreign investigation as they did here, followed by the opportunistic conduct wherein U.S. agents took advantage of the unconstitutional Searches.

The U.S. MLAT request is indeed the direct cause for the Belize Searches, but, as summarized below, the evidence indicates that the MLAT request represents a small fraction of U.S. involvement that is equally causally related. While Mr. Bandfield further expands on the evidence that supports the below at pages 6-9 herein, U.S. conduct can be summarized as follow:

1. Belize did not have any parallel investigation into Mr. Bandfield or IPC and only had—at best—a tangentially related investigation into the security CYNK;
2. U.S. agents had several meetings and telephone calls with Belizean law enforcement officials months before the September 9, 2014 Searches;
3. Belizean law enforcement indicated to U.S. agents that it had no intent to seek a search warrant or execute search and seizure operations;
4. U.S. agents enticed Belizean law enforcement prior to the MLAT request by offering to later reveal its targets and evidence and provide Belize with CART and other assistance that Belize does not otherwise have;
5. U.S. agents indicated that they would be requesting an expedited search warrant well in advance of any MLAT request and attempted to take a direct police-to-police cooperation route;
6. The U.S ultimately submitted an MLAT request that directed Belizean law enforcement to seize ***all*** materials in IPC's office on an expedited basis;
7. In the MLAT request, the U.S. agents requested to be involved in the Searches and directed that the FIU should oversee the Searches;
8. Belize authorities did not utilize the evidence, but simply asked the U.S. to quickly review it because the non-pertinent documents needed to be returned soon.

Under both *Getto* and *Vilar*, the conduct here—separate and apart from the MLAT request—clearly establishes that Belizean law enforcement acted not in its own interest but for U.S. interests and as agents or virtual agents of the U.S. The conduct of Belizean law enforcement has since been declared unconstitutional and invalid by the Supreme Court of Belize. Because Belize was acting as an agent of the U.S. in carrying out its unconstitutional and invalid Searches, the Court should not permit the U.S. Government to use the fruits of the Searches here.

The Honorable I. Leo Glasser
May 10, 2016
Page 5

### *Evasion of Constitutional Requirements*

Alternatively, Mr. Bandfield has another avenue upon which to prevail on his motion. The second prong of the "constitutional restrictions" exception provides that "cooperation between the United States and foreign law enforcement agencies [must be] designed to evade constitutional requirements . . . this method of fulfilling the 'constitutional restrictions' exception requires some intent to evade American constitutional requirements." *Getto*, 729 F.3d 221, 232 (2d Cir. 2013).

In the instant case, U.S. agents used Belizean officials as their seizure agents (though the U.S. requested to participate) in order to remove *all* materials from IPC and other offices without a search for relevant evidence so that U.S. agents could circumvent warrant requirements and later conduct an initial search of the materials themselves.  The U.S. was fully aware of the overly-broad nature of both its request and the Searches and thereby acted intentionally to circumvent Mr. Bandfield's Fourth Amendment rights by conducting essentially a new and warrantless search when it reviewed the materials.  As with Mr. Bandfield's position concerning the agency relationship, the evidence elicited to date is detailed below at pages 6-10, but can be summarized as follows:

1. Belizean law enforcement informed the U.S. that it had no intent to obtain a search warrant or conduct a search and seizure operation; but the U.S. enticed the Belizeans months before the actual Searches with offers of CART and other technological and man-power assistance that Belize does not otherwise have;
2. The U.S. submitted an MLAT request that directed Belizean law enforcement to seize all materials in IPC's office;
3. The U.S. became aware on the day of the Searches that Belizean law enforcement would simply take everything from the target offices and ask the U.S. to review later;
4. After seizing all the materials in IPC's office, Belize authorities did nothing with the evidence other than store it and ask the U.S. to quickly review it because the non-pertinent items needed to be returned;
5. U.S. agents travelled to Belize knowing both that the MLAT request was extraordinarily broad and that the Searches themselves had been overly-broad and in fact general in nature; U.S. agents then took advantage of the Belizeans' conduct—which was consistent with the U.S. MLAT request—to conduct its own general search.

The outline of the facts and evidence in this case demonstrates that U.S. agents used Belizean officials as their seizure agents in order to remove all materials from IPC and other offices, and then the U.S. took advantage of the general search to circumvent warrant requirements in spirit and conduct a general search themselves.

The Honorable I. Leo Glasser
May 10, 2016
Page 6

**Summary of Evidence Supporting Mr. Bandfield's Position**

At the outset of the April 22, 2016 hearing, the Court correctly noted that the Government has the burden to overcome the motion to suppress. *See* Hearing Tr. at 5:24-6:2. The Government has failed to meet its burden in light of the significant evidence showing both an agency relationship between the U.S. and Belize *and* the U.S. evasion of constitutional search warrant requirements as noted in the above summary of the legal framework.

The evidence elicited at the hearing that supports findings of an agency relationship and the evasion of constitutional requirements is described below. The Defense Exhibits admitted at the hearing are each attached here, as well as a copy of the hearing transcript and three new exhibits marked for identification as Defense Exhibits 39, 41, 48, and 49, which Mr. Bandfield requests that the Court receive as evidence.

*Advanced Coordination and Cooperation Between the U.S. and Belize*

The evidence elicited at the hearing demonstrates that U.S. agents had numerous meetings and telephone conversations with Belizean law enforcement in the months leading up to the Searches. Agent McGuire testified that he had made several initial trips to Belize with the Undercover Informant in this matter; trips which "required [him] to make a notification" to the Belize Government. Hearing Tr. at 84:4-7. FBI agent Eric Williams met with the Belizean FIU—the white collar crime specialists in Belize—in a meeting in or around July 2014 and was instructed by Agent McGuire to probe the FIU regarding its CYNK investigation. *Id*. at 41:7-15; *see also* Defense Ex. 42 (instructing Williams on information he should share and should obtain in order to plant the seed for a future search warrant with the FIU). Agent McGuire later instructed Agent Williams to prepare a written summary of the FIU meeting that included references to a "somewhat related" Belizean investigation because of the legal difference between "them [Belize] opening a case and asking us (US gov) for information vs. us having a case and asking FIU to do a search warrant for us." Defense Ex. 45. Agent Williams complied with Agent McGuire's guidance and prepared a summary of his meeting with the FIU outlining the FIU's willingness to consider executing a search warrant. *See* Defense Ex. 46.

Legal attachés Jason Kaplan, Brett Curtis, and Troy Caldron also had telephone conversations and meetings with the FIU to sort out the process of gaining "cooperation" with Belize in order to obtain and execute a search warrant. Hearing Tr. at 40:9-20. Based on these meetings and conversations with Belizean attorneys and law enforcement, Agent McGuire testified that the FBI was pursuing "police-to-police cooperation" with Belize, the logistics of which U.S. agents Troy Caldron and Jason Kaplan sought to determine with the FIU. *Id*. at 27:21-28:5. In determining that "police-to-police cooperation" was the preferred route, the FBI

The Honorable I. Leo Glasser
May 10, 2016
Page 7

relied on legal guidance from the FIU.  *See* Defense Ex. 20 (attorneys Eric Eusey and Kellie Bailey from the FIU describing to U.S. agents how to obtain a search warrant from the FIU).

This evidence demonstrates that U.S. agents essentially made a pitch for cooperation to the FIU, which had no prior investigation into IPC or Mr. Bandfield or any prior interest in executing a search warrant.  Hearing Tr. at 47:4-14, 49:4-18 (Agent McGuire noting that the FBI was "advancing a proposal that we work with the FIU" and "if we had a case and we came to you with the evidence, what would you do, what would the process be.").  While the Government makes much of the notion that U.S. agents purportedly did not reveal the targets of the U.S. investigation, the U.S. certainly indicated to Belize that an "urgent request to secure premises might be forthcoming."  Hearing Tr. 66:25-67:2. In addition, at least one Government Exhibit suggests that U.S. agents may have revealed Mr. Bandfield's identity to Belizean law enforcement. *See* Government Ex. 3500-TC-16, attached and pre-marked as Defense Ex. 48 (Attaché Caldron summarizing Agent Williams' meeting with the FIU, noting that they "met on various other matters and briefly discussed Robert Bandfield.").

### *The MLAT Request was the Sole Reason for the Search and Improperly Directed the Seizure of All Documents Relating to IPC*

During these advanced meetings between the U.S. and Belize, Agent McGuire testified that the Belizean authorities informed U.S. agents that Belize had no intent to obtain or execute search warrants in connection with its "somewhat connected" investigation.  Hearing Tr. at 30:8-12, 86:10-14.  Accordingly, the U.S. agents' pitch to Belizean law enforcement and the eventual MLAT request were the sole starters for the issuance of the search warrant and execution of the Searches.  *Id*. at 18:20-19:5.

Though the FBI preferred the police-to-police cooperation route that it had explored with Belizean law enforcement, Agent McGuire testified that the FBI had to bend to the will of the U.S. Office of International Affairs; but the FBI "wanted the evidence" for its investigation and "needed to figure out a way" to get it *Id.* at 85:10-12.  Accordingly, the U.S. submitted its MLAT request, a copy of which is attached here and pre-marked as Defense Exhibit 39.[2]

The MLAT request, drafted by the USAO and FBI, requested that the Belizean authorities "treat this request as urgent and execute it on an expedited basis" (which the Belizeans were prepared for based on prior communications).  MLAT, Def. Ex. 39 at 2.  The MLAT then makes the overly-broad request for "[a]ny and all documents or other evidence (in

---

[2]  The attached copy of the U.S. MLAT request was obtained from court filings in the Belize litigation in which the Belize Supreme Court ruled the Belize Searches unconstitutional and invalid.  Mr. Bandfield's counsel obtained the court bundle from the Belizean litigation from counsel for Unicorn and will produce the entire court bundle on request.  Despite repeated requests and its plain relevance under Rule 16, the Government has refused to turn over the MLAT request.  A defense request that the Court direct the Government to do so is still pending.  Alternatively, the Government simply could confirm that the defense-acquired copy is in fact the same as the request sent by the U.S.

The Honorable I. Leo Glasser
May 10, 2016
Page 8

copy or original) seized during the execution of search warrants at the following locations together with documents relating to the execution of search warrants, including but not limited to . . . *[a]ny documents (in hard copy or electronic form) containing information relating to . . . IPC.*" *Id.* at 21.  In addition, the MLAT request asks for U.S. agents to participate in the Searches and that the Belizeans either turn evidence directly over to U.S. agents if present, or track chain of custody using Form C, which essentially allows the U.S. to later use seized evidence at trial.

After receiving the overly-broad MLAT request, Belizean law enforcement used essentially the same language in the search warrant, which directed Belizean police to seize any documents relating to IPC—meaning the entire office—which they did without first searching for relevant evidence.  The Belizeans then ignored the request to complete Form C or any meaningful chain of custody documents and simply made the materials available for U.S. search and review (in so doing, per the MLAT request, they treated the request as one conducted with U.S. participation).[3]  For these and other reasons, the Belizean Searches were later ruled unconstitutional by the Belize Supreme Court.

### *U.S. Agents Were Aware of the Unconstitutionally Broad Nature of the Belize Searches and Took Advantage to Evade Constitutional Requirements*

The U.S. was aware of the extraordinary breadth of its document requests within its MLAT request.  Indeed, the MLAT request could be understood no other way than the way the Belizeans understood it: take everything.  In this respect, the U.S. MLAT request was not for a search, but rather for a general seizure with a U.S.-led search to follow.

Upon receiving the MLAT request, the Belizean authorities acted immediately on the MLAT's request for "expedited" assistance.  But U.S. agents stationed in Belize and in the United States learned on the same day of the unconstitutionally broad manner in which the Searches were conducted.  The same evening of the Searches, Agent McGuire informed attaché Jason Kaplan that the Belizean authorities "may take *everything* and ask for CART assistance later[.]"  Defense Ex. 11 (emphasis added).  McGuire then testified that, the very day after the Searches, "Belize authorities wanted U.S. agents to promptly travel to Belize to review the evidence seized by Belize authorities."  Hearing Tr. at 18: 11-17, 22:8-11.

Upon travelling to Belize and viewing the seized materials stored in two different locations—the Attorney General's Ministry and the FIU—Agent McGuire observed that what the Belizeans had taken "was broad, that they had taken a lot of documents."  *Id.* at 19-20.  In fact, they had seized approximately 240 boxes and about 60 computers. *Id.* at 35:24-36:2.

U.S. agents, including Agent McGuire, were further on notice of the unconstitutionally broad nature of the Belize Searches because they knew that Belizean law enforcement had seized numerous "non-pertinent" materials.  *Id.* at 38:7-10.  Moreover, U.S. agents observed that Belizean law enforcement had seized photocopy machines, keyboards, personal items, and other

---

[3] Even where the Government to prevail on this motion, it is unclear to the defense how the Government intends to offer the fruits of evidence at trial, without any chain of custody forms to establish from which of the four different businesses searched in Belize, the evidence to be offered was seized.

The Honorable I. Leo Glasser
May 10, 2016
Page 9

equipment not capable of storing information. *Id*. at 56:17-25. However, Belizean law enforcement did nothing with the evidence until U.S. agents arrived in Belize and conducted their own search of the seized materials. Belizeans "did not review the evidence" and just "stopped by to check up" on U.S. agents reviewing it. *Id*. at 88:19-23.

Despite these indications and direct observations concerning the unconstitutional nature of the Belize Searches, U.S. agents never bothered to ask to see the search warrant or conduct any due diligence into the Searches—the U.S. simply took advantage of the circumstances to essentially conduct a warrantless *new* search of the seized materials in circumvention of Fourth Amendment requirements. *Id*. at 27:10-11.

### *The Searches Were Found by the Belize Supreme Court to be Unconstitutional*

As noted above, the Belize Supreme Court determined that the Belize Searches were unconstitutional in connection with several lawsuits that have been initiated against the FIU and Attorney General's Ministry by corporate and individual defendants in this matter. The Belize Supreme Court has already ruled in the cases of Titan and Unicorn, and Mr. Bandfield expects a similar ruling soon in the related case initiated by IPC.

The Belize Supreme Court decision in the Unicorn case provides an example of the court's view on the manner in which the Belize Searches were conducted, including on U.S. involvement. As a threshold matter, the court found that the Searches "did not comply with Section 18 of MLAIC [the MLAT provision], which sets out procedures for identifying and seizing relevant evidence." Unicorn Decision dated Apr. 15, 2016, attached and pre-marked as Defense Exhibit 41, at 10. Further, the Searches breached the defendants' rights to protection from arbitrary search or entry and "resulted in an unmitigated violation of [their] constitutional right to protection." *Id*. at 16-17.

With regard to its agency on behalf of the U.S., the court found that Belize, "in its ***zeal to carry out its mandate of assisting the United States under the MLAIC***, trampled on the rights of the claimant by ***carting away ALL of the Claimant's property instead of sifting through and taking only what was needed***." *Id*. at 19 (emphasis added). And, "[w]hile the importance of Belize assisting in the fight against international crime cannot be overstated, the police and other members of the State Team must be given the requisite training and resources to carry out the mandate from those countries who seek our assistance." *Id*. at 20.

The Belize Supreme Court decision essentially observed that Belizean law enforcement was acting as an agent of the United States and, in doing so, acted in a manner that violated Mr. Bandfield's and other defendants' constitutional rights.

### **Conclusion**

The above-described evidence, when viewed within the legal framework requiring that American officials play "some role in controlling or directing the conduct of the foreign parallel investigation," makes clear that the United States initiated contact with Belizean law enforcement regarding Mr. Bandfield and IPC when there was no truly related parallel

The Honorable I. Leo Glasser
May 10, 2016
Page 10

investigation in Belize; planted the seed early on for a future expedited search warrant request and search operation; promised CART and other assistance that Belize does not have; requested the manner and means by which the Searches be executed; requested an overly-broad search that amounted to a general seizure; and later took advantage of what they knew to be overly broad, unconstitutional Searches to conduct their own search in Belize. For these reasons, Mr. Bandfield respectfully requests that the Court find that Belize acted as virtual agents of the United States in carrying out its Searches and that, accordingly, the fruits of the Searches be suppressed because of the unconstitutional manner in which the Searches were executed.

\* \* \*

We thank the Court for its time and attention to Mr. Bandfield's request. We are available at the Court's convenience should it wish to further discuss this or any other matter in relation to this case.

Respectfully submitted,

Eugene Ingoglia