1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,          :
                                   :   14-CR-00476 (ILG)
                                   :
        -against-                  :
                                   :   United States Courthouse
                                   :   Brooklyn, New York
                                   :
ROBERT BANDFIELD, GREGG            :
MULHOLLAND,                        :   Friday, January 22, 2016
                                   :
        DEFENDANTS.                :   10:00 a.m.
                                   :
- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE I. LEO GLASSER
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government:     ROBERT L. CAPERS, ESQ.
                        United States Attorney
                        BY: **JACQUELYN M. KASULIS, ESQ.**
                            **WINSTON M. PAES, ESQ.**
                            **MICHAEL T. KEILTY, ESQ.**
                            Assistant United States Attorneys

For the Defendant
ROBERT BANDFIELD:       BY: **EUGENE INGOGLIA, ESQ.**
                            **SAVANNAH STEVENSON, ESQ.**

For the Defendant
GREGG MULHOLLAND:       BY: **JAMES KASOURAS, ESQ.**
                            **EDWARD V. SAPONE, ESQ.**

Court Reporter:     **Angela Grant, RPR, CRR**
                    Official Court Reporter

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

```
                         PROCEEDINGS                      2
```

1            (In open court.)

2            (Time Noted: 10:00 a.m.)

3            (Defendants present in open court.)

4            COURTROOM DEPUTY:  Criminal cause for motion.  The

5    United States versus Robert Bandfield and Gregg Mulholland.

6            Counsel, please state your appearances for the

7    record.

8            MS. KASULIS:  Jacquelyn Kasulis, Winston Paes and

9    Michael Keilty for the government.

10           Good morning, Your Honor.

11           MR. INGOGLIA:  Good morning, Judge.  Gene Ingoglia

12   and Savannah Stevenson, my colleague, from Morvillo, LLP for

13   Mr. Bandfield.

14           Good morning.

15           THE COURT:  Good morning.

16           MR. KASOURAS:  Good morning, sir.  James Kasouras,

17   Edward Sapone and Chase Ruddy for Gregory Mulholland.

18           THE COURT:  Good morning.

19           We have quite a series of motions before me.

20   There are a number which are, in effect, jointly made.  And

21   there are some which are made by Mr. Mulholland and some

22   which are made individually by Mr. Bandfield.

23           Why don't we address the joint requests first.  I

24   don't know how you want to proceed with respect to that.

25           MR. KASOURAS:  Judge, Mr. Ingoglia and I have

PROCEEDINGS                                    3

1   discussed this and instead of both arguing the same motion

2   we're each going to pick one that we make jointly and then

3   we can separately address our separate motions.

4           THE COURT:  All right.  Now, there are quite a few

5   that were made jointly.  Am I correct in understanding that

6   you're going to address those, Mr. Ingoglia?

7           MR. INGOGLIA:  Yes, Judge.

8           THE COURT:  All right.  Fine.  So why don't we

9   start with the motion to suppress the evidence that was

10  seized from the corporate offices in Belize.  That's a

11  motion which both of you have made.

12          MR. KASOURAS:  Yes, Judge.

13          MR. INGOGLIA:  Correct, Judge.

14          And as a matter of housekeeping before I start,

15  yesterday we filed an affidavit.  It was not a reply.  We

16  didn't argue, but we attached a supplemental exhibit which

17  was --

18          THE COURT:  That was Exhibit H.

19          MR. INGOGLIA:  Correct.  I just wanted to make

20  sure Your Honor had received it.

21          THE COURT:  I did receive it, and I'm looking

22  forward to having it all interpreted for me.

23          MR. INGOGLIA:  I think we all are.

24          The only other sort of housekeeping item is the

25  Supreme Court in Belize has apparently issued a decision in

PROCEEDINGS                                    4

1   a lawsuit that was filed by Titan, which is one of the

2   entities that's at issue in the case and that was searched

3   pursuant to what we're calling the Belize searches in this

4   case.  And the subject of that lawsuit by Titan against the

5   government in Belize was the legality of the search.  And,

6   apparently, the Supreme Court of Belize has ruled in favor

7   of Titan.

8           We are trying to get some kind of certified copy

9   of the opinion so that we can provide it to you, but I

10  wanted you to be aware.  I know the government is aware that

11  that had happened after the time that the government had

12  filed its response.

13          THE COURT:  This motion that was made by Titan,

14  was that predicated upon a search warrant issued by the

15  Belize law enforcement authorities?

16          MR. INGOGLIA:  It was predicated --

17          THE COURT:  Let me rephrase it.

18          What was the basis of the motion to suppress?

19  Maybe that will get you.

20          MR. INGOGLIA:  They were challenging, and, again,

21  I'm not familiar enough with the opinion to give you the

22  details, but they were challenging the searches that are at

23  issue in this case.

24          THE COURT:  On what basis?

25          MR. INGOGLIA:  On the constitutionality of them

PROCEEDINGS                                    5

1    under the Belize constitution.

2         There may have been more aspects than just the

3    constitutionality, but the constitutionality was one of the

4    challenges.

5         THE COURT:  Well, the reason I ask is I would

6    suspect that the legal analysis would be probably similar to

7    the analysis which underlies at least the government's

8    analysis of it, underlies the motion to suppress the Belize

9    search.  Insofar as it was based upon law enforcement

10   activity by the Belize law enforcement persons or search

11   warrants issued by Belize, I understand the government's

12   position is that's not implicated or wouldn't effect the

13   validity of the admissibility of the evidence.

14        MR. INGOGLIA:  I think that's right.  I think

15   their position, well, is that it's irrelevant, and our

16   position is it's not dispositive, but it's relevant that a

17   Belize court has said it's illegal.

18        We'll get you that opinion as soon as I can get

19   it, a comfortable copy of it for you.

20        THE COURT:  All right.  I'm sorry to --

21        MR. INGOGLIA:  So I'd like to quickly summarize

22   sort of the gist or the heart of our argument.  This is the

23   Rule 16 challenge.

24        THE COURT:  Yes.

25        MR. INGOGLIA:  At its core it's a simple argument

PROCEEDINGS                                    6

1   is we can't assess whether or not the searches in Belize

2   pass muster without access to documents that show how they

3   were conducted, under what authority they were conducted

4   and, importantly, what the degree of U.S. involvement and

5   control was.

6          Relatedly, and this is not an issue that we

7   flagged in our motion, but, relatedly, we can't challenge at

8   trial the admissibility and the weight of evidence that was

9   seized from these four corporate offices, but as you saw in

10  the papers, not, not itemized.  So we would normally, if

11  this had been a search in the U.S., we would -- and they

12  searched four offices and lumped everything together and

13  you couldn't tell which came from IPC and which came from

14  Titan and which came from Unicorn, we would have arguments

15  about their admissibility, we would have arguments, even if

16  they were admissible, as to the weight the jury should give

17  them given that their providence is uncertain.

18         So those arguments that we would have at trial

19  that are impeded by not having access to the documents.  So

20  that's the heart of our Rule 16 argument and why it's, in

21  essence, why it's material to us.

22         THE COURT:  Now, before you go any further, I

23  think what makes sense to have the government address each

24  of these individual motions.  So when you're finished with

25  that Rule 16 motion, we'll let the government respond to it.

PROCEEDINGS                                    7

1           MR. INGOGLIA:  Fair enough.  That seems fair.

2           THE COURT:  Okay.

3           MR. INGOGLIA:  And then, look, the heart of our

4    argument here is it's inequitable, profoundly inequitable,

5    for the government to use the fruits of the search, which it

6    has received from Belize, and decline to even try to get the

7    documents underlying the search.  And when I say decline to

8    try to get, what I mean is not that the U.S. Attorney's

9    Office hasn't conferred with the Office of International

10   Affairs.  They apparently have discussed the issue with the

11   Office of International Affairs.

12          But jointly or based on those conferring

13   discussions, apparently the U.S. Attorney's Office has

14   decided they don't need to or don't want to ask Belize for

15   the underlying documents, and we think those two things

16   together, using the fruits, but deliberately choosing not to

17   even try to get the documents that underline the search that

18   are in Belize is profoundly inequity.  That's what's

19   animating everything I'm going to talk about.

20          THE COURT:  Just let me ask, these documents that

21   are underlying the search, I take it you're referring to

22   documents which authorized the search.

23          MR. INGOGLIA:  I'm -- I'm talking about those --

24   those are among the documents I'm talking about.  I mean, I

25   think -- so the MLAT application is what initiated the

PROCEEDINGS                                    8

1   search.  Presumably, a warrant was issued, that's what,

2   under Belizean law, authorized the search.

3           THE COURT:  Right.

4           MR. INGOGLIA:  And governed what the terms would

5   have to be.

6           Because the ultimate legal issue about whether

7   this search passes muster, whether Your Honor is going to

8   exclude it or not, apply the exclusionary rule or not, turns

9   on the degree of U.S. involvement and whether they exercise

10  control.  Any documents that evidence that are part of what

11  we're seeking under the Rule 16.  So it's not just simply

12  those two documents.  It's not simply just the application

13  and just the warrant.

14          THE COURT:  Well, before I get to the government's

15  response, if the government's argument is that the documents

16  that your request -- is not under their control, they don't

17  have possession of it, that's what they say.  Or if the

18  government's argument is that the documents which have

19  authorized the search are documents which were generated by

20  the authorities in Belize, and that's foreign law, which the

21  validity of which or the extent of which or the implication

22  of which doesn't implicate the exclusionary, my question is,

23  do we need a hearing to determine or do I take it on faith

24  that the government says we don't have it?  And the

25  government says that the documents are documents with which

1   we had nothing to do, we didn't execute any warrants, they

2   weren't ours and, more importantly, I suppose those would be

3   relatively easy to resolve amongst you.

4            MR. INGOGLIA:  I think that's probably right.  I

5   think --

6            THE COURT:  Excuse me.  Excuse me.  I just -- the

7   last part of that, which I think is probably as important as

8   the other two, is the government's position, as I understand

9   it, that there's no agency relationship between the

10  government and the law enforcement authorities in Belize,

11  that we were not their partners, we weren't there, we

12  weren't in the offices in Belize when the search was

13  conducted, we didn't authorize it.  That was all done by

14  Belize.

15           Now, does that require a hearing or do we

16  accept -- assume that if the government issues a memorandum

17  which says that's the fact, I believe it?

18           MR. INGOGLIA:  On the last point, the question of

19  whether there is an agency relationship is a fact-based

20  analysis.  And the facts that would help us determine

21  whether that assertion is accurate are the documents I'm

22  trying to get in my Rule 16 application.  So I think -- I

23  certainly think that just the fact that in their response

24  brief they have asserted that the record shows certain

25  things, when there's no documentary evidence of any of it,

PROCEEDINGS                          10

1    by itself isn't enough.  What it would take to be enough to

2    try to establish some of those things, you know, obviously,

3    we're seeking the actual underlying documents, but there may

4    be that some aspects of those that could be done short of

5    that.

6              THE COURT:  Okay.

7              MR. INGOGLIA:  So -- wave at me at the end and I

8    promise I'll add.  How about that.

9              So I think they're making two arguments.  They're

10   making the first argument is what we're seeking is not

11   material, and I think that's the weaker of their two

12   arguments.  I think the basis for a search is sort of

13   classically material to a defense.  I think I previewed why

14   I think it's important.  We need to evaluate whether the

15   search passes muster, whether it meets -- the standards are

16   does it shock the judicial conscience, right?  And we're not

17   arguing that it does.  We didn't see any facts that

18   suggests.  Even on our limited access to the facts, we're

19   not aware of any fact that suggests it rises to that level.

20   It shocks the conscience of my client the way it was

21   conducted, but in terms of the case law, we're not arguing

22   that.  But in terms of was there U.S. control or significant

23   involvement that is indicative of U.S. control, I think

24   that's a fair question.

25             THE COURT:  Okay.

PROCEEDINGS                    11

1          MR. INGOGLIA:  And that's what we're getting at.

2          And then my point about trial.  I think if we were

3    going to challenge -- if they get -- if they prevail and

4    they're able to use this evidence that was taken apparently

5    without an inventory ever being conducted by the Belizeans

6    when they moved everything from the offices to some unknown

7    location for the agents to come down and sift through, when

8    they did that, apparently they didn't do an inventory and

9    it's four different offices.  Not all of them are associated

10   with my client.  IPC is my client's office.  So if they're

11   going to use evidence that they seized sort of in

12   blunderbuss fashion and they can't document where it came

13   from, that's another reason why we think the underlying

14   documents are material.  So I don't think -- I don't think

15   that's a close call, but -- and I'm happy to answer

16   questions about it, but I think the documents,

17   notwithstanding their assertions, are material.

18          They make one specific argument about the MLAT

19   application itself and there's case law that suggests that

20   because a defense can challenge the treaty itself, the MLAT

21   application doesn't have to be produced because the

22   defendant doesn't have standing to challenge the treaty.

23   But we're not seeking to challenge the treaty.

24          What we're trying to assess is the degree of U.S.

25   involvement, and a piece of that story is the MLAT

1    application that prompted the search.  And we know now for

2    the first time from the government's response that there are

3    details in that application that are factually significant.

4    The government asked that the search be done in an expedited

5    fashion and it was.

6              If I'm not dating myself too much, there's an old

7    Looney Tunes cartoon with the bulldog and his little terrier

8    friend, and the terrier would scamper around the bulldog and

9    say, "What are we doing today?  What are we doing today,

10   boss?" And the bulldog would sort of slap him on the back of

11   his hand.

12             Well, that's the relationship between the U.S. and

13   Belize.  The U.S. is the bulldog and Belize is the terrier.

14   And when the U.S. said can you please do this search on an

15   expedited basis -- I'm sure it was a polite request -- they

16   sort of sprinted out and they took -- they went to the

17   offices with a small, you know, an army of people and

18   gathered whoever they could and drove over in U.S. decaled

19   vehicles that there's some factual dispute about and took

20   everything out of the office, wholesale, including the

21   copiers, which only we think is significant, and just

22   relocated the contents of the office, wholesale, to some

23   other location.  And then they invited the U.S. to come down

24   and take a couple weeks to go through.  And to us, you know,

25   putting aside the sort of narrow point that that expedited

PROCEEDINGS                              13

1    request aspect is important and it shows why the MLAT is a

2    Rule 16 appropriate in this case.

3              THE COURT:  As I understand the government's view,

4    they say that the MLAT material is confidential.

5              MR. INGOGLIA:  Yeah, I think --

6              THE COURT:  And with respect to the bulldog

7    terrier analysis, if my memory serves me, I think the people

8    in Belize just ignore the request that the government was

9    making to turn the material over.  They said we're not going

10   to give it to you.

11             MR. INGOGLIA:  But they didn't, right?  Under the

12   treaty --

13             THE COURT:  Well, they eventually did.

14             MR. INGOGLIA:  Well, they searched it in an

15   expedited way.

16             And what the government says is we asked that

17   agents be present at the time.  And Belize didn't respond.

18   But what Belize did is they took everything out of the

19   offices, moved it to a different location and said, come on

20   down and you search it.  Because, remember, what the Belize

21   officials did, they didn't search, they just took.  They

22   seized the entire consents of the office.  You know who

23   searched, the U.S. agents.  The U.S. agents came down, they

24   searched the contents of the office.

25             So all of which is to say, I've gotten ahead of

PROCEEDINGS                               14

1    myself, but the fact that in some cases the MLAT application

2    has not been deemed to be Rule 16 material, I don't think --

3    I think in this case we get a slightly different posture and

4    it matters that they asked for expedited review and U.S.

5    involvement.

6              There are -- so that's materiality.  And there are

7    some documents that I think are -- have to be in the U.S.

8    government's possession that we haven't seen on the subject.

9    And I guess it's because they don't view them as material,

10   but the FBI never does anything without copiously

11   documenting it.  I haven't seen any FBI documents about

12   their involvement in the search.  We haven't seen any

13   documents about communications between U.S. officials and

14   Belize officials about the search.

15             So I'm not talking about documents that are in

16   Jackie Kasulis' possession, but in the U.S. government's

17   possession related to this investigation, there has to be

18   documents about the search, about communications back and

19   forth that's in their possession.  They don't really

20   address this in their papers directly, but I don't know why

21   that wouldn't be.  You know, the possession, custody or

22   control isn't in dispute I don't think on those issues.  I

23   don't know why we don't have those.

24             With respect to -- so that's -- I can go on and

25   on, right.  But let me go to the documents that are in

1    Belize.  And because that's the other question, right, does

2    the U.S. really have possession, custody or control of

3    those?  And our argument is that the U.S. -- the big dog

4    does have control here; that -- and the way to test it is

5    for the government to ask, for the U.S. government to ask

6    Belize for the documents.  And then we would know within,

7    you know, maybe 15 minutes whether Belize would say, oh,

8    you're offending me by trying to expand the treaty or Belize

9    would say here they are.

10          The idea that the treaty is -- has aspects that

11   envision certain documents to be confidential or that the

12   treaty was only drafted with an eye toward the government's

13   Brady disclosures and not to its larger discovery

14   obligations, I don't know whether that's true or not.  I'm

15   not a student of the treaty, but it's not our problem.  It's

16   their problem.  They investigate the way they choose to

17   investigate.  There's no MLAT exception to their Rule 16

18   obligation.  I read it again.  It doesn't say unless OIA

19   says they have concerns that maybe it will upset the

20   Belizeans, then you don't have to ask.  There's nothing in

21   there about that.

22          So that is interesting.  It's a problem for them,

23   I understand.  I'm not -- it is true that the United States

24   wants to maintain relationships with countries and they

25   enter treaties for that purpose.  But that doesn't dictate

1    what Rule 16 requires.  And that's what the government is

2    arguing, they're saying, well, Rule 16 must not provide for

3    this because the treaty doesn't.  And that's backwards.  The

4    rights that are at issue here are the rights of my client in

5    this courtroom being tried criminally by this office.  And

6    that's, that's -- Rule 16 is implicated there.

7            Lots of governments -- the U.S. Attorney's Office

8    makes tactical decisions about where it goes and how it

9    collects evidence all the time, and you're stuck in the bed

10   that you make.  And if you gather a bunch of evidence

11   abroad, you know, there are limitations on that and there

12   are consequences to it.  And it might be that you can't use

13   it as much as you want, but their obligations are the same.

14   So I don't think it's a fair response to say either the

15   treaty is, you know, is restrictive or to say OIA, the

16   Office of International Affairs, has told us that they have

17   concerns.

18           I was a prosecutor for nine years.  OIA never says

19   yes the first 12 times you ask for anything, and it's

20   because their interests are different than -- and I'm sure

21   they will agree with me about this -- than what a criminal

22   defendant's interests are, what the Court's interests are

23   and even what the prosecutor's interests are.  They're not

24   interested in that.  They're interested in not just

25   maintaining a relationship between the U.S. and Belize, but

PROCEEDINGS                                    17

1    they're interested in maintaining their individual personal

2    relationship with whatever their counterpart is on the other

3    side, and I don't want to annoy that person, or whatever it

4    is.

5              And so frequently it is the case that the U.S.

6    Attorney's Office has to go all the way up the chain at OIA

7    asking again and again and again.  I've got a prosecution

8    here.  I need this for my prosecution.  And that dialog

9    happens all the time.  And it is not the case that, and it

10   shouldn't be the case, that an OIA functionary determines

11   the degree of production we get on these documents when

12   they're so material to our defense.

13             I think we disagree about the import of a couple

14   cases.  Castroneves we think is instructive here.  It's not

15   binding.  It's the Southern District of Florida, but it's

16   instructive.  It's persuasive I think on its face.  And the

17   district court there ordered the production of the MLAT

18   application, the supporting affidavit that went with it and

19   Brazilian documents that were produced in response.  And

20   that was because the Court determined that was the only way

21   the defendant could evaluate the assertion by the U.S.

22   Attorney's Office that they had tolled the statute of

23   limitations, right.  And so the government's response, well,

24   this is not a statute of limitations case.  You're right, it

25   isn't, but the analysis is exactly the same.

PROCEEDINGS                    18

1        The parties are in a position where the person

2   with the access to the documents is the government, and the

3   defense doesn't have an ability to test it without access to

4   the documents.  And so in that case I don't know whether the

5   government made the argument that, you know, it's going to

6   offend the treaty with Brazil in some way, but the court

7   ordered what was to be produced.  It didn't order, by the

8   way, how it was to be produced.  It would not be our

9   suggestion that Your Honor make this very specific order

10  that they sort of throw up I think as a straw man that that

11  might cause problems with the executive powers or some such.

12       All -- look, we're asking that -- our argument is

13  the ship has already sailed.  Mr. Bandfield has been here a

14  year and a half.  The time for them to have decided all this

15  and made these inquiries has long past, and you should just

16  suppress this and they can proceed to trial on their other

17  overwhelming evidence which includes videotape of our client

18  and all the other things that they think is overwhelming.

19       That's our argument, right, but you could order

20  them to produce certain materials and they can figure out

21  how they get it in a way that doesn't contravene the treaty.

22  Respectfully, that's their obligation.  They're the

23  government.  We're the defense.

24       The fact that there may be a letters rogatory

25  opportunity, that's equally available to both sides.  It's

1   the government's obligation, let them file the letters of

2   rogatory to get the documents that they're obligated to give

3   us as part of their discovery obligation.

4         We also seem to disagree on Gomez Castrillon. And

5   I just want to point out on that, I realize I'm in the weeds

6   here, but in Gomez Castrillon the government says well --

7   they point to the Court's description of the defendant's

8   motion as a doomed motion.  But the reason that it was a

9   doomed motion in that case was the defendant's in that case

10  were not U.S. citizens.  But Mr. Bandfield is a U.S. citizen

11  so the analysis is completely different.  But the overall

12  reasoning of Gomez Castrillon supports our argument, right.

13        I think that I have spoken too fast, but I suppose

14  the last thing I want to say is -- I'm sure that I'll take

15  that back and I'll have more to say -- but at least at the

16  moment the last thing I want to say is the government keeps

17  saying that we're relying on conjecture upon conjecture

18  about what the events were as they happened in Belize.  And

19  it takes a lot of moxie, and, apparently, they have it to

20  make that argument when the reason we don't know what

21  happened in Belize is because they won't ask Belize for

22  those documents.  And it's -- it just can't be.  It can't be

23  and it shouldn't be that the government can use the fruits

24  of the search, which it happily accepts from Belize, but not

25  even try to get the documents in Belize that show whether or

PROCEEDINGS                    20

1    not that search was done properly.

2          It's true that some of the individual facts that

3    we offered in support of our motion by themselves are not

4    enough to reach the standard that you have to reach to

5    justify suppression.  We don't have all the facts.  What

6    we're trying to show to Your Honor was there's a lot to be

7    concerned about with this particular search.  This is not

8    your ordinary foreign search.  And the fact that you've got

9    Belizean court activity that is questioning the validity of

10   the search; the fact that you've got some facts about the

11   nature in which it was conducted, it's very unusual.

12   There's no other case I have seen where the thing we're

13   fighting about, the nature of the search we're fighting

14   about is Belize takes all, you know, the foreign country

15   takes all the documents out of one location, literally all

16   of them, moves them to another location and then invites the

17   U.S. agents down to come and do a search for two weeks.

18   That's a higher degree of U.S. involvement than in any of

19   the other cases we've talked about as it relates to the

20   search itself.  And, again, that's not all the facts.  They

21   have all the facts.  They have some of the facts and Belize

22   has some of the facts.  I don't have any of the facts, but

23   that's my point of my motion is we're entitled to them.

24          I think that's mostly what I want to say.  I'm

25   sure Jackie will say something that will cause me to have a

PROCEEDINGS                    21

1    heart attack but.

2             THE COURT:  Ms. Kasulis.

3             MR. KASOURAS:  Judge, may I just very, very

4    briefly.  There's just one thing that I wanted to add to

5    that argument in response to the motion since it is a joint

6    motion.

7             On the question of the government's assertions and

8    whether or not the Court should hold a hearing or simply say

9    it's so because they say it's so.  Oftentimes, there are

10   things that perhaps prosecutors may think they know, but the

11   development of facts at a hearing may indicate otherwise.

12   One of the things that troubled us, we are trying to garner

13   facts from whatever extraneous sources we can get them from.

14   And as we indicated in our motion on page 32 and in

15   Exhibit 9, one thing that we were able to do was to obtain

16   certain proceedings and transcripts and statements made by

17   Belizean courts.  And as the Court knows, there was the

18   litigation concerning the financial unit going after the

19   funds and going after the accounts.

20            To put it mildly, the court, which ultimately

21   lifted the restraints, was very concerned about the manner

22   of the searches.  And the responses by the Belizean

23   authorities also buttressed our claim of significant United

24   States involvement that perhaps these prosecutors may not

25   know.  For example, on page 32 we quote that the FIU -- the

PROCEEDINGS                    22

1    records -- Exhibit 9 indicates the FIU thereafter conducted

2    investigations and collaborated with unnamed foreign

3    competent authorities.

4           And later when questioned by the court which was,

5    again, very upset with the manner in which the investigation

6    had proceeded, the FIU's new director stated, and I quote,

7    no, it wasn't a bungle because it wasn't a Belize case.  It

8    was a U.S. case, and the American government was very clear

9    as to their request.  They were very clear in respect to

10   that end.  And to the extent, that is, request, then that is

11   as far as we go, essentially is stating, and I forget what

12   the analogy was, it may have been before my time.  But

13   essentially what the Belizean response, and, actually, we're

14   probably the same age, what the Belizean response was to the

15   Court's criticism, this wasn't our case.  We were simply

16   doing as we were told and requested by the United States

17   government which was calling the shots.

18          And so, again, this is yet another indication of

19   very significant and rather clear United States involvement.

20   So these are facts that we've been able to glean from

21   elsewhere that do seemingly indicate something contrary to

22   the government's position.

23          I otherwise adopt my colleague's arguments.

24          THE COURT:  Ms. Kasulis.

25          MS. KASULIS:  Your Honor, it's clear that Your

PROCEEDINGS                    23

1    Honor understands the government's positions as set forth in

2    its papers.  There are a couple of issues that I do want to

3    address.  The first is the issue of the government not

4    making the request to Belize to get the search warrant

5    documents.  As we noted, it's not typical in MLAT requests

6    to get those documents.

7              We have been in pretty much constant contact with

8    the Office of International Affairs who does take this case

9    very seriously and understands all of the issues and

10   concerns.

11             And as set forth in the Lee case, the Second

12   Circuit case from 2013, there was some language in that case

13   about the prosecutors having made a good-faith effort to get

14   the underlying documents.  And in that case it was regarding

15   the wiretaps that had been authorized in Jamaica where the

16   defendant had been intercepted on those wiretaps.  And when

17   we went ahead and looked at the underlying facts and

18   circumstances regarding the good-faith effort that the

19   prosecutors made.  What had happened there was the

20   prosecutor said exactly what we did in this case, which was

21   they consulted and conferred with OIA.  They had asked OIA

22   if it would be appropriate to make such a request to

23   Jamaica, and OIA said the same thing that OIA said here

24   which is it's not  within the bounds of the MLAT.  There is

25   the letters rogatory and we have -- OIA meaning, has

1    significant concerns about such a request having an adverse

2    impact on its relationship with Jamaica which at the time

3    was strained.

4            There are similar facts and circumstances that

5    apply here.  OIA is best suited and positioned to understand

6    the implications of making such requests on a relationship

7    with a foreign separate sovereign government.  There is no

8    bulldog terrier relationship here, Your Honor.  I think Your

9    Honor rightly noted that Belize clearly is an independent

10   actor.  We've made requests of Belize that they have either

11   ignored, not responded to or have done what they've wanted

12   to.  So the MLAT was merely an ask to execute searches

13   following Mr. Bandfield's arrest.  We asked for them to be

14   expedited for obvious reasons.  Bandfield's arrest was

15   public at that time.  And the first we even learned that the

16   searches were being executed was through news reports.

17           So, you know, this idea that there was all of this

18   collaboration and documentation regarding our involvement in

19   the searches is simply not true because there is no such

20   documentation or collaboration that is documented therein.

21           This really does turn on whether or not there's an

22   agency relationship between the U.S. and Belize in this

23   case.  And the government has set forth in its papers that

24   facts that show that there are -- there was no such agency

25   relationship, you know.  I spent a lot of time, Your Honor,

1   speaking with the agents who are involved in this case,

2   consulting with the U.S. Embassy, consulting with the Office

3   of International Affairs.  The Office of International

4   Affairs has reviewed our materials for accuracy.  We have

5   taken every allegation of U.S. involvement very, very

6   seriously and have tracked those allegations down to their

7   end.

8          The U.S. Embassy has consulted with every U.S. law

9   enforcement member who was in Belize at the time of the

10  search, and they have all affirmed that they were not

11  involved in the obtaining of the search warrants, nor were

12  they involved in the execution of the searches.

13         So it's the government's position, Your Honor,

14  that a hearing is not necessary.  If Your Honor thinks

15  otherwise, we are happy to provide witnesses to attest to

16  what the government has set forth in its papers.  But I can

17  represent that we have not taken this issue lightly; that we

18  have satisfied our requirements pursuant to Rule 16 and what

19  the law calls for.  And the bottom line is that the facts of

20  this case do not come close to an agency relationship.  And

21  if that's the case, the law is clear that we're in a shock

22  to the conscience category.  And as the defendants have

23  conceded, we're not even close.  Even taking what Andrew

24  Godfried said on its face is true, we're not even close to

25  that standard.  This does not violate the norms of

PROCEEDINGS                      26

1    international decency.

2            And with respect to the government's participation

3    in the search, the government's understanding was that

4    Belizeans obtained a search warrant, that they executed that

5    search warrant pursuant to their own laws.  Those -- the

6    fruits of that search was then made available to U.S. law

7    enforcement.  We were not able to take copies or -- excuse

8    me -- not able to take the originals.  Belizeans were very

9    clear the extent to which the government could even access

10   those materials.  We were not allowed to take originals

11   outside of Belize.  And so the government's position

12   ultimately is that the MLAT request is not -- is not

13   relevant and, therefore, it's not triggered by Rule 16; that

14   we don't have the search warrant materials, nor are we

15   obligated to obtain those; and that there are no Fourth

16   Amendment rights that have been violated or implicated here.

17   And that putting the Fourth Amendment aside, the shock to

18   the conscience test makes clear that this evidence is

19   admissible.

20           And, separately, with respect to the inventory

21   and, you know, how -- to what extent the Belizeans

22   documented that search, that's really issues, Your Honor,

23   for authenticity.  It's not regarding whether these

24   documents are ultimately admissible and whether there's some

25   sort of violation of standards of decency or Fourth

PROCEEDINGS                    27

1    Amendment here.  So for those reasons the government

2    believes that the Belize search results are admissible and

3    should be admitted by the Court.

4              THE COURT:  All right.  The Rule 16 issue is very

5    specifically defined by Rule 16.  The government is

6    obligated to produce to the defendant documents which are in

7    the government's possession or control, documents which are

8    significant and material to the defendant in preparing a

9    defense, if they have it, if it's in their possession or

10   control.  Documents which the government intends to use in

11   its case in chief should be provided to the defendant.  And

12   anything that belongs to the defendant should be provided to

13   the defendant, if the government has it. Those are very

14   specific.  They don't require very much in the way of

15   interpretation.  The words are self-defining.

16              If the government does not have these documents in

17   their possession, then your argument, Mr. Ingoglia, is very

18   understandable.  The government should make a request that

19   raises the question as to whether the government is

20   obligated to make a request, whether I can direct the

21   government to make a request.  But beyond that, assume the

22   government does and the documents which you're requesting

23   that they attempt to get would be the documents which were

24   the basis for or the authorization for the search, which as

25   I understand it, as I understand your argument, as I

1    understand what this entire discussion is about.  But

2    assuming that my understanding is correct, and I'm aware of

3    the fact that the notion that judges know all the law or

4    even all the facts is very rebuttable.

5            But assuming that that is correct, then you are

6    faced with a very specific legal principle that what a

7    foreign government may have done in connection with a search

8    or in connection with whatever the activity is which may, if

9    it had been done by the United States be offensive, is not

10   offensive as far as the introduction of the material which

11   is the object of what they did, would not be excludable in a

12   United States courtroom.  So you have that problem to deal

13   with.  Even if they did get the documents and even if it is

14   a Belize search warrant and there's something wrong with the

15   search warrant when tested against the American requirement

16   for search warrants, it wouldn't have effected the

17   admissibility of the material which were obtained pursuant

18   to that search.

19           MR. INGOGLIA:  I have a response which is if the

20   U.S. -- we've been talking about it as an agency

21   relationship between the U.S.  If the U.S. exercised some

22   control, then it does matter.  And --

23           THE COURT:  Yes.

24           MR. INGOGLIA:  And what -- we have to address that

25   question is Ms. Kasulis' -- and I take her at her word --

1   her investigation that she conducted to conclude, which she

2   sets forth in her brief, that there is no agency

3   relationship.  And, respectfully, that's never been the

4   standard.

5          THE COURT:  So we'll have a hearing.  We'll need a

6   hearing if that's what it is that would be required.

7          And the other question, of course, is an

8   interesting one.  What is the role of a United States

9   federal court in making, if there is any at all,

10  determinations regarding diplomatic determinations made by

11  the government as to whether some conduct which is being

12  requested or acquiescing in a request offends diplomatic

13  protocol which we're not prepared to get involved with.

14         Is it the function of a court to say, well, you

15  know, we're not interested in the diplomacy of the matter.

16  We're not interested in diplomatic protocol.  We're

17  interested in due process, fairness and all the standards of

18  the federal court.  It's an interesting issue but --

19         MR. INGOGLIA:  Well, I think there's another

20  alternative which is --

21         THE COURT:  What is rogatory?

22         MR. INGOGLIA:  Well, for sure.

23         And I see the U.S. Attorney's Office eagerly

24  preparing letters rogatory.  But I think you answered the

25  question the way I would answer it, although I don't know if

PROCEEDINGS                              30

1    you agreed.  You're asking it rhetorically.

2            I think that the answer is the Court's role is to

3    make sure that what happens to Mr. Bandfield in this court

4    before you meets with -- satisfies due process and

5    constitutional requirements.  That doesn't mean that issues

6    of diplomatic relationships aren't important.  And it might

7    be that the U.S. Attorney's Office decides, bowing to those

8    diplomatic concerns, that it won't seek to offer into

9    evidence things that -- for it to use it would have to risk

10   concerning, you know, violating a concern that's been

11   articulated by the Office of International Affairs.  That's

12   another direction it could go, and I'm not sure that the

13   burden -- we should reinterpret Rule 16 in a way that lets

14   them use the evidence out of diplomatic sensitivities.

15           THE COURT:  All right.  Just let me conclude this

16   part of the argument by this observation.  I devoutly hope

17   to believe that the government is purer than Caesar's wife.

18           I'm offended, really offended whenever I read or

19   hear about government misconduct or government which does

20   something which is impure.  The object of what goes on in

21   this courtroom or in any American courtroom is to be fair

22   and to see that the trial which is conducted and the rights

23   of the defendant are fully protected, and that the

24   government should do what the government should do in the

25   interest of fairness and justice.

PROCEEDINGS                    31

1           It may be the government is not legally obligated

2     to do certain things, but if the government can do it

3     without violating some law or other protocol, the government

4     should, if that would be the fair thing to do.

5           Rule 16 is very specific.  It tells the government

6     what it is the defendant is entitled to by way of discovery.

7     And I would hope that the government complies with the

8     spirit of Rule 16, which is to give the defendant the

9     material they need to prepare an effective defense and to

10    see that the trial, which they will be a party to, the

11    prosecution of which they're the object, is completely fair,

12    satisfy all notions of decency and fairness.  That's what I

13    devoutly hope the government will do.

14          And the same is true for the defendant.  The

15    government makes reciprocal requests of the defendant to

16    turn over material which the defendant has.  More often than

17    not, that request is ignored.  At least that's been my

18    experience over the years, so it works both ways.  The

19    object here is to have a fair, fair trial which satisfies

20    any conception of decency and a civilized concern.

21          Having said that, lets move on to Joint Request

22    Number 2 which -- now, we'll deal with whether a hearing

23    should be scheduled with respect to the agency issue when

24    we're finished, but if I for some reason overlook it, please

25    remind me that that's what we should be doing.

PROCEEDINGS                              32

1          The Joint Request Number 2 is to suppress

2    discovery produced after the discovery deadline.  I really

3    don't quite understand that request or whether it really has

4    any merit.  I mean, Rule 16 or my experience here over a

5    number of years is that the government is obligated to

6    produce whatever discovery material they should be producing

7    regardless of whether there is or isn't a deadline.  If

8    material becomes available to the government after the

9    deadline, the government -- it's a role in -- particularly

10   in a case like this where the amount of discovery is just

11   voluminous.  It hasn't all descended into the hands of the

12   government on one fell swoop.

13          So what is the -- what is the --

14          MR. INGOGLIA:  So we don't disagree about what you

15   just said.  And, in fact, we're not seeking to exclude newly

16   discovered evidence.  So I don't -- they didn't give me

17   dates of when they found whatever they found, but if they

18   came into possession of some document that, you know,

19   because they had signed up a cooperator and that cooperator

20   gave them new documents they didn't have before, of course

21   they couldn't have produced it.  They don't have a time

22   machine.  They couldn't have produced it before.  That's not

23   what we're saying.

24          I'll give you the two, what we think are the most

25   egregious examples.  At the time of Mr. Bandfield's arrest

PROCEEDINGS                                    33

1    in September of 2014, roughly a year and a half ago, he had

2    with him a laptop and a flash drive.  And his wife was

3    traveling with him and she had a laptop.  Those documents --

4    those items were seized, and they were not -- and, look, I

5    think what happened is they got put in a drawer and then

6    people forgot about them.  I don't think that that's an

7    issue, but more than a year passes, they're not produced in

8    discovery.  They're -- right before the deadline, Your Honor

9    set a deadline at a conference that we had in April for

10   May 18th, and three days before that they decided to get a

11   search warrant to search the contents.  So up until that

12   point they had them.  There's personal stuff on there,

13   photographs of their children, emails, communications with

14   their family.  Those were seized, but not searched.

15           And then they go get a search warrant and then

16   even then there's nothing produced to the defendant.  And I

17   think most egregiously in the case of Mr. Bandfield's wife,

18   that laptop -- there's no argument that her laptop was

19   seized incident to arrest or anything.  They just take it.

20   They take it, they don't search it, they hold on to it.  She

21   calls and says what's going on with my laptop.  They say do

22   you consent to a search?  She says no.  They say, well, it's

23   going to be a while.  And they don't get a search warrant

24   then and they wait a very long time to get -- to bother to

25   get a search warrant.  And even then they don't return it

PROCEEDINGS                              34

1    until we file our motions.  And then, according to a

2    footnote in the brief, the government realizes that

3    Mr. Bandfield's wife would like her property back.

4            And, respectfully, that's, that's crazy.  Of

5    course, she's not gifting it to the United States.  Of

6    course she wants her property back.  And that's an unlawful

7    seizure.

8            And, yes, the defense says we're not extremely

9    prejudiced because, you know, we get that electronic

10   evidence late because we don't have a trial date yet.  Look,

11   I don't know yet because I haven't studied what's on her

12   laptop, and whether we're prejudiced or not.  But this is

13   the flip side of the coin to the argument about when one

14   should consider employing the exclusionary rule.  It's when

15   there's conduct, not necessarily of malintent, but of

16   malconsequence where -- that you want to deter.

17           And it's not okay to seize a U.S. citizen's

18   laptop, not search it, not do anything with it, not return

19   it for more than a year.  It's just simply not okay.

20   There's no justifiable basis for it.  They don't attempt to

21   excuse it.  I don't think it was -- I don't know what

22   happened, but I don't think anyone disagrees about broadly

23   what the facts are.  And so this is, I think, an easy one

24   that should be suppressed.  There's just no basis for doing

25   what they did.  They mishandled it.  They shouldn't have

PROCEEDINGS                    35

1   done it.  What they should have said was, our bad, we're not

2   going to use the evidence.  So that's the argument on the

3   laptop and the flash drives.  Those, I think, are the most

4   egregious examples.

5            There's some other discovery that comes after the

6   deadline that the government had before the deadline, and

7   that's the category of stuff we're objecting to.  I'm not

8   objecting to stuff they found later.  That's our argument.

9            THE COURT:  Well, let me understand your argument,

10  Mr. Ingoglia.  First, I thought I heard you say that the

11  seizure was completely illegal to begin with.

12            Is that what you said?

13            MR. INGOGLIA:  The seizure of -- I don't know what

14  the basis was for the seizure of Mr. Bandfield's wife's

15  laptop.

16            THE COURT:  I thought I heard you say that the --

17  having possession of it was completely unlawful to begin

18  with which suggested that the seizure was unlawful.  I

19  assume that it's a seizure incident to arrest.  I would

20  just -- if I asked what was the basis for the seizure,

21  that's the answer I would get otherwise I can't imagine why

22  else the laptop was seized, why it was held for as long as

23  it was.

24            MR. INGOGLIA:  Well, she wasn't arrested, but

25  Mr. Bandfield was, yes.

PROCEEDINGS                          36

1          THE COURT:  I'm sorry.

2          MR. INGOGLIA:  Go ahead.  Please, I apologize.

3          THE COURT:  Assuming that's not the basis for your

4    suppression, the only other basis for suppressing would be

5    if there's extreme prejudice.  Or, third, just simply punish

6    the government and say what they did was bad and we're going

7    to punish you for being bad, and we're going to suppress it.

8          MR. INGOGLIA:  I think that -- I mean, to be fair,

9    I don't really disagree with your analysis.

10         THE COURT:  Which is what you're asking me to do.

11         MR. INGOGLIA:  Exactly right.  I think that's

12   right.  Look, I think --

13         THE COURT:  What they did was terrible, therefore,

14   we should suppress it.  All right.

15         Ms. Kasulis.

16         MS. KASULIS:  I think Your Honor summed up the

17   defendant's arguments well.  There was a delay.  I think

18   we've conceded that in our papers, but we do not believe the

19   delay was unreasonable considering -- unreasonable

20   considering the voluminous amount of evidence in this case,

21   Your Honor.

22         As you're aware, the government had been

23   processing all of the Belize computer evidence that had been

24   seized starting in October of 2014.  We did obtain the

25   search warrant in May.  We then were able to provide a copy

PROCEEDINGS                    37

1   to the defendant.  I believe it was -- we obtained a hard

2   drive and then provided it in November.  But there are no

3   allegations, Your Honor, that the agent acted in bad faith

4   or that really there was any prejudice here whatsoever,

5   especially considering that the computer is Mr. Bandfield's

6   own computer.

7          If there's any evidence for which he should know

8   what's on the computer, it's his own computer.  So we

9   concede, Your Honor, there was a delay.  There's a lot going

10  on in this case and a lot of moving parts, but we do not

11  believe that suppression is warranted here considering the

12  facts and circumstances.

13          THE COURT:  Is there anything in that -- in those

14  laptops that the government intends to use in it's case in

15  chief that's Rule 16 material that hasn't yet been turned

16  over?

17          MS. KASULIS:  It's been turned over, Your Honor.

18  And we actually even turned over the subset of the evidence.

19  So we imaged the laptop and turned it over to Mr. Bandfield

20  right away.  We then actually or the agent, of course, went

21  through the laptop and culled the information that would be

22  responsive to the search warrant.  We then produced that

23  culled set to Mr. Bandfield so he knew what we had deemed

24  relevant pursuant to the search warrant or within the bounds

25  of the search warrant.  And produced only that culled set to

PROCEEDINGS                    38

1   Mr. Mulholland to, of course, address concerns about

2   personal information, et cetera.

3           Then the rest of the computer, Your Honor, is

4   locked by FBI CART.  Our agents can't access it.  It's only

5   then the relevant -- evidence deemed relevant from the

6   computer that the agents can now have access to.

7           We did produce it in Rule 16 discovery.  It's

8   unclear at this point whether or not we're going to rely on

9   any of that evidence at trial.  We're still really reviewing

10  it and considering it with respect to the rest of our

11  evidence, but we believe we complied with Rule 16 and the

12  evidence shouldn't be suppressed.

13          THE COURT:  Well, has -- is the question whether

14  the computer should be returned?  Just the thing, the

15  computer?

16          MR. INGOGLIA:  Well, that was a question.

17          THE COURT:  Has that been returned?

18          MR. INGOGLIA:  Apparently, last week they returned

19  Mr. Bandfield's wife's computer to her.

20          THE COURT:  Okay.  All right.  All right.  Lets

21  move on.  I'll undoubtedly deny that motion, Mr. Ingoglia.

22          MR. INGOGLIA:  You're less outraged than I am,

23  Judge.

24          THE COURT:  I'm sorry.

25          Now, with, with a footnote of reprimand to the

PROCEEDINGS                              39

1    government for being dilatory, to put it mildly.

2          The next third joint request is the bill of

3    particulars.  The bill of particulars -- is it necessary for

4    material?  I don't have to review it.  I think I've written

5    bill of particulars motions at least a dozen or more times,

6    and they're almost always denied, but why should this one be

7    granted?  There's no double jeopardy problem I don't

8    believe.

9          MR. INGOGLIA:  No.  Look, they gave us some

10   information in their response --

11         THE COURT:  And the indictment tells you exactly

12   what it is you're charged with.  I mean, those are the basis

13   upon which a bill of particulars would be granted.

14         MR. INGOGLIA:  So let me give you the couple of

15   items that I think are out of the ordinary and you'll rule

16   on it.

17         One of our requests was the time period after

18   which one of the cooperators began cooperating.  And what we

19   didn't articulate in our papers was the reason for this

20   request.  And the reason is that while Mr. Bandfield was in

21   prison and represented by us, a person who is now a

22   government cooperator, I believe, tried to contact him and

23   tried to visit him in jail, and, in fact, called our office

24   to seek our assistance in arranging for a visit.

25         So we asked the U.S. Attorney's Office, was he a

1   cooperator then or not, because if he was a cooperator, he

2   should -- and he's acting as an agent of the U.S. Attorney's

3   Office, he can't be contacting the defendant.  That would be

4   a violation of his Sixth Amendment rights.  So we just asked

5   that question, and they said we decline to tell you, and so

6   that's why it's in our bill of particulars.

7          THE COURT:  That's the only item that you're

8   requesting in the bill of particulars?

9          MR. INGOGLIA:  The other item is we asked for the

10  time period, the universe of co-conspirators by time period.

11  They've charged roughly a five-year conspiracies and the

12  bulk of the evidence is in 2014.  I'm on significant notice

13  about who the participants are in 2014.  That's when the

14  undercover was involved.  So there's wires.  There's a lot

15  of documentary evidence about communications between people.

16         In 2009 I got bank records and so I can't tell if

17  their theory is this same core group that was involved in

18  2014 was also involved in 2009 or there's some other cast of

19  characters that was involved in 2009 and that's why we made

20  that request.

21         MR. PAES:  Your Honor, if I may address the bill

22  of particulars issue.

23         One I think as Your Honor pointed out, the two

24  requests that they've made now, I don't think are the basis

25  for a bill of particulars.  Trying to find out when a

PROCEEDINGS                    41

1   cooperating witness started cooperating with the government,

2   I don't see what that has got to do anything with respect to

3   requesting a bill of particulars.

4         Again, similarly, with respect to when certain

5   co-conspirators were part of the conspiracy and when they

6   were not, again, I don't think that is part of the bill of

7   particulars request again.  With respect to what the charges

8   are in terms of, you know, their facing, which is really

9   what a bill of particulars is meant to do, which is to

10  inform them about those charges, I think it was pretty

11  clear.

12        And especially when it comes to Mr. Bandfield, as

13  we stated in our papers.  This isn't a situation where we

14  have a defendant who's a minor player in a conspiracy who

15  joins for a portion of the conspiracy, and, hence, is

16  concerned about, well, I want to just be sure.  You know,

17  I've been charged with this five-year conspiracy period and

18  I want to get a sense of who are they alleging I was

19  involved with during the period that I was involved in the

20  conspiracy.

21        Yeah, Mr. Bandfield, according to the government's

22  theory, is the head of the conspiracy who was involved

23  during the entire time period.  Yes, over that time period

24  there were certain individuals who joined in and left the

25  conspiracy, but that is not, again, information that

1    necessitates a bill of particulars in this case.  And so he

2    has no concern as to what his conduct was or as to what the

3    allegations are with respect to the charges brought against

4    him.  And, hence, like finding out what exactly the time

5    periods of the various co-conspirators when they came and

6    left, if anybody knows that information better than even the

7    government, it's Mr. Bandfield because he was the one who

8    was operating the entire operation in Belize.

9              THE COURT:  All right.  With respect to that,

10   Mr. Ingoglia, I think the rules regarding bills of

11   particular are so clear.  What you're charged with I think

12   is nothing that you have any doubt about.  The indictment is

13   very clear insofar as the charges are concerned.  You don't

14   need a bill of particulars to tell you what it is you're

15   charged which, which is essentially the purpose of it.  The

16   purpose of it is also to restrict the government with

17   respect to evidence at some later time and, of course,

18   you're not really not asking for that knowing your very

19   professional conduct of -- your representation of your

20   client and effective representation of it.

21              And, certainly, there's no double, double jeopardy

22   issue.  It seems to me what I'm hearing all the bill of

23   particulars material you want is really evidentiary stuff

24   which really you're not entitled to.  So that's denied.

25              The next joint request is to strike surplusage

PROCEEDINGS                    43

1    from the indictment.  I think I've written about that on a

2    number of occasions in the past, probably in Gotti and a

3    couple of others where they sought to strike snitches and

4    rats and all of that stuff in organized crime indictments.

5              Now, you want to strike what, nominees?

6              MR. INGOGLIA:  Look, I think the particular quote

7    that most aroused my ire was that certain words had a

8    meaning in the quote "securities fraud context."  I can't

9    imagine that there will be admissible testimony at trial

10   concerning definitions of terms in the securities fraud

11   context.  Not -- we're not talking about the securities

12   context, you know, because I'm sure there will be plenty of

13   testimony about that, what do these words mean.  To educate

14   the jury a little bit, I think that's fine.  But the

15   securities fraud context, to me, it's inherently pejorative.

16   It's speculative and I don't think there's going to be

17   evidence to back it up and, yet, it's going to be in the

18   charging instrument as written.  And so I think that's the

19   most striking example of what we sought to strike.

20             THE COURT:  Well, I just don't have a specific

21   language that you have in mind, but I've got the superseding

22   indictment.  If you know --

23             MR. INGOGLIA:  I can point you --

24             THE COURT:  It will probably be in the papers.

25             MR. PAES:  Paragraph 17, Your Honor, I believe it

PROCEEDINGS                              44

1   is.

2             THE COURT:  Of the superseding indictment.

3   Paragraph 17?

4             MR. PAES:  Yes.

5             THE COURT:  The term "nominee," is that the

6   paragraph?

7             MR. PAES:  I believe that's --

8             THE COURT:  Is that the paragraph you're concerned

9   about, Mr. Ingoglia?

10            MR. INGOGLIA:  I don't have it in front of me.

11            Do you mind if I look over your shoulder?

12            MR. PAES:  I would just --

13            THE COURT:  The nominee in the securities fraud

14   context refers to a person or firm.

15            MR. INGOGLIA:  Yes, that's it.  In the securities

16   fraud context, yes.

17            THE COURT:  What it is that you're --

18            MR. INGOGLIA:  My objection is to --

19            THE COURT:  What is it that raises your ire?

20            MR. INGOGLIA:  -- the securities fraud context as

21   if there is a securities fraud context for the term

22   "nominee."  There is a term "nominee" that's frequently

23   used in the securities context.

24            I mean, look, I've never heard of such a thing,

25   you know, the securities fraud context.  I don't think it

PROCEEDINGS                    45

1  would be admissible testimony.

2          THE COURT:  So what you're asking is that this

3  ought to read the term "nominee" refers to a person or firm

4  in whose name.  You just want to delete "in the securities

5  fraud context," just that phrase, is that it?

6          MR. INGOGLIA:  That would be acceptable to us, you

7  know.  The term "nominee" as used in this indictment.

8          THE COURT:  Okay.  Any problem with that?

9          MR. PAES:  Your Honor, one of the things we did

10  mention also in our response that we'll be superseding to

11  fix a couple of things which actually were helpful and

12  brought to the attention to us by the defense motions.  We

13  can try and clarify.  The reason if you just take out -- if

14  you modify a word right now, it would change the meaning

15  because the government, you know, the word "nominee" is in

16  terms of standard English language clearly means something.

17          THE COURT:  Mr. Paes, this whole indictment is a

18  securities fraud indictment, isn't it?  So what are you

19  adding?

20          If it's upsetting Mr. Ingoglia, I can take it out.

21          Now, what's next.

22          MR. INGOGLIA:  I was hoping that was going to be

23  the standard on the Rule 16.

24          MR. PAES:  We'll fix that in the superseding to

25  make it a little bit more acceptable to Mr. Ingoglia.

PROCEEDINGS                    46

1          THE COURT:  Okay.  Now, with respect to -- I think

2     I've taken care of that motion, that joint request.

3          MR. KASOURAS:  Judge, we've made a separate motion

4     on surplusage and it is --

5          THE COURT:  Well, I'll get to that.  I'll get to

6     your motions.

7          With respect to Joint Request Number 5, I think

8     that's the next one.

9          MR. PAES:  7.

10         THE COURT:  It requires the government to produce

11    Brady materials immediately and Giglio material 120 days in

12    advance of trial and Jencks material.

13         As far as Jencks material is concerned, you know,

14    I have no authority to direct the government.  The statute

15    tells the government when it is they have to turn over that

16    material.

17         But I think it's been the government of this

18    office, in any event, to turn Jencks material over pretty

19    much in advance, even though they're not required to.

20         As far as Brady and Giglio material is

21    concerned --

22         MR. INGOGLIA:  Judge, I think that their response

23    addressed one aspect of our Brady requests, so I think we

24    don't have a remaining dispute on that.  I think we'd like

25    more time on the Jencks material and 3500 material than

PROCEEDINGS                    47

1   they're offering, but I recognize that unless you feel like

2   you wish to exert some persuasive power.

3           THE COURT:  All right.  Again, this is -- I don't

4   want to make that speech again about fairness and so on and

5   so forth.  There's no reason in the world why it can't be

6   turned over earlier.  You're not putting a witness in

7   jeopardy or worried about things that would be unlawful or

8   prejudicial for somebody   I don't see any reason why it's

9   held until.

10          I wrote an opinion on that.  I directed, because

11  if you read Brady and you read Giglio in the Supreme Court

12  it says upon request.  And I wrote a rather long opinion in

13  which I said the Supreme Court said turn it over upon

14  request.  And the Second Circuit didn't think upon request

15  means upon request.  So, again, the government, do what is

16  the decent, nice thing to do.

17          All right.  That takes care of that.

18          All right.  Now we have Bandfield's individual

19  requests.  Request Number 1, severance from Mulholland.

20          MR. INGOGLIA:  So the request is principally

21  animated by speedy trial concerns.  As you know,

22  Mr. Bandfield has been incarcerated since September of 2014

23  and we're ready to go as soon as Your Honor can have us.

24  You know, starting April 1st, if that would work.  I

25  recognize that Mr. Mulholland joined the party late.  He was

1  arrested, you know, a year in and hasn't had the benefit of

2  the same amount of time.  So that's what's animating the

3  request.

4          In terms of the evidence against the two

5  gentlemen, as I understand it, they're, you know, two

6  circles that overlap in the middle, but there's a big piece

7  of trading activity evidence that you wouldn't necessarily

8  need to introduce against Mr. Bandfield.  And there's

9  probably a bunch of undercover testimony you wouldn't need

10 to introduce against Mr. Mulholland.  There is an overlap,

11 but I don't think it is, given Mr. Bandfield's speedy trial

12 concerns I think -- what I want to make sure we achieve is

13 that he goes forward as fast as possible.

14          THE COURT:  Do you want me to respond to that?

15          MR. PAES:  No, Your Honor, I'm happy to.

16          THE COURT:  Well, I will.

17          MR. PAES:  With respect to any prejudice, I think

18 our papers make it clear there's absolutely no prejudice to

19 Mr. Bandfield in terms of, you know, what he describes as

20 the evidence that would be admissible against

21 Mr. Mulholland.  In fact, the evidence admissible against

22 Mr. Mulholland, the trading activity that he describes, is

23 going to be admissible against Mr. Bandfield regardless

24 because we have  charged him with the securities fraud

25 counts that we've talked about.  We have charged him with

PROCEEDINGS                    49

1   securities fraud conspiracy, because he provided the
2   platform by which the scheme was executed.  So all of that
3   evidence is coming in anyway.

4           And I think we made it very clear with respect to
5   the kind of arguments about how Mr. Mulholland is somehow a
6   much more -- I don't want to mischaracterize it, but at
7   least a bigger player for some reason because he made a
8   whole lot of more money than Mr. Bandfield.  We talked about
9   it in terms of role.  We look at Mr. Bandfield as being kind
10  of the mastermind of the entire Belize operation, and
11  Mr. Mulholland is a leader in terms of the top client that
12  Mr. Bandfield had.  So they're equally bad role players in
13  the government's eyes.  And so none of this prejudice is
14  substantial that under case law constitute a miscarriage of
15  justice.

16          So I think severance is -- if there were ever a
17  case where severance should not be granted, I think it's
18  this.  They are so intertwined and interlinked in this case.

19          And with respect to speedy trial concerns, I
20  haven't heard, you know, Mr. Kasouras say anything about it
21  as to when, you know, he would be ready.  I think the only
22  thing we had -- Mr. Kasouras asked for so far was a one-week
23  extension to file his motions.  That's the only delay I
24  think that has been called so far by Mr. Mulholland being
25  added to the indictment.  So I don't think that qualifies as

1   some kind of miscarriage of justice either in terms of a

2   delay of speedy trial.

3          Whether we have a trial on April 1st as

4   Mr. Ingoglia wants, or if we have it on May 1st to give it

5   some time for Mr. Kasouras.  And we also don't know what

6   lawyers' schedules are right now or the Court's schedule for

7   that matter.  But the government is ready to go to trial

8   whenever the Court deems.

9          THE COURT:  How long does the government

10  contemplate this trial will take?

11         MS. KASULIS:  Approximately a month, Your Honor.

12  Four weeks.

13         THE COURT:  With respect to the motion to sever, I

14  really can't add anything, anything at all to what the

15  Supreme Court said in Zafiro which is essentially the

16  deciding case in all severance motions.

17         The parties are properly joined.  If you look at

18  Rule 8, properly joined as far as Rule 14 is concerned.  So

19  that severance on that basis really has no merit from a

20  legal point.

21         And insofar as the Speedy Trial Act is concerned,

22  I'm sure that Mr. Mulholland is much anxious to have a

23  speedy trial as Mr. Bandfield is.  And I think that judging

24  by the motion that was made on behalf of Mr. Mulholland, I

25  will suspect that Mr. Mulholland knows just about everything

PROCEEDINGS                                   51

1   about this case in order to go to trial and prepare an

2   effective defense as Mr. Bandfield knows.

3          With respect to from a legal point of view, I

4   think it's 3161 of Title 18, as far as speedy trial is

5   concerned, I think specifically says that if the speedy

6   trial clock is stopped as to one defendant, it stops as to

7   all.  That happens frequently where you have

8   multiple-defendant cases.  So I don't know if that speedy

9   trial argument is effective.

10          So I made some observations, Mr. Kasouras, about

11   your readiness to go to trial, and I would expect that

12   you're going to be ready to go to trial expediently.  I

13   don't think that there should be very much need for a delay

14   as far as your preparation for trial is concerned.  You've

15   had an enormous amount of material provided already.

16          MR. KASOURAS:  That's true, Your Honor.  My issue

17   is -- well, I have a couple of issues.  But my schedule will

18   not permit a trial for -- and I'm not talking about a long

19   time, but I'm starting a trial that is definitely going in

20   this courthouse on February 22nd.  And then I have a trial

21   that has been scheduled in March.

22          I spoke to Mr. Ingoglia about this, and reasonably

23   speaking, Judge, there's a lot of material that we have been

24   provided, but there's also a mountain of material that we

25   need to continue with in order to prepare for trial.

PROCEEDINGS                     52

1        With respect to Mr. Mulholland, the documentary

2   evidence and the complexity of the case with respect to him

3   is far greater given the fact that he is accused of pretty

4   much masterminding the trading of stock for over 40

5   companies as well as a manipulation of it.  So I'm just

6   saying this is not a case for which a tremendous amount of

7   preparation is not in order.  And I am going to be tied up

8   for the next three months on trials that are older, that

9   have been set and that are also somewhat complicated.

10        So, reasonably speaking, I spoke to Mr. Ingoglia,

11   the very earliest I can be prepared is June 1st.

12        THE COURT:  Well, we'll deal with that at a later

13   time, and I'll have a conference with all parties with

14   respect to that, and we'll fix the earliest conceivable date

15   that we can fix to get this case moving.

16        MR. PAES:  Can I just add one thing to what

17   Mr. Kasouras said.  With respect to the 40 pump and dumps

18   that he referenced and the complexity of it.  We have no

19   doubt about, obviously, the complexity of the case.  But I

20   think as the government represented in its motions, you

21   know, we will be providing by the end of this month a list

22   of ten tickers or less that the government is going to be

23   relying on at trial.

24        Two of those tickers we've already identified as

25   being the two substantive counts, which is CYNK and VLNX.

PROCEEDINGS                                    53

1    And those two tickers are the main substantive counts that

2    they were aware of when the indictment was returned.  So --

3    and we will further reduce the additional tickers that we

4    would include as part of the conspiracy count to, you know,

5    eight or less than that.  So it's going to be a much more

6    narrow case than, you know, I think Mr. Mulholland is

7    concerned about at this time.

8            THE COURT:  All right.  As I've indicated, I

9    intend to have another conference before long to see if we

10   can't fix the speediest trial date or that would accommodate

11   all the issues that may be involved.

12           Now, I understand there's another superseding

13   indictment.

14           MR. PAES:  Yes, Your Honor.

15           THE COURT:  Now, is that going to be superseding

16   anything that's substantive that would prevent?

17           MR. PAES:  The only substantive change to it would

18   be the addition of Mr. Mulholland to the tax fraud

19   conspiracy count which Mr. Mulholland actually already

20   addressed and tried to counter in his papers.  So we're

21   going to fix that.

22           The only other change, again, changes which are

23   not significant or not substantive, is the change in the

24   date range for one of the charges as I believe Mr. Ingoglia

25   pointed out.  There was some inconsistency between the

PROCEEDINGS                    54

1   conspiracy range and the money laundering range.  And since

2   they're tied, we will fix that.

3          And the third thing, again, which was pointed out,

4   was the definition of corrupt clients in the indictment

5   which indicated them to be U.S. clients only.  And we will

6   kind of fix that to include both U.S. and non-U.S. clients.

7   So other than the addition of Mr. Mulholland to the tax

8   fraud conspiracy, most of the other changes are, you know,

9   more ministerial.

10          THE COURT:  When do you contemplate having --

11          MR. PAES:  We've actually scheduled -- I'm sorry,

12   Jackie, do you want to address that?

13          THE COURT:  I'm sorry?

14          MS. KASULIS:  We requested grand jury time, Your

15   Honor, I believe it was February 12th.  So in the very near

16   future.

17          THE COURT:  Okay.  All right.  Now, the next

18   motions are Mr. Mulholland's individual motions.  And

19   Mr. Mulholland seeks to suppress wiretap evidence from March

20   and April.

21          Mr. Kasouras, do you want to address that?

22          MR. KASOURAS:  Yes.  Thank you very much, Judge.

23          Judge, initially when I first came aboard and I

24   heard about a wiretap and I heard about Belize and I heard

25   about extraterritorial involvement by defendants, I didn't

PROCEEDINGS                              55

1    expect to have much of a wiretap motion.  But in reading all

2    of the materials that we have been provided with, it has

3    struck me that even in a case involving other countries,

4    that the government in this case has supplanted the

5    requirement of necessity with a different standard that I

6    would refer to as wouldn't it be nice.  And wouldn't it add

7    to our case.

8              With respect to necessity, Judge, it is seldom

9    that I am able to discern such easy and complete

10   infiltration by the United States government into an

11   organization, albeit one that's out of the country.

12             In this case, from the very beginning I have

13   really not in quite some time seen anything easier.

14   Starting in November of 2012 there's an initial contact with

15   a Kevin Leach with an undercover and what follows is

16   basically an invitation into this organization.

17             THE COURT:  Excuse me.  Would you just help me by

18   identifying what it is that you find egregious or warrants

19   suppressing the wiretap evidence.  Is there something about

20   the wiretap application?  Is there something deficient about

21   what it is that the agent said was the necessity for the

22   wiretap?  Was there a question of whether he exhausted

23   ordinary, normal investigative techniques or normal

24   procedures?  What is it that you're complaining about?

25             MR. KASOURAS:  It's all of it.  The necessity

1   requirement, in our view, is not satisfied.

2          Judge, you had undercover infiltration into this

3   organization, contact with several people, meetings in

4   Belize during which the government describes statements by

5   Mr. Bandfield and other people basically explaining what the

6   government believes is this scheme from the beginning to

7   end.  You have a confidential informant.  There's

8   surveillance, videotape, audio tape.  There are subpoenas

9   that were executed.  There are interviews that were

10  conducted.  There were toll records that were obtained.

11  There were telephone toll analyses, email search warrants

12  and financial investigations, that basically, according to

13  this affidavit.

14         Now, we do make a Franks' motion later, and I'll

15  explain that, but the necessity requirement here is not

16  satisfied.  There was no necessity for a wiretap.  They had

17  the financial institutions.  They had 23 email addresses

18  which yielded tremendous results.  They identify all of the

19  people if -- well, most, if not all, of the people in those

20  accounts.  They had Pay Pal records which clearly

21  demonstrated how the money was moved into the accounts in

22  Belize, out of the accounts in Belize, from whom they were

23  moved, who owned the accounts.

24         And then, again, you had meetings in Belize,

25  invitations to come back, invitations to dinner to basically

1    meet the people the government deems to be the

2    co-conspirators.  They had the names of the accounts, they

3    had all of the transactions.  And then combined with that,

4    they had admissions on video and audio of the transactions.

5            And the undercover actually became a client, went

6    to them and said, I'd like to open an account, I'd like to

7    not pay taxes, I'd like to avoid American regulatory

8    authority.  And was then, in detail, in detail explained,

9    okay, this is how we do it, this is the way we're going to

10   do it and then they did it.  They had the names of financial

11   institutions.

12           So in terms of necessity, this wiretap was nothing

13   more than to supplement a case.  When the affidavit -- when

14   the affiant in the affidavit explains that surveillance

15   wouldn't have worked.  Well, Your Honor, surveillance

16   wouldn't have worked if the company was located across the

17   street from the courthouse.  You can't just sit on a

18   financial office and see what happens.  The point is, every

19   single investigative technique that we know of was utilized

20   with, with great success.

21           And I guess the way I would put it to you is if

22   you take the wiretap and the evidence gleaned from the

23   wiretap out of this case, you wouldn't have the same

24   indictment.  You would have the same evidence except for

25   these additional and what we would submit are, in this case,

PROCEEDINGS                          58

1  gratuitous conversations that were simply not necessary.

2          Now, with respect to the affidavit and the

3  standard for misstatements and omissions, what I'll say is

4  this:  The affidavit simply does not describe the resounding

5  success that all of these investigative techniques that were

6  utilized demonstrate.  And so one is left to wonder if the

7  issuing magistrate had a recitation of this investigation

8  and all of the results from it, then a question becomes

9  whether the issuing magistrate would have determined that

10  necessity was demonstrated.

11          With respect to one specific item that we do alert

12  the Court to, is there's an inconsistency in an affidavit

13  that was submitted in support of a search warrant, I

14  believe, for something belonging to Mr. Bandfield in which

15  the agent very specifically states just how successful the

16  email investigation was in identifying the IPC clients. And

17  then in the affidavit in support of the wiretap, that's

18  downplayed and it's stated that the email, the emails that

19  were, were a product of the search warrant were not

20  successful in identifying the IPC clients.

21          The fact of the matter is, Your Honor, the

22  investigative techniques, the old stuff, the traditional

23  stuff that they've been using, you know, for decades and

24  decades, worked in this case really without a glitch.  You

25  had no counter surveillance.  You had no countermeasures

PROCEEDINGS                          59

1    taken by any of the individuals.  These people were,

2    according to this affiant, ready and willing to talk and to

3    conduct business in very, very specific means.  Wiretaps

4    reveal the words spoken by particular individuals.  And I

5    understand that that's important when it's necessary.

6           Your Honor, all of the individuals here were

7    recorded in Belize and videotaped.  There are consensuals.

8    They have conversations.  So that is the crux of our motion,

9    that necessity was not established and that the affidavit

10   did not adequately apprise the issuing magistrate of the

11   success of investigative techniques.  And at least, in one

12   instance, misrepresented the success of the emails that were

13   procured through search warrants.

14          MS. KASULIS:  Your Honor, the idea that the

15   wiretaps could not provide any sort of additional evidence

16   in this case is just simply not true.  Certain kinds of

17   evidence, obviously, yield different kinds of results.

18          In this case Mr. Bandfield had a very voluminoius

19   set of clients.  The only way in which the government was

20   able to understand the nature and scope and the identities

21   of those clients was to use different investigative tools.

22   One of them was to use the undercover agent.

23          As set forth in the recordings that the undercover

24   agent made, Mr. Bandfield referred to other clients but

25   didn't name those other clients.  He didn't hand our

1    undercover agent, for example, a full client list.  And it's

2    clear that some of the clients, for example, used email;

3    others did not.  In fact, Mr. Bandfield cautioned our

4    undercover agent really to refrain from using email as much

5    as possible.  There are certain kinds of information that

6    the government was only able to obtain, for example, through

7    wiretaps.

8         For example, the clients directing trading of

9    various stocks through their brokerage accounts, that, most

10   of the time happened, I would say the majority of the time

11   happened via the telephone.  So there's whole kinds of

12   information that the government would -- did not have

13   wiretap capability, we would not have been able to obtain.

14        And we want to refute what Mr. Mulholland is

15   saying with respect to that our indictment would look

16   exactly the same.  If you look at the indictment itself, for

17   example, there's a stock, Cana, C-a-n-a, in which we

18   actually set forth the trades that were directed by one of

19   the corrupt clients of that stock to manipulate that stock.

20   The way in which we were able to set forth that evidence was

21   through wiretaps.

22        And that's just one example, Your Honor, of the

23   way in which we intend to use the wiretap evidence at trial

24   and why it was very critical in this case.  There's no

25   accusation here that all of these different investigative

PROCEEDINGS                    61

1   techniques were not made clear to the Court.  We were very

2   clear of what had been successful, but why the wiretaps were

3   very critical in this case, and they absolutely were.

4           With respect to this inconsistency, I believe

5   there's no inconsistency, Your Honor, about the email search

6   warrants -- sorry, the search warrant for Mr. Bandfield's

7   computer.  The agent did explain how the email search

8   warrants had been very helpful to help us identify some of

9   the clients that were involved in this case.  But that

10  doesn't mean that the wiretap evidence was not incredibly

11  helpful and necessary to help us round out the full scope of

12  who those clients were.

13          And, additionally, with respect to, you know, the

14  fact that the undercover agent was actually in Belize and

15  was able to access all of these co-conspirators that were in

16  Belize.  For example, Mr. Mulholland wasn't even in Belize

17  during the time period that the undercover agent was there.

18  What we were able to do was capture Mr. Mulholland calling

19  in to IPC and giving direction and talking with his

20  co-conspirators about, for example, acquiring IBCs.  He used

21  an alias.  We were able to capture his voice.  So that's,

22  obviously, critical evidence that we wouldn't have had

23  without the wiretaps.

24          So for those reasons.  There were no

25  misrepresentations, Your Honor.  We were very clear about

PROCEEDINGS                        62

1    what the wiretaps meant for our investigation, what else we

2    had done to investigate the case.  And so the idea that

3    there was no necessity here is just simply not true.

4              THE COURT:  All right.  I'll reserve on that.

5    I'll deal with that.

6              The next individual request is the government is

7    requested to provide 404(b) evidence 60 days before trial.

8              Do you want to respond to that?

9              MR. KASOURAS:  If I can just say, the reason -- I

10   understand what the normal practice is in the courthouse,

11   Judge, and it really depends, my request does depend on what

12   the 404(b) evidence is.  And I think what Your Honor's

13   response may be is that they just need to do what's right

14   here.  All I'm saying is that since Mr. Mulholland is not in

15   the United States, if the 404(b) material here consists of,

16   you know, things that happened in other countries, that it

17   would be very difficult and time consuming for us to

18   investigate, that the sooner they give it to us the better,

19   because it's a lot harder for us to be able to deal with it

20   if that's the case.

21             MR. PAES:  Your Honor, in response we, obviously,

22   mention that we would provide any 404(b) one month prior to

23   trial.  I can tell the Court right now, as we stand here

24   today, it's not that we are sitting on any 404(b) material,

25   you know, that we are not providing to the defense.  So we

1    don't have any 404(b) material in our possession at this

2    time.

3              To the extent we get it and we can produce it, you

4    know, a little bit sooner, we'll be happy to do that, but we

5    also don't want to be precluded as we think the defense

6    motions are trying to do with having us provide this.

7    Setting kind of a deadline by which we're going to bind

8    with them and then say, well, you can't do it if you find it

9    after that fact.

10             THE COURT:  All right.  That motion is a motion

11   that I can't grant.  I'm, obviously, not going to direct the

12   government to be tied to any specific date, even if I had

13   authority to do it.  They'll provide the 404(b) fully in

14   enough time to permit the government to prepare its defense.

15   I can't imagine -- just my overall sense of this case, the

16   indictment, what 404(b) evidence is going to be available to

17   me in terms of bad acts under 404(b).

18             In any event, turn it over as soon as you get it.

19   There's no reason why you have to hold on to it.  The notice

20   of expert testimony, I think the law requires that.  So

21   Mr. -- that motion is a motion which is a motion that I

22   don't have to deal with.  I'd better say it's denied for

23   reasons that I don't have to deal with it.  The law requires

24   that you do it.

25             Permission to file additional motions in limine.

PROCEEDINGS                          64

1    Yes, you have permission to file a notice in limine.

2    Hopefully, you'll do it in enough time to permit the

3    government to respond to it.

4              MR. KASOURAS:  We will try, Judge.

5              We have two other --

6              THE COURT:  If there's nothing else, I think that

7    the only motion that I really have to deal with is the Rule

8    16 motion which is the only significant.

9              MR. KASOURAS:  Judge, we have two motions that we

10   have not addressed.

11             THE COURT:  Which ones?

12             MR. KASOURAS:  Well, our motion with respect to

13   surplusage is a little bit different and I think that, if

14   anything, it just simply need to be clarified in the

15   indictment.

16             Our singular motion with respect to surplusage has

17   to do with the language in the indictment relating to FATCA.

18             THE COURT:  Relating to what?

19             MR. KASOURAS:  F-a-t-c-a.  And it's in paragraph

20   14 of the superseding indictment.  And essentially FATCA is

21   a federal law that was enacted in 2010 that the government

22   states that targeted tax noncompliance by U.S. taxpayers

23   with foreign financial accounts in offshore assets.  We

24   don't quarrel with that, with that fact, because it was

25   enacted in 2010.  But as we set forth in our motion, it

1    actually came into effect on a rolling basis, and so our

2    simple point is the indictment gives the impression that

3    FATCA was enacted and in effect, and, therefore, there to be

4    violated throughout the entire period of the conspiracy

5    whereas that's just not the case.

6              So while we understand the reference to FATCA in

7    the indictment, we do believe that the way it is referred to

8    in the indictment is misleading.  And we, we set forth on

9    page 44 of our motion, Judge, how it basically, on a rolling

10   basis, certain parts of it were expanded and came -- and

11   even though it was in effect in 2010, was not being enforced

12   in full form.  And in many ways, ways that do effect the

13   charges in this case.

14             THE COURT:  Let me see if I understand what it is

15   that you've said.  You said that the paragraph 14 is

16   misleading in some respect.

17             MR. KASOURAS:  It's misleading in that it states

18   that the FATCA was enacted in 2010 and, therefore, gives the

19   impression that it was in effect and being enforced in the

20   years thereafter, which include the entire period charged in

21   this conspiracy.  In fact, even though it was enacted in

22   2010, it was not being enforced.  And there were specific

23   memoranda by the government as to its non-enforcement.

24             So all I'm asking is that the government clarify

25   in the indictment that it was enacted in 2010, but was not

PROCEEDINGS                        66

1    in effect until I believe it's 2000 and -- starting in 2012

2    and then it was expanded in 2013.

3              THE COURT:  Did the statute, when it was enacted,

4    explicitly provide, the legislation explicitly provide that

5    this statute, this law becomes effective on a particular

6    date?

7              MR. KASOURAS:  It did, but then there was a

8    memorandum issued that it was not going to be enforced.

9              MR. PAES:  Your Honor, may I respond?

10             If I may.

11             MR. KASOURAS:  Sure.

12             MR. PAES:  Your Honor, first of all, the paragraph

13   is accurate in what it states.  Additionally, first of all,

14   it doesn't meet the standard for surplusage, but that's

15   besides the point.  And just in terms of its accuracy, it is

16   accurate.

17             What Mr. Kasouras is alluding to is that because

18   it was a new statute, the government didn't start enforcing

19   it to give individuals, businesses time to get in compliance

20   with the statute.  But, obviously, the law is on the books.

21             And, importantly, we charged conspiracy count over

22   here.  And, clearly, what this whole operation was set up

23   for and which Mr. Bandfield also explains in the video

24   referencing, you know, at parts FATCA by him and his

25   co-conspirators is an attempt and kind of a scheme that's

1    designed to evade FATCA now that it's on the books.

2          The fact that it was being enforced, if we had a

3    substantive tax fraud count, that -- it would -- may be

4    relevant at that point in time because then you're saying,

5    well, it wasn't being enforced so we had time to comply with

6    it.  And you are charging him for the entire time period

7    with tax fraud violation.

8          The charges are conspiracy, which is an agreement

9    to violate a law, which is on the books and whether it's

10   enforced or not, that's still a crime.

11         THE COURT:  That's a remarkable argument that

12   there's a statute that says that something is unlawful, but

13   because it's not being enforced, you can violate the statute

14   and do what is unlawful.  I mean, if I understand what

15   you're saying, that's essentially what you're saying to me.

16         MR. KASOURAS:  I'm saying it only because the

17   government issued a memorandum publicly stating that it

18   would not be enforced.

19         THE COURT:  Is that a fact?

20         MR. PAES:  Your Honor, the government has stated

21   at various times that this is now going to be in effect.

22   There were certain parts that went into effect in 2012, some

23   in 2013, and there may have even been a part that went into

24   effect in 2014.

25         MR. KASOURAS:  Right.

PROCEEDINGS                        68

1        MR. PAES:  Regarding, you know, individuals,

2   business, whether they were U.S. based or based outside the

3   United States.

4        The issue though for the indictment and what

5   Mr. Kasouras is asking is to strike something in the

6   indictment as surplusage is that, one, accurate; two,

7   doesn't effect the charge in any way because it's a

8   conspiracy count and the fact that they were not enforcing

9   it until later, is, you know, is not relevant with respect

10  to the conspiracy count.  The law was on the books and the

11  government gave individuals and businesses time by which to

12  become compliant with the law.  But it was still on the

13  books and enacted in 2010.

14       THE COURT:  All right.  Your motion is denied.

15       What else, Mr. Kasouras?

16       MR. KASOURAS:  Judge, with respect to the

17  privilege issue, there were documents that were provided to

18  prior counsel and the government has set forth in their

19  motion --

20       THE COURT:  Right.

21       MR. KASOURAS:  -- how they discerned what was

22  privileged and what was not privileged.  And here's our

23  problem.  Contrary to or different from the normal procedure

24  of what we normally have where the government, for example,

25  will execute a search warrant, they'll come into possession

1  of documents that may be privileged.  And then what happens

2  is after the person is arrested, there's usually a

3  discussion between both sides as to what is privileged, what

4  is not privileged, with the defense being given an

5  opportunity prior to that decision being made to voice an

6  opinion as to whether certain documents are privileged.  And

7  oftentimes the Court may look at things in camera to make a

8  determination.

9          What we had here was the cooperating witness in

10 this case, the main cooperating witness, was an attorney who

11 represented various entities in this case for which the

12 government concedes there was an attorney or could have been

13 an attorney/client privilege.  This individual, after he

14 begins cooperating, and I would submit we'd all agree may

15 have an agenda, motivated in some ways, provides these

16 documents to the government.  And then the government on

17 page 80 of their response indicates the four criteria that

18 they used in determining what was privileged and what was

19 not privileged.  One of them would be that the document

20 contained communications between the cooperating witness and

21 an individual who was not the witness' client.  That's fine.

22 But then we have the document contained communications

23 between the cooperating witness and a client, but the

24 presence of a third party on the communication broke the

25 privilege.  It's things like this that concern us.

PROCEEDINGS                          70

1            And all we're asking for is for the government to

2     provide us with, with respect to the documents that they

3     decided are not privileged, what criteria is attached to

4     each one.  My client will then be able to discern if they

5     were communications between him and the government.  For

6     example, whether or not there was or was not a third party

7     present.  And he'd be able to articulate a response or a

8     challenge to the conclusions by the government, which is

9     precipitated and fueled, in large part, by a lawyer who's

10    now a cooperating witness seeking to carry favor with the

11    government, a smart guy, by the way, who presumably knows

12    what the privilege is and knows how to pierce it.

13            So the only way that we can really decide whether

14    the government has made an accurate determination as to

15    whether these things are privileged is to know which of

16    these four criteria attached to them.  My sense is that in

17    making its determination, the government certainly would

18    have made notations with respect to the documents which are

19    all Bates numbered as to why they're not privileged.

20            MS. KASULIS:  Your Honor, there's not one document

21    that Mr. Kasouras has pointed to thus far where he says the

22    document was improperly provided to the prosecution.  It

23    seems to make more sense here is that there are documents

24    that Mr. Kasouras disputes should have been in the hands of

25    the prosecution after the firewall process was undertaken.

We can certainly address that with him. But to go through every single document to have to show what basis or what combination of bases the firewall team who undertook an extensive review of these documents seems very inefficient considering the amount of evidence and discovery in this case.

We are happy to address any concerns that Mr. Kasouras has about specific documents that went through the firewall process were deemed not privileged and provided to the prosecution. He's not done so up until this point, and if he chooses to do that, we're happy to address his concerns.

MR. KASOURAS: Judge, there are over a thousand documents that I can tell you most of which look privileged. If the -- if the reason they're not privileged is because some third party was there, I can't look at the document and discern that. If they have an index where they can tell us --

THE COURT: Well, excuse me. You say most of which look privileged.

MR. KASOURAS: Right.

THE COURT: Why don't you tell the government what documents you believe you think are privileged. And let the government respond to it.

MR. KASOURAS: Okay.

PROCEEDINGS                                72

1          THE COURT:  Instead of simply assuming that what

2     the government did is improper, incomplete.  Improper in the

3     sense that the firewall didn't -- when the firewall says

4     there was a third party present there and, therefore, it's

5     not privileged, you don't believe it.

6          MR. KASOURAS:  I don't imply any impropriety by

7     the government.  I'm saying the information came from a

8     cooperating witness given to the government.  How are they

9     to discern whether he's telling the truth or not?

10          MS. KASULIS:  Your Honor --

11          MR. KASOURAS:  It's not the government that's

12     making the decision.  They're making a decision and it's

13     novel because they're making it based on information from a

14     cooperating witness as opposed to just an independent

15     analysis as to whether it's privileged.  That's all I'm

16     saying.

17          THE COURT:  Why don't you point out to the

18     government what documents you think the government -- the

19     cooperating witness may be disseminating about.

20          MR. PAES:  One other thing, Your Honor.  I think

21     Mr. Kasouras may also want to consider in that analysis,

22     which might save him some time.  Obviously, the crime fraud

23     exception has been implicated here by the fact that the

24     lawyer and the client have been charged in this case.  So

25     that might actually help get us done faster.

PROCEEDINGS                                73

1          THE COURT:  That's a rather interesting argument

2     you're making.  The government should determine whether the

3     cooperator is telling the truth.  I suppose if the

4     government has any suspicion that the cooperator is not

5     telling the truth, he wouldn't for very long have a

6     cooperation agreement.  I think you've been through that on

7     more than one occasion.

8          Is there anything else?  Nothing.

9          MR. INGOGLIA:  No, Your Honor.

10         MS. KASULIS:  No, Your Honor.

11         THE COURT:  So all I really have is the Rule 16

12    issue, essentially.  And as soon as the superseding

13    indictment is handed down, I'll have the parties come in and

14    see if we can fix a firm trial date.  Get this case started

15    without undue delay, unnecessary delay.

16         And you'll have to be concerned about your own

17    trial schedule with respect to that, Mr. Kasouras.

18         All right.  Anything else?

19         MS. KASULIS:  No, Your Honor.

20         THE COURT:  Thank you very much.  It's been a

21    pleasure to have you all here.

22         MS. KASULIS:   Thank you, Judge.

23         MR. INGOGLIA:  Thank you.

24         THE COURT:  There was something I was supposed to

25    ask you about, whether we need a hearing on the agency

1    issue, right?

2              MR. PAES:  Oh, yes.

3              THE COURT:  I asked you to remind me.

4              MR. INGOGLIA:  The question of the hearing.

5              THE COURT:  We need a hearing on that agency

6    issue.

7              MR. INGOGLIA:  That's right.  And we didn't remind

8    you.

9              THE COURT:  All right.  Do you want that?  Do you

10   think that's necessary?

11             MR. INGOGLIA:  I think so, Judge.

12             THE COURT:  Okay.  That's fine if you think it is.

13   It's like in the nature of kind of a Fatico hearing.  So why

14   don't we fix a date for that.

15             When can you have your witnesses available?

16             MS. KASULIS:  Your Honor, if we could just have a

17   quick moment.  We just want to talk about the nature of the

18   hearing.  Excuse me.

19             THE COURT:  Sure.  Sure.

20             (Brief pause.)

21             COURTROOM DEPUTY:  March 29th, that's Tuesday, at

22   10:00 a.m.

23             MR. PAES:  Okay.

24             MR. INGOGLIA:  Done.

25             MS. KASULIS:  Okay.

PROCEEDINGS                              75

1      THE COURT:  March 29th at what time?

2      COURTROOM DEPUTY:  10 o'clock.

3      MR. SAPONE:  Did you say 10:00 a.m.?

4      COURTROOM DEPUTY:  10:00 a.m.

5      THE COURT:  When we said that the only thing that

6   I think I have to deal with was the Rule 16, let me just

7   clarify something.  I'm not sure -- I don't think you're

8   making a Franks' motion, Mr. Kasouras.  Your contemplation

9   of a Franks' motion was based upon what you perceive to be

10  some inconsistency in two affidavits.

11      If my recollection of Franks v. Delaware is still

12  accurate, I think the question would be whether assuming

13  those two so-called inconsistencies or those two items were

14  not in the affidavit, would the affidavit still be enough to

15  justify the issuance of a warrant?  Or would they be so

16  material that if they, in fact, were inconsistent the

17  magistrate wouldn't have issued the warrant.  I would

18  suspect that even if there is some slight inconsistency, it

19  probably would not have effected the determination whether

20  there was enough probable cause to --

21      MR. KASOURAS:  I don't make those motions lightly.

22  The reason that I put it in was under Rajamatari

23  (phonetic) --

24      THE COURT:  It's part of your necessity argument.

25      MR. KASOURAS:  Right.

PROCEEDINGS                                76

1           THE COURT:  So I still remember Franks v.

2   Delaware, at least in part.

3           MR. KASOURAS:  Judge, there's not a lot you don't

4   remember.

5           THE COURT:  Is there anything else?

6           MR. INGOGLIA:  No, Judge.

7           MS. KASULIS:  Your Honor, obviously, the motions

8   are pending so time would be excluded.

9           THE COURT:  Right.  Right.  That's correct.

10          MS. KASULIS:  Until the hearing date?

11          THE COURT:  Aside from which I think it's an

12   understatement to say this is a complex case, which is also

13   a basis for excluding time, but the fact that motions are

14   pending.  Although, I think the Speedy Trial Act also in the

15   cases say that there was a period of time within which

16   motions can't be pending forever have to be disposed of at

17   some point.

18          In any event, thank you very much.  Time is

19   excluded until March 29th and we'll deal with a further

20   exclusion then.

21          Thank you.

22          MS. KASULIS:  Thank you, Judge.

23          MR. INGOGLIA:  Thank you, Your Honor.

24

25