UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

UNITED STATES OF AMERICA,

        -against-

                              14 CR 476 (ILG)

ROBERT BANDFIELD,

             Defendant.

-------------------------------------------------------------- X

## SENTENCING MEMORANDUM ON BEHALF OF ROBERT BANDFIELD

MORVILLO LLP
500 Fifth Avenue
43rd Floor
New York, New York 10110
(212) 796-6330

*Attorneys for Defendant Robert Bandfield*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................... 1

  I.   Robert Bandfield's Personal History ........................................................... 2

    A.   Bob's Background and Family History......................................................... 2

    B.   Bob's Time in Belize.................................................................................... 4

  II.   The Offense Conduct and Pre-Sentence Investigation Report ........................... 7

    A.   Nature of the Offense .................................................................................. 7

    B.   The Presentence Investigation Report......................................................... 8

    C.   The PSR Addendum Correctly Concludes that Restitution is Inappropriate ................. 12

SENTENCING ANALYSIS........................................................................................ 14

  I.   The Loss Amount Overstates Mr. Bandfield's Culpability ............................. 14

  II.   The Purposes of Sentencing as Expressed in 18 U.S.C. § 3553(a) are Best Served By a
       Sentence of Time Served or No Longer Than Five Years Inclusive of Time Served............... 16

    A.   Bob Has Accepted Responsibility for His Crime and is Willing to Cooperate with
         Relevant Enforcement Bodies ................................................................... 17

    B.   Bob's History and Personal Characteristics Warrant a Sentence of Time Served or No
         Longer Than Five Years Inclusive of Time Served ........................................... 19

    C.   A Sentence of Time Served or No Longer Than Five Years Inclusive of Time Served
         Will Avoid Disparities with Similarly-Situated Defendants ................................. 25

    D.   Deterrence is Satisfied by a Sentence of Time Served or No Longer Than Five Years
         Inclusive of Time Served...................................................................... 29

  III.   Bob Requests a Court Recommendation for RDAP and Assignment to FCI Sheridan
        Should the Court Impose a Sentence Greater Than Time Served........................... 32

CONCLUSION......................................................................................................... 33

**TABLE OF AUTHORITIES**

**Cases**

*Rita v. United States*, 551 U.S. 338 (2007) ......................................................... 16, 18

*United States v. Blarek*, 7 F. Supp. 2d 192 (E.D.N.Y. 1998) ..................................... 23

*United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (VLB) ...................... 30

*United States v. Gigante*, 989 F. Supp. 436 (E.D.N.Y. 1998) .................................... 23

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) ................................................ 17

*United States v. Machitidze*, No. 05-cr-327 (S.D.N.Y.) (RJH) .................................... 18

*United States v. Mehta*, 307 F.Supp.2d 270 (D. Mass 2004) ...................................... 20

*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) ................................... 14

*United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000) .............................................. 20

*United States v. Stewart*, 590 F.3d 93, n.30 (2d Cir. 2009) ........................................ 16

*United States v. Watt*, 707 F. Supp. 2d 149 ............................................................. 15

*United States v. Whitman*, No. 12-cr-125 (S.D.N.Y.) (JSR) ........................................ 20

**Statutes**

18 U.S.C. § 1956(h) ........................................................................................... 7, 16

18 U.S.C. § 3553(a) ............................................................................................ 1, 24

18 U.S.C. § 3621(e)(2) ........................................................................................ 30

U.S.S.G. §§ 2A2.2(b)(2)(A), (b)(3)(C) .................................................................. 14

> *"During Robert's time in incarceration he has expressed deep remorse for his actions and wants nothing more than to live out his last years, quietly with his family, fulfilling dreams and taking on creative projects . . . I know if he could have the chance he would be a blessing for so many people and would dedicate the rest of his life to his family and his passion of making art . . . as a father, grandfather, partner and friend [he is] needed dearly."*
>
> *Letter from Bonnie Lawless.*

## PRELIMINARY STATEMENT

Robert "Bob" Bandfield is a 72-year-old man who believes in hard work and kindness. As of the date of his sentencing, Bob will have spent nearly two and a half years incarcerated at the Metropolitan Detention Center ("MDC") where he still endeavors to live out these principles, as he has throughout his life. Bob faithfully performs push-ups and sit-ups every day in his cell, takes indoor walks wherever space permits, helps his fellow inmates with reading and typing documents, and counsels them about life matters. He reaches out to his family daily, though he has not had one single personal visitor during his incarceration because his family lives on the west coast and cannot afford to travel to New York. Bob thinks daily about the conduct that led to his incarceration, and about whether he will ever see his wife, children, and grandchildren again.

There is no doubt that Bob pled guilty to a serious crime. Indeed, he does not retreat from his role in the money laundering conspiracy at issue here. However, for reasons bearing on Bob's kind and giving nature, his age, and his specific conduct in the conspiracy at issue, Bob respectfully asks the Court to impose a sentence of time served or a period of no longer than five years inclusive of his time served. Indeed, the totality of the facts and circumstances relevant to Bob's sentencing suggest that a sentence in this range is sufficient but not greater than necessary to satisfy the purpose and aims of sentencing embodied in 18 U.S.C. § 3553(a).

# FACTUAL AND PROCEDURAL BACKGROUND

## I. Robert Bandfield's Personal History

### A. Bob's Background and Family History

Bob Bandfield was born on Farragut Naval Base in Idaho toward the end of World War II in 1944.  Bob has one sister, Charmayne, who is two years his elder.  Bob's family relocated to Iowa when he was two years old only to return to Idaho four years later.  At the age of seven, Bob moved with his family to Portland, Oregon, where Bob came of age and remained through college and eventually dental school.

Bob's parents were strict disciplinarians who mandated the values of hard work and discipline.  Bob took these lessons to heart and sought throughout his life to work hard and help others.  But Bob's authoritarian parents often did not allow for much personal time with Bob; he experienced a somewhat lonely childhood and spent much of his time playing alone in the forest, learning to whittle creatures out of wood.  *See* Letter of Bonnie Lawless, attached as Exhibit 1.

Bob attended college and dental school in Oregon.  While in dental school, Bob met and married his first wife.  Together they moved to British Columbia, Canada, where Bob established and ran a dental practice for the next decade.  While in Canada, Bob and his wife welcomed two children, Brent and Bonnie Jean, who are now 40 and 36, respectively.  Bob worked long hours as a dentist and served twice the typical number of patients for the size of his practice, but his work ethic allowed him to provide financially for his family back in Oregon.  Notwithstanding his significant number of patients, Bob—who has always been determined to help others—gave "free dental care to patients who could not afford it."  Letter of Barbara Bandfield, attached as Exhibit 2 ("He has used his skills to help people, especially in his Dental Practise, when he has given free dental care to patients who could not afford it.").  Indeed, Bob provided free dental

services quietly and for the satisfaction of helping others.  *See* Letter of Charmayne Bischel, attached as Exhibit 3 (Bob's sister noting that she only learned through others that her brother gave free dental care to those in need and never did he mention it to seek attention or approval).

In 1980, Bob and his first wife amicably divorced; she moved back to the United States with their children and Bob moved to the Cayman Islands to continue with real estate development endeavors that he began from abroad.

Though he was geographically separated from his children, Bob always supported them financially and remained close to them emotionally.  As his daughter Bonnie describes, she and her brother "always had an incredible bond" with their father.  Bonnie Lawless Ltr., Ex. 1 at 1. Bonnie speaks of the adventuresome times she and Brent enjoyed with their dad:

> As a young child I did not live with [my father], but I constantly received very thoughtful letters, photos and phone calls from him. He paid child support to my mom and always provided anything we ever needed. When my brother and I did see him, we always had the best time. He would take us camping and on fun adventures to the mountains. He taught us how to shoot a bow and catch a fish. He would always make us laugh with his silly faces, homemade songs and jokes. He was very knowledgeable about the outdoors and taught my brother and I so much in the time we had with him, both camping and life skills. I always felt loved by him, even in his absence.

*Id*.

While in the Cayman Islands working on real estate projects, Bob met his second wife, Barbara Bandfield (nee Blake), a British teacher working for a Cayman elementary school. Barbara moved with Bob back to Oregon in 1990, but they eventually divorced when she was forced to return to England to care for her ailing elderly parents and they did not see a future where they would be reunited.  Nonetheless, Barbara and Bob remain close friends.  She describes Bob as "a very caring, kind, generous and intelligent man, who is gifted in many ways. He is not an outwardly gushing and emotional man, but rather a quiet, thoughtful, intelligent man

who did many acts of kindness to help people financially without them knowing, which was his way of caring and showing his emotions." Barbara Bandfield Ltr., Ex. 2 at 2.

Bob resettled in Portland, Oregon after his divorce from Barbara. Having learned about asset protection, privacy and offshore companies while in the Caymans, Bob started the business known as IPC—International Privacy Corporation—to provide clients with privacy and asset protection, especially against protracted litigation. While Bob used foreign-domiciled corporations in his work, he continued to reside in Oregon close to his family.

Nearly a decade later, while at a business conference, Bob met Glenna Fay Bergey. Bob and Glenna Fay quickly and easily became life partners, as they have now been for nearly 20 years. Letter of Glenna Fay Bergey, attached as Exhibit 4. In 2002, Bob's business demanded that he move to Belize; Glenna Fay moved with him and they resided there until Bob's arrest in September 2014. *Id*.

**B.      Bob's Time in Belize**

After moving to Belize, Bob immersed himself in the culture and continued his practice of helping others. Belize is an extremely poor country and Bob saw the devastation of poverty, proliferation of crime, and lack of opportunity all around him. *See* Glenna Bergey Ltr., Ex. 4 at 1-2. For these reasons, Bob sought to change the lives of Belizean people through personal and institutional means.

For example, Bob was personally responsible for utterly changing the life of one particular young Belizean girl by affording her the opportunity to attend and succeed in school:

In one of the poorest neighborhoods in the city he became acquainted with a little girl from a poor family and saw potential in her to be successful if she had the right education. He talked with her parents and helped the family out by buying her schoolbooks, uniform and shoes. At one point when he found out she was falling behind in her classes he got her a tutor to help bring her grades up in the subjects she was behind. [He] Also provided transportation to and from the tutor's house after school. Made sure she had an after school snack so she could study better.

*Id*. at 1.

Bob sought to create economic opportunities for local Belizeans through IPC and other ventures. After witnessing the lack of opportunity in one particular Belizean neighborhood, Bob opened a restaurant nearby and hired only individuals that lived in the neighborhood. *Id*. at 2. Moreover, Bob filled the administrative and secretarial positions at IPC with only local Belizeans who had families to support.[1] Several of these employees have provided letters of support in which they describe Bob's kindness and his impact on their lives. Aaliyah Whittaker writes that, as an employee, Bob "treated me like his family member." Letter of Aaliyah Whittaker, attached as Exhibit 5. Another former IPC employee, Clodine Anderson, expressed appreciation of Bob's compassion as an employer while she battled an illness. *See* Letter of Clodine Anderson, attached as Exhibit 6. Finally, Lellia Moh, another IPC employee, notes that Bob "truly cared about us and encouraged us to work hard and strive to better our lives. He is the best boss I have ever had. I will always be grateful to have known him." Letter of Lellia Moh, attached as Exhibit 7.

Bob became intimately involved with Lifeline Foundation, a non-governmental organization that raises money to benefit schools and orphanages in Belize. In her letter to the

---

[1] The administrative and secretarial employees of IPC have never been accused of any wrongdoing or complicity in the money laundering or securities conspiracies the Government alleges.

Court, Kim Simplis-Barrow—the First Lady of Belize and Chairwoman of the Lifeline

Foundation—best describes Bob's generosity:

> Mr. Bandfield was generous in contributing his time and effort to the Foundations' activities, and encouraged his employees, friends and visiting family members to contribute to the Foundation either by volunteering to help at our fundraisers or by purchasing tickets. Mr. Bandfield was always one of the first to arrive at our events, and so sometimes found himself assisting with last minute preparations! He is also a talented artist and donated his own artwork to the Foundation on more than one occasion. He was always unfailingly polite, helpful and concerned about the circumstances of the disadvantaged children in Belize, and was always more than willing to assist when needed.

Letter of Kim Simplis Barrow, attached as Exhibit 8.

Similar to the free dental services Bob provided, his charitable and community-minded

endeavors in Belize are representative of Bob's true nature and a life spent giving freely of his

time, talent, and treasure. As Bob's step-children observe, "[t]he thing that stands out the most

about Bob is his love and graciousness towards others. I have met his employees, children and

sister and they all say the same thing about him. They all say that he would give the shirt off of

his back before he let anyone suffer or go without." Letter of Luke and Samantha Bergey,

attached as Exhibit 9.

The Belizean people and traditions that Bob grew to know, support, and love each moved

Bob to express the profound impressions they left on him; and so Bob taught himself to paint.

With no prior experience and a skill level suitable for stick figures, Bob learned to channel his

discipline and his deep capacity for feeling through a paint brush to capture the awe of his

surroundings, the people he grew to know, and the communities he tried to help. Four examples

of his paintings are included here: a Belizean fisherman going about his daily work; a Belizean

boy playing on his way to school; a baby's hand cradled in its mother's palm; and an elderly

Belizean man whose smile lifted the spirits of others. *See* Bandfield Paintings, attached as Exhibits 23 - 26. As Bob's daughter Bonnie observes, Bob's "paintings capture a genuine empathy that gives them extremely insightful emotional elements" concerning their subjects. Lawless Ltr., Ex. 1 at 2. Viewing Bob's paintings also provides insight into the emotional elements of Bob's nature and the kindness and empathy that he extends to all.

## II.     The Offense Conduct and Pre-Sentence Investigation Report

### A.     The Nature of the Offense

Bob pled guilty to one count of conspiracy to commit money laundering pursuant to 18 U.S.C. § 1956(h). While Bob fully accepts responsibility for his role in the money laundering conspiracy, it warrants noting that the factual basis for his guilty plea rests on conduct that facilitated laundering other people's money. Indeed, Bob's role in the offense was limited to incorporating companies and corporate structures (through his business, IPC) that permitted their true owners to obscure their identities and, for some owners, to disaggregate and conceal the percentage of publicly-traded securities controlled by those owners. These entities were, in turn, used by other defendants who were clients of IPC for nefarious reasons, such as classic "pump & dump" schemes. Various accounts associated with the companies Bob created were used to transfer the proceeds of these securities manipulation schemes. At times, Bob facilitated the transfer of these moneys at the request of those codefendants who were engaged in such "pump & dump" activities.

Notably, Bob did not plead guilty to securities fraud, nor to conspiring to commit securities fraud; he was not involved in nor was he aware of his codefendants alleged "pump & dump" schemes. It bears emphasis that Bob had no specific knowledge of the securities trading that others conducted; but he knew that the companies and structures he created made it possible

for others to manipulate securities, and he does not minimize his role in that respect. But Bob

did not gain or profit in any way from the trading activity engaged in by his codefendants. Bob

received a flat fee of $1,000 - $2,000 for creating the companies that his codefendants requested

and used to carry out their securities manipulation; however, Bob did not participate in any

scheme to manipulate the stocks of CANA, VLXN, CYNK, or any other stock. Indeed, defense

counsel expects the Government to confirm that it does not view Bob as a participant in the

"pump & dump" schemes to any extent beyond incorporating the companies or brokerage

structures that others used for holding and trading stocks.

In essence, the companies that Bob created were vehicles that he provided to others with

the understanding that they could be used by others for criminal purposes; not unlike lending an

automotive vehicle to others with the knowledge that it may be used in the course of a crime.

While this indirect role in the alleged schemes does not excuse Bob, it is relevant to assessing his

culpability as compared to his codefendants and in light of the astronomical imprisonment range

under the Sentencing Guidelines.

**B.** **The Presentence Investigation Report**

The Probation Office disclosed its draft PSR on September 15, 2016 and a final

addendum (the "PSR Addendum") on December 14, 2016. [2] The PSR recites the Guidelines

calculation to which the parties stipulated in the Plea Agreement, which yield an Adjusted

Offense Level of 42. *See* PSR ¶ 60. Defense counsel expects that the Government will further

move for an additional one-point reduction for timely acceptance of guilt, thereby yielding an

offense level of 41. The PSR also concludes that Bob falls into Criminal History Category I

---

[2] Bob's objections were stated in a letter timely submitted to the Probation Department on September 30, 2016. For the Court's convenience, a copy of the letter is attached as Exhibit 30. The Addendum duly notes and attempts to address each of the defense's objections to the PSR.

because he has no prior instances or accusations of criminal conduct. *Id.*, ¶ 63. Accordingly, the applicable Guidelines range is an unimaginable 324 to 405 months imprisonment; however, because the statutorily authorized maximum sentence for the offense is 20 years, the restricted Guideline term is 240 months imprisonment. *Id.*, ¶ 95. As of the date of this memorandum, the Probation Department has not made a specific recommendation concerning a term of incarceration beyond the nearly two and a half years that Bob has served.

For purposes of the Guidelines calculation, the PSR and its Addendum reference a total of $250 million that the Government alleges to have passed through relevant accounts. But the Government asserts a total net profit of approximately $53 million that was gained by others in connection with the securities manipulation schemes in which Bob was *not* a participant, but which provide the criminal basis for the money laundering conspiracy.[3] *See* PSR Addendum at 2. As for his personal gains, Bob received only a flat fee of between approximately $1,000 and $2,000 for each entity he incorporated. He received nothing more in connection with the securities fraud scheme through which his codefendants profited by the millions. Bob did *not* receive 50% of the commissions from Legacy clients who were referred by IPC. *See* PSR ¶ 20; PSR Addendum at 3 (noting that the Government provided no information to support this allegation from the Indictment). Certain of his codefendants offered Bob a share of commission

---

[3] Bob's codefendant, Gregg Mulholland, has engaged in a financial proffer with the Government concerning his forfeiture order and, in doing so, appears to have further refined the profit calculations pertaining to Mulholland's securities fraud scheme, which is the criminal conduct that underpins the money laundering conspiracy charge to which both Bob and Mulholland plead guilty. The parties also appear to have agreed that the enhancements for more than ten victims and for conducting the scheme from outside the United States do not apply. *See* No. 14-cr-476 (ILG), Mulholland Sentencing Memo., Jan. 10, 2017, Dkt. No. 169 at 4-7. It appears that the resulting Guidelines calculation for Mulholland could be reduced to a total offense level as low as 33 (135-168 months imprisonment). While Bob has accepted his Guidelines calculation in the Plea Agreement, and he has not engaged in a similar financial proffer with the Government (because he did not share in the millions in trading profits that Mulholland gained), Bob joins in Mulholland's request for a lower Guidelines calculation should the Court find, as a factual matter, that such lower Guidelines calculation is appropriate. Because Bob and Mulholland pled guilty to the same charge—albeit based on markedly different conduct—Bob respectfully requests that the Court grant Bob any reduction in the Guidelines calculation that the Court grants to Mulholland.

payments on a handful of occasions totaling approximately $60,000, but Bob did not accept those funds.

To put Bob's purported "gain" in perspective, Bob's entire IPC business venture (including law-abiding clients) earned no more than $1,000,000 of the alleged $250,000,000 gain, and the defense estimates Bob's gain to be substantially less than that. In fact, the Government's rough estimate of the moneys earned and expensed by IPC was *less than $350,000*. However, for purposes of the plea agreement, Bob agreed to $1,000,000 as the amount of the forfeiture judgment to be entered against him. *See* Plea Agreement ¶ 1(f).

While the PSR and its Addendum overestimate Bob's "gains" from incorporating companies in this matter, it does not clearly state the amounts by which the other defendants, including the cooperating defendants, profited by the charged scheme. Even a rough estimate of other defendants' proceeds would be in excess of $10 million. Notably, the preliminary forfeiture order for codefendant Greg Mulholland includes a sum of $12 million and expensive assets such as a Falcon Jet private airplane and three different homes. The gains relating to the Government's two cooperating witnesses are in the tens of millions, at the least. The Government has this information, and it is relevant to the assessment of relative culpability in this case. Bob made a small fraction—less than 10%—of the amount made by his coconspirators; the fees he earned were solely in connection with incorporating companies and not related to securities trading or profit sharing from his codefendants' securities fraud schemes.

Moreover, Bob managed IPC's administrative and secretarial employees as part of the money-laundering conspiracy to which he pled guilty, but he did not have any leadership role in the other schemes described in the Indictment or PSR—in particular, the stock manipulation schemes. *See* PSR Addendum at 4 ("the PSR does not indicate that [Bob] functioned as a leader

or manager in the stock fraud scheme").  Indeed, Bob has limited knowledge of securities in general.  Neither he nor his companies own securities or profit from securities; nor has Bob marketed or promoted securities.

Finally, while conspiracy to commit tax evasion may be considered as relevant conduct, Bob did not plead guilty to such an offense.  *See* PSR Addendum, ¶ 18.  Bob in fact created companies that he understood could be used by others to hinder the IRS's ability to ascertain true ownership and assess proper taxes.  But it is also true that many (though not all) of Bob's clients were non-U.S. citizens whom Bob had no reason to believe had U.S. tax obligations.  In any case, neither Bob nor IPC gave any tax advice; they recognized that tax reporting is the responsibility of individual clients, who—as noted—came from all over the world.  The IPC website and client applications clearly stated that tax reporting and payment were individual obligations.

Bob stands before the Court prepared to accept its sentence.  While the PSR and its Addendum describe all of the potentially relevant conduct, a fair assessment of Bob's role in the money laundering conspiracy and the broader schemes demonstrate that he was a facilitator but not the mastermind of any scheme.  Moreover, Bob did not personally pocket the enormous amounts of money alleged to have passed through accounts, nor did he personally profit in the millions from the underlying securities conduct, as did his codefendants.  Accordingly, Bob's relative culpability militates in favor of a custodial sentence of time served or an incarceratory period of no longer than five years inclusive of time served.

### C.      The PSR Addendum Correctly Concludes that Restitution is Inappropriate

The PSR Addendum indicates that the Government has asked for restitution to be ordered in this case.  *See* PSR Addendum at 1-2.  Bob does not dispute that the money laundering conspiracy to which he plead is subject to mandatory restitution pursuant to the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A.  However, a restitution order must be predicated on *actual* loss and awarded to the *actual* victim of the crime.  *See*, *e.g.*, *United States v. Germosen*, 139 F.3d 120, 130-31 (2d Cir.1998) (unlike the Guidelines, which allow for "a loss calculation based on 'intended loss,'" restitution "requires a showing of actual loss . . ."); *United States v. Quarrell*, 310 F.3d 664, 680 (10th Cir. 2002) (finding that the government was entitled to restitution based on its actual loss, not the cost of a hypothetical or speculative calculation).  While Bob does not dispute the agreed-upon loss amount (or, rather, gains) for the purpose of calculating the Guidelines, a restitution order based on this or any other amount is improper.

Restitution cannot be awarded to anyone other than the actual victim of the *charged crime* and must be awarded only on the basis of the victim's actual losses.  *See United States v. Apex Roofing of Tallahassee, Inc.*, 49 F.3d 1509, 1513 (11th Cir. 1995) (reversing district court's restitution order because there was but one victim of the charged crime, and the district court's assessment of losses actually sustained by other persons as a result of related conduct were inappropriate because those persons were not the victims of the actual charged crime).

Here, the alleged victims the Government puts forth are victims of the securities fraud scheme alleged in the Indictment.  However, as the PSR Addendum notes, Bob pled guilty to the charge of conspiracy to commit money laundering "wherein the 'victim' is society at large."  PSR Addendum at 2.  The Government concedes that Bob was not a participant in the underlying "pump & dump" schemes, nor did he profit from the trading in these schemes.  Most

importantly, Bob did not plead guilty to securities fraud.  The Government cannot now claim losses for victims of a crime to which Bob did not plead guilty.

Moreover, the Government has not shared with the defense any support for the alleged victims of the securities manipulation scheme.  The defense thus cannot assess or challenge the Government's calculation of the alleged victims' losses.  Even the PSR Addendum only vaguely describes the names and addresses of "victim investors" together with what appears to be the Mulholland Group's total net profits from the trades.  *See* PSR Addendum at 2.  The PSR Addendum does not provide any indication that the Government can tie those investors' stock purchases to any losses related to the securities manipulation scheme, let alone the money laundering conspiracy.  Because Bob cannot readily assess the Government's position or evidence of loss, and because it appears there are no victims of the money laundering conspiracy, it would be unjust to order restitution.

For the foregoing reasons, Bob respectfully requests that the Court decline to order restitution in this case.  To the extent that the Court disagrees, Bob respectfully requests that the forfeiture order be counted against any restitution order and that any restitution order reflect the relatively indirect role that Bob played.

**SENTENCING ANALYSIS**

**I.    The Loss Amount Overstates Mr. Bandfield's Culpability**

The Honorable Frederic Block once observed: "Although [the Court must] begin the sentencing proceeding by correctly calculating the applicable Guidelines range, ... it is difficult for a sentencing judge to place much stock in a Guidelines range that does not provide realistic guidance." *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008) (internal quotations and citation omitted). Courts have agreed that, in financial fraud cases, the Guidelines place an "inordinate emphasis" on "putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *United States v. Adelson*, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006) (JSR).[4]

The Guidelines' "arithmetic approach" is particularly ill-suited in cases where—as here—the calculated loss is often arbitrary and attenuated from the defendant's actual conduct. *Id*. at 512. Indeed, the loss amount—or rather, the "gain"—set forth by the Government in this case serves as the primary basis for Bob's significant Guidelines calculation. Bob's base offense level is six. *See* PSR at ¶ 51. A total of 28 levels are added to reflect the "gain" of $250,000,000 allegedly resulting from the offense. *Id*. With an offense level of 41 and a criminal history category I, Bob's Guidelines range is 324 to 405 months. *Id*. ¶ 55. Bob recognizes that he has accepted these calculations in his plea agreement, and does not challenge the Guidelines calculation. However, it bears emphasis that his total offense level of 41 is four levels higher than that applicable to a defendant convicted after trial of *attempted first-degree murder* where

---

[4]    The Sentencing Commission also recognizes there may be cases where the offense level substantially overstates the seriousness of the offense. *See* U.S.S.G. § 2B1.1 Application Note 20 (C) ("There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.").

14

the victim sustained permanent or life-threatening bodily injury, *see* U.S.S.G. §§ 2A2.1(a)(1), (b)(1)(A), and it is 15 levels higher than the Guidelines for a defendant who is convicted after trial of aggravated assault with a firearm resulting in *permanent* or *life-threatening bodily injury*. *See* U.S.S.G. §§ 2A2.2(b)(2)(A), (b)(3)(C). A sentence in that range would dwarf the sentences of high profile white collar defendants whose crimes—mostly fraud-related—had much greater societal impact, like Jeffrey Skilling of Enron (14 years imprisonment) or Raj Rajaratnam of Galleon (11 years imprisonment).

While Bob agreed to the loss amount for Guidelines purposes, the Court should view the emphasis on loss amount with extreme skepticism in light of the above-referenced variances and the § 3553(a) factors detailed below. Any reliance on loss amount here will lead to a sentence that unfairly magnifies Bob's actual conduct, which was limited to incorporating companies that were used by others to accomplish their criminal objectives. Attaching Bob's sentence to the size of profits or scale of losses will have the practical effect of punishing egregious, direct conduct—such as the codefendants' actions here—in the same manner as Bob's less culpable, facilitative conduct. Indeed, courts have recognized that the mechanical application of the Guidelines in white-collar cases can lead to severely inflated offense levels and have imposed sentences lower than the bottom of the Guidelines range upon defendants for whom the Guidelines prescribed terms of 360 months or life imprisonment. *See*, *e.g.*, *United States v. Parris*, 573 F. Supp. 2d 744, 746 (E.D.N.Y. 2008) (imposing 60-month sentence when Guidelines prescribed 360 to life); *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (imposing 42-month sentence when Guidelines prescribed life), *aff'd*, 301 F. App'x 93 (2d Cir. 2008); *United States v. Watt*, 707 F. Supp. 2d 149, 151, at *1 (D. Mass. Apr. 27, 2010) (imposing 24-month sentence when Guidelines prescribed life).

Bob has accepted responsibility for his conduct; yet, it is indisputable that his crimes are not comparable to the types of crimes that justify a draconian sentence that may—because of Bob's age—operate as a life sentence. As discussed above, although the "gain" of an alleged $250,000,000 is used for purposes of Section 2B1.1, Bob's business (including law-abiding clients) earned no more than about $350,000.[5] In comparison to his co-defendants' gains numbering in the tens of millions, Bob's actual gain is a small fraction thereof—roughly one twentieth of the sum. Accordingly, we respectfully request that the Court grant Bob significant leniency based on the undue severity of the Guidelines and the statutory maximum as applied to his case, both of which overstate his culpability and would result in an unjust sentence.

## II. The Purposes of Sentencing as Expressed in 18 U.S.C. § 3553(a) are Best Served By a Sentence of Time Served or No Longer Than Five Years Inclusive of Time Served

The mandate of 18 U.S.C. § 3553(a) is, of course, for the Court to "impose a sentence sufficient, but not greater than necessary," to comply with the purposes of sentencing expressed therein. *United States v. Stewart*, 590 F.3d 93, n.30 (2d Cir. 2009). In *Rita v. United States*, the Supreme Court summarized the § 3553(a) factors that a sentencing court should consider: "(1) the offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) just punishment (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution." 551 U.S. 338, 347-48 (2007). After considering each and all of these factors, the sentencing court has wide latitude to "make an individualized assessment of the sentence warranted by Section 3553(a) based on the facts presented." *United States v. Jones*, 531 F.3d

---

[5] Using the $350,000 figure strictly to highlight the arbitrary inflation under loss-driven Guidelines, the imprisonment range associated with this figure is 57-71 months. This figure accounts for the entirely of Bob's profits during his time running IPC.

163, 170 (2d Cir. 2008) (internal quotations omitted).  Indeed, "the low marginal utility of the guideline in [a] very high intended loss case should have prompted greater, not lesser, reliance on the section 3553(a) factors other than the Guidelines.")  *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring).

The factors set forth in § 3553(a) counsel in favor of a sentence of time served or no more than five years inclusive of time served for Bob Bandfield.  In conducting the analysis that leads to this conclusion, Bob respectfully requests that the Court give particular consideration to the following factors:  (1) Bob accepted responsibility for his conduct; (2) Bob's personal history and characteristics are indicative of a generous, caring older man who has led a positive life but whose age, family history, and Guidelines raise the possibility that he will die in prison; (3) the need to avoid unwarranted sentencing disparities supports a significantly lenient sentence; and, (4) the need for adequate deterrence is served by a significantly lenient sentence.

### A.  Bob Has Accepted Responsibility for His Crime and is Willing to Cooperate with Relevant Enforcement Bodies

Bob pled guilty to one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).  First and foremost, Bob has acknowledged the seriousness of this offense and expressed remorse for his conduct.  By pleading guilty, Bob demonstrated to the Court that he unequivocally takes responsibility for his actions.  Moreover, Bob has provided prior assistance to Canadian authorities and the SEC in connection investigations into offshore corporations and accounts.

Bob's prior assistance to enforcement bodies in both the Unites States and Canada relate specifically to investigations regarding tax avoidance.  His prior efforts to cooperate demonstrate his true nature and add force to the argument that Bob poses no risk as a recidivist.  *See* Sentencing Analysis, Section II(E), *infra* at 27.  Indeed, in *United States v. Fernandez*, the

Second Circuit determined that, in considering § 3553(a)(1), the sentencing court "should take under advisement any related arguments, including the contention that a defendant made efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. § 5K1.1." 443 F.3d 19, 33 (2d. Cir. 2006) (abrogated on other grounds by *Rita v. United States*, 551 U.S. 338 (2007)). In reaching this determination, the Second Circuit reasoned that "Section 3553(a)(1) . . . contains no express limitations as to what 'history and characteristics of the defendant' are relevant. This sweeping provision presumably includes the history of a defendant's cooperation and characteristics evidenced by cooperation, such as remorse or rehabilitation." *Id.*; *see also United States v. Machitidze*, No. 05-cr-327 (S.D.N.Y.) (RJH), May 24, 2006 Sentencing Tr., Dkt. No. 160 (imposing a non-Guidelines sentence based in part on defendant's non-5k cooperation).

While Bob's past assistance is related to other investigations and enforcement actions, his willingness to assist reflects Bob's true character and his acceptance of responsibility. For example, in 2013, Bob testified in a Canadian court in Calgary as an expert witness in an off-shore tax avoidance case. He also assisted the Royal Canadian Mounted Police ("RCMPs") in an investigation into the largest-known Ponzi scheme in Canada. In connection with this investigation, Bob gave lengthy interviews with the RCMP officers and testified via video-conference in a pre-trial proceeding in about 2012. Bob was scheduled to testify in Canadian court as a witness for the RCMP via video conference again on September 24, 2014—only two weeks after his arrest in this matter, and which he continued to be willing to do after his arrest and incarceration. Bob has also responded to requests for documents and information from the United States Securities and Exchange Commission and the IRS.

Bob does not seek to imply that he cooperated with the Government concurrently with his case or that he is a "cooperator" in terms of legal art. Yet Bob's prior efforts to assist enforcement bodies demonstrate Bob's good and helpful nature, and indicate that he recognizes the consequences of his actions and will not offend again. These traits are further reflected in Bob's desire to discontinue running IPC—which he intended to do in fairly short order before the time of his arrest. *See* Bonnie Lawless Ltr. At 3; Brent Bandfield Ltr. At 1 (both reflecting Bob's intent to retire and move back to the U.S. in or around 2014-2015). Accordingly, Bob respectfully submits that the Court should take into account his efforts of assistance together with his acceptance of responsibility in assessing his characteristics under § 3553(a)(1) as a barometer for his true character and his intent to move his life forward in a positive, law-abiding manner. As one of Bob's former employees observes, "Since Mr. Bandfield has been incarcerated I have been in contact with him by email and he has told me that he is very sorry for what has taken place." Moh Ltr., Ex. 7.

 **B.**   <u>Bob's History and Personal Characteristics Warrant a Sentence of Time Served or No Longer Than Five Years Inclusive of Time Served</u>

  **1.**   **Bob's History of Kindness and Generosity**

Bob's true character is evident in the love and devotion he shows to his family and friends and the contributions he makes to his community. These attributes are best described by Bob's loved ones. Bob is a "a quiet, thoughtful, intelligent man who did many acts of kindness to help people financially without them knowing, which was his way of caring"). Barbara Bandfield Ltr., Ex. 2 at 1.

Bob's caring outlook and community-mindedness are further detailed above in the Factual and Procedural Background, Section I(A), *infra* at 2-7. While acts of this nature are certainly indicative of strong character, courts often recognize that smaller acts of kindness are

equally extraordinary. Indeed, it is the "private acts . . . that reveal something about the heart and conscience of the human being." *United States v. Whitman*, No. 12-cr-125 (S.D.N.Y.) (JSR), Jan. 24, 2013 Sentencing Tr. at 17:6-23; *United States v. Mehta*, 307 F.Supp.2d 270, 277 (D. Mass 2004) ("[T]he focus should be on the defendant's activities . . . particularly those that go beyond the kind of 'impersonal writing of checks . . .'"); *United States v. Serafini*, 233 F.3d 758, 773-75 (3d Cir. 2000) (upholding variance based on defendant's assistance to pay an individual's electric bill to continue service and other small acts of kindness).

Bob's life is filled with many of the seemingly small or personal acts of kindness that the *Whitman*, *Serafini*, and *Mehta* courts found compelling. Ms. Whittaker, a former IPC employee, notes that Bob's "generosities to others and small gestures of kindness" are "countless." Whittaker Ltr., Ex. 5 at 2. Indeed, many of the letters of support attached here provide anecdotes demonstrating that Bob is sincerely dedicated to attending to people's needs. Following are several examples—and yet only a handful—of the small, "private acts" that demonstrate Bob's true character:

- "[M]y best friend in high school was suffering deeply as a result of having abusive, addict parents. Without a question my Pop invited her to live with us in our spare room. … She lived with us for a couple of years and my Pop always made her feel welcome and empowered in her interest in fashion and design." Bonnie Lawless Ltr., Ex. 1 at 2.

- "When I was a struggling college student, Robert allowed me to stay at his home and rent out the basement for a very small fee. I lived in his home for approximately one year and this was a tremendous help while I was in college." Letter of Sarah Wittfield, attached as Exhibit 10.

- "I know that *every* year before Christmas [Bob] would go shopping—by himself—[and] completely fill his car with toys & clothing for children, & then deliver it to the local fire station for them to distribute to those in need. He did not take a receipt for those contributions. Even most of our family members did not know he did this until I told them." Bischel Ltr., Ex. 3 at 2.

- "Mr. Bandfield was the best boss I ever had. He was extremely good to me because I am a sickly person [struggling with] Hemophelia. While working with

Mr. Bandfield I was admitted to the hospital two or three times, but instead of firing me, as other employers might have done, Mr. Bandfield supported me both emotionally and financial[ly] . . . he never gave up on me and, for this I will always love and appreciate him."  Anderson Ltr., Ex. 6 at 2.

- "When I was short or low on cash Mr. Bandfield would always be there to help . . . knowing the hardship we all faced financially … especially when our country would be threatened by a storm during hurricane season . . . he would ask the staff to write down our clothing and shoe size, because upon his return from his yearly vacation and visits with his family in the United States, he would bring nice clothing and shoes for us to wear."  Whittaker Ltr., Ex. 5 at 2.

- "Shortly after Uncle Bob moved to Belize, [he asked me] to do him a favor. He had noticed that many of the little girls were playing with Barbie[s], but they were all Caucasian with light skin. He said he had asked several of them if they also have Barbie[s] with dark skin like theirs, and [the little girls] did not know they existed. He asked me if I could purchase several African American dolls to send to him so he can give them away to the girls."  Letter of Beth Stoner, attached as Exhibit 11.

The above examples of Bob's attention to others' needs illustrates his truly human nature apart from the conduct that brings him before the Court.  Importantly, the many instances of kindness and good works noted in the attached letters of support indicate that there is no particular time of his life in which Bob engaged in such activities—his giving nature is consistently demonstrated throughout his life.

Bob's long life spent caring for, encouraging, and supporting others indicates a personal character deserving of leniency now.  "[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."  *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (JSR).  Accordingly, Bob respectfully urges the Court to impose a sentence of time served or five years inclusive of time served.

**2. Bob's Age, Health Concerns, and Pre-Trial Incarceration Suggest that a Sentence of Time Served or No Longer Than Five Years Inclusive of Time Served is Most Appropriate**

Bob Bandfield is now 72 years old. He has spent the last almost two and a half years incarcerated at the MDC in what are recognized within this district as sub-standard, harsh conditions. His age, the realities of incarceration, and his personal and family health together warrant a sentence of time served or no longer than five years inclusive of time served.

*i. Bob's Age Militates Against a Lengthy Sentence*

The average life expectancy for United States citizens is about 78 years, *see* http://www.cdc.gov/nchs/fastats/life-expectancy.htm. Moreover, one of the leading indicators of personal life expectancy is that of one's parents. *Id*. Both of Bob's parents passed away from heart conditions—the number one cause of death—well before Bob's current age; his father at age 56 and his mother at age 65. *See* PSR, ¶ 68. Taken together, these statistics and factors strongly suggest that the imposition of a lengthy prison term would effectively be a life sentence for Bob.

Section SH1.1 of the Sentencing Guidelines specifically permits the Court to consider a defendant's age in determining whether to impose a Guidelines sentence. Given that any substantial period of incarceration may well be a life sentence, Bob respectfully submits that such a sentence is far greater than necessary to achieve the goals of sentencing.

*ii. Bob's Incarceration at the MDC Warrants a Lenient Sentence*

Incarceration has been demonstrated to reduce the average life span of those who are incarcerated. A study of inmates incarcerated in New York States found that, on average, inmates in the New York State prison system lost two years of life for each year of incarceration. *See* Evelyn J. Patterson, PhD, *The Dose—Response of Time Served in Prison on Mortality: New*

*York State, 1989-2003*, AMERICAN JOURNAL OF PUBLIC HEALTH, March 2013, Vol. 103, No. 3, pp. 523-528. While we note that incarceration in the Federal Bureau of Prisons ("BOP") is not the same as incarceration in a New York State Penitentiary, Courts have indeed found that incarceration in the Federal BOP tends to reduce an inmate's life expectancy where the inmate is older or infirm. *See United States v. Gigante*, 989 F. Supp. 436, 443 (E.D.N.Y. 1998) (recognizing that elderly and infirm defendants' lives would be "threatened and shortened" by incarceration); *United States v. Blarek*, 7 F. Supp. 2d 192, 212 (E.D.N.Y. 1998) ("Despite federal authorities' concerns for prisoners' welfare, incarceration is likely to be detrimental to this defendant's health, resulting in a lessening of his present life expectancy.").

In addition to reducing life expectancy, incarceration *specifically* at the MDC has been found in recent years to be harsher than most facilities—nearing inhumane. This finding surely was no surprise to anyone familiar with the MDC. For instance, in 2015 and 2016, the National Association of Women Judges examined the conditions for women inmates at the MDC. The 2016 report summary stated in part that conditions "at MDC since December 2013 were unconscionable . . . The absence of fresh, clean air, the complete absence of sunlight, and the absence of ANY outdoor time and activities are immediate issues which the BOP has failed to address in any meaningful fashion . . . these conditions violate the ABA Standards of Treatment of Prisoners and the UN Standard Minimum Rules for the treatment of prisoners. … MDC Brooklyn is a temporary detention facility and is an inappropriate facility to house women ***or any person*** long term." *See* Nat'l Assoc. of Women Judges Women in Prison Committee Report dated June 3, 2016 re: Second Visit to MDC, Brooklyn (emphasis added) *available at* https://www.nawj.org/uploads/files/monthly_update/referenced_docs/august_2016/bop_nawj_june_3_2016_visit_metropolitan_detention_center_ny.pdf.

Bob submits that his experience at the MDC has been no different that the conditions described in the above-referenced report. Bob has not been outside in over two years; he has no regular activity (though he religiously performs calisthenics in his cell and walks lengths in the common area); he is subject to extreme temperature fluctuations; the MDC lacks any programs for education or substance abuse; he witnesses frequent violent episodes as a resident in general population; he has had no personal visitors (only legal visits) in the nearly two and a half years he has been incarcerated because his family is on the west coast and cannot afford to visit; he spends nearly all his time in his cell (aside from meals and exercise) because his hearing condition makes it difficult to communicate or even focus in the cacophonous common areas. In sum, the already significant time that Bob has spent at the MDC has been under onerous conditions and, especially in light of his age, represents the equivalent of significantly more time.

### iii. Bob's Personal Health Warrants a Lenient Sentence

As noted in the PSR and in several letters of support appended here, Bob suffers from hearing loss and bouts of depression. *See* PSR ¶ 79-80; Whittaker Ltr., Ex. 5 (Bob "is partially hearing impaired"); Glenna Bergey Ltr., Ex. 4 (Bob has an "inability to hear well"). Either of these conditions alone work to isolate and diminish the sufferer; but when taken together and matched with Bob's age and already lengthy period of incarceration, the result is untenable. Both depression and hearing loss impact the sufferer's ability to fulfill the basic need of human connection, without which life expectancy is minimized. Bob typically copes with these impairments with support from his family and community, and the past two years without this support system have greatly diminished his health and wellness. His family and friends fear the effect that a lengthy term of incarceration will have on him; indeed, they fear he will not live to be released. Respectfully, a sentence with such a practical result is greater than necessary under the circumstances.

### C. A Sentence of Time Served or No Longer Than Five Years Inclusive of Time Served Will Avoid Disparities with Similarly-Situated Defendants

In determining the appropriate sentence, the Court must consider "the need to avoid unwarranted sentenc[ing] disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). After an examination of other sentences imposed for offenses involving money laundering or "pump & dump" securities fraud schemes (which the Government alleges form the basis for the money laundering charge), Bob respectfully submits that imposing a sentence of time served or no longer than five years inclusive thereof will avoid creating disparities among similarly situated defendants in cases like his.

The following chart summarizes several recent cases in the Southern and Eastern Districts of New York involving money laundering, "pump & dump" securities fraud schemes, or tax fraud schemes, and the incarceratory sentences imposed relative to the Guidelines range indicated: [6]

| **Case** | **Charge(s)** | **Guidelines** | **Sentence Imposed** |
|---|---|---|---|
| *United States v. Lennox and Lester Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) (Block, J.) | <ul><li>Conspiracy to commit securities fraud;</li><li>Securities fraud (pump & dump);</li><li>Witness tampering</li></ul> | 360 months to life imprisonment | 60 months (after trial) |
| *United States v. Martin Weisberg*, 08-cr-347, (E.D.N.Y.) (Garaufis, J.) | <ul><li>Money laundering;</li><li>Wire fraud</li></ul> | 68 to 96 months imprisonment | 24 months |

---

[6] This chart does not reflect periods of probation or supervised release, or monetary aspects of the sentences included.

| | | | |
|---|---|---|---|
| *United States v. Donna Levy*, No. 11-cr-62 (PAC) (S.D.N.Y. 2014)[7] | • Conspiracy to commit securities fraud and wire fraud<br>• Securities fraud (pump & dump)<br>• Money laundering | 292 to 365 months imprisonment | 66 months (after trial) |
| *United States v. David Levy*, No. 11-cr-62 (PAC) (S.D.N.Y. 2014) | • Conspiracy to commit securities fraud and wire fraud<br>• Securities fraud (pump & dump)<br>• Money laundering | Life imprisonment (capped by the 85 year maximum for the convicted counts) | 108 months (after trial) |
| *United States v. Coplan*, No. 10-583-cr (2d Cir. 2012; S.D.N.Y. 2009)[8] | • Conspiracy to defraud the Government via impeding IRS functions<br>• Tax evasion (offshore tax shelters)<br>• Obstructing the IRS | 276 months imprisonment | 36 months (after trial) |
| *United States v. Abdallah*, No. 09-cr-717 (E.D.N.Y. 2012) (Biano, J.) | • Conspiracy to commit securities fraud and wire fraud<br>• Securities fraud | 97 to 121 months imprisonment | 42 months (after trial) |
| *United States v. Branfenbrener, et al.*, No. 10-cr-459 (E.D.N.Y.) (Sterling, J.)[9] | • Tax evasion<br>• Money laundering<br>• Health care fraud | 51 to 65 months imprisonment | 41 months |

[7] Defendants David and Donna Levy were sentenced after trial. However, they had numerous codefendants who, like Bob Bandfield, pled guilty rather than go to trial and were sentenced to incarceratory periods ranging from time served to 18 months imprisonment. *See generally United States v. Levy, et al.*, No. 11-cr-62 (PAC) (S.D.N.Y. 2011).

[8] Defendant Coplan had four codefendants who were sentenced after being convicted at trial. Two defendants were later acquitted on appeal and the respective sentenced of 20 months and 15 months were affirmed for the two remaining defendants. *See generally United States v. Coplan, et al.*, No. 10-583-cr (2d Cir. 2012).

[9] Defendant Branfenbrener had several codefendants who also pled guilty to money laundering charges, among others, and received sentences of 24 months (Mugerman), and 70 months (Semerik). Other codefendants pled guilty to charges other than money laundering (*e.g.*, tax evasion) and received sentences of 41 months (Afanasyev, Bodrunov, Bronshteyn, and Shapiro), 60 months (Vinokour), 24 months (Groysman), 6 months (Zagladko), and probation (Rud). *See generally United States v. Afanasyevi et al.*, No. 10-cr-459 (SJ) (E.D.N.Y. 2010).

| *United States v. Richard Adelson*, No. 05-cr-325 (JSR) (S.D.N.Y. 2006) | • Securities fraud<br>• False reporting to the SEC<br>• False proxy solicitation | Life imprisonment (capped by the 85 year maximum) | 42 months |
|---|---|---|---|

While the above comparisons from the Eastern and Southern Districts are a small representative set of sentences imposed in regional money laundering and securities-related cases, the United States Sentencing Commission reported in its 2015 Sourcebook of Federal Sentencing Statistics that the national mean sentence for money laundering offenses is *29 months imprisonment* and the national median sentence is *18 months imprisonment* among the 669 cases examined. *See* U.S. Sentencing Comm'n, Sourcebook of Federal Sentencing Statistics (FY2015), Table 13, *available at* http://isb.ussc.gov/content/ (last visited December 5, 2016). [10] Similarly, fraud crimes (including securities fraud) resulted in sentences with a *national mean of 27 months and a national median of 14 months imprisonment* among 7,420 cases examined. *Id*. Bob has served almost 28 months since the time of his arrest on September 9, 2014, which puts him within one month of the mean sentence for money laundering offenses and higher than the mean sentence for fraud offenses. This analysis suggests that an incarceratory sentence of time served or no longer than five years inclusive of time served is more than sufficient to meet the aims of sentencing but without creating unwarranted disparities among similarly-situated defendants regionally or nationally.

Importantly, Bob's codefendant, Gregg Mulholland, faces a 12-year sentence as agreed by the Government and Mulholland, subject to the Court's approval. Bob respectfully submits that his conduct is substantially less egregious than Mulholland's conduct and thus Bob should be sentenced far less stringently. Mulholland and the Mulholland Group were, in fact, the

---

[10]   The Sentencing Commission's analysis excludes cases for which non-incarceratory sentences (probation) were imposed.

masterminds of a sprawling market manipulation scheme that impacted more than 40 publicly-traded securities. *See* Superseding Indictment ¶ 23. Mulholland and his associates used companies formed by IPC and other offshore corporate services firms to disguise the nature of their securities ownership, execute wash trades, and run "pump & dump" schemes. *Id*. Mulholland profited in the tens of millions—enough to afford a private jet and several luxury homes. He then laundered the proceeds from these manipulative securities schemes through his varied and numerous offshore companies. Moreover, Mulholland has a prior history of "pump & dump" activity and has been previously sanctioned by the SEC for precisely such conduct. *See SEC v. Ruettiger (Mulholland)*, No. 11-cv-2011-GMN-VCF (D. Nev. 2012), Judgment as to Gregg Mulholland, Jan. 19, 2012, Dkt. No. 18. After this judgment, Mulholland apparently resumed such activity on an even larger scale. And, as Mulholland indicates in his Sentencing Memorandum, Bob and Mulholland never met prior to being arrested. The Government's cooperating witness was the true mastermind of the securities fraud scheme and acted as a conduit between Mulholland and IPC; the cooperating witness had direct knowledge of Mulholland's "pump & dump" trading and indeed controlled the transfer of related funds through escrow accounts that the cooperating witness controlled. *See* Mulholland Sentencing Memo. at 3.

Bob's conduct is far less egregious than Mulholland's conduct described above and in the charging instruments in this case. Bob certainly facilitated Mulholland's securities manipulation and money laundering schemes by incorporating companies and transferring certain proceeds at the request of Mulholland or others in the Mulholland Group. But Bob's actions were never aimed at enriching himself at the detriment of others. Bob has no prior history of misconduct, unlike Mulholland. And, as Mulholland himself makes clear in his Sentencing Memorandum,

the puppeteer and profiteer behind the securities fraud scheme is the Government's cooperating witness—an attorney who made millions.  *See* Mulholland Sentencing Memo. at 5-7.

Accordingly, for the foregoing reasons, a sentence of time served or no longer than five years inclusive thereof will prevent unwarranted disparities among defendants guilty of money laundering or fraud offenses.

### D.     Deterrence is Satisfied by a Sentence of Time Served or No Longer Than Five Years Inclusive of Time Served

Section 3553(a)(2)(B)-(C) instructs the Court to impose a sentence that will adequately deter future criminal conduct by the individual defendant and by society as a whole.  Significant progress toward accomplishing specific and general deterrence has already been made in this case.

The goals of general deterrence can be met without further incarceration for Bob.  Here, the stigma, public humiliation, loss of reputation from pleading guilty to a crime, publicity surrounding the plea, and the attendant loss of career that Bob experienced each serve to deter others from engaging in similar conduct.  And, the well-publicized fact of Bob's arrest and incarceration have already sent a powerful signal to others in similar businesses and they are now on notice.  These factors, together with Bob's demonstrated remorse, his abandonment of the business at issue in favor of pursuing artistic endeavors, and his ability to reach out to others through community involvement, suggest that he will have greater influence and ability to deter potential offenders through direct means than through a further period of incarceration.

In addressing the need for specific deterrence, courts deem the requirement satisfied when the "[e]limination of the defendant's ability to engage in similar or related activities . . . and the substantial loss of assets and income resulting from [his crime] have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake . . .

constitutes a source of both individual and general deterrence." *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (VLB). Moreover, the Court has the discretion to substitute for any period of imprisonment or supervised release the requirement of extensive community service, with or without home confinement. Such an approach would impose punishment while still allowing Bob to support his family and give back to his community by sharing his experiences and redoubling his volunteer work. Based on these factors, the nature and circumstances of Bob's case suggest that a sentence of time served or five years inclusive of time served will achieve specific deterrence.

Bob and the IPC businesses are finished. Bob has no intention of trying to work in any similar industry again and, at age 72, the likelihood that he successfully begins any other business is slim. In a matter of moments, Bob lost his career, a network of people, friends, and a reputation that he spent his life building. He faces significant legal and other expenses flowing from his conduct, which represent a true hardship.

Considering these very personal forms of punishment, a lengthier term of incarceration than that which Bob has already served will not contribute any further deterrent effect. *See*, *e.g.*, Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 169 (2008 WL 2201039) (calling into question the deterrent effect of lengthier sentences imposed based on increasingly inflated Guidelines).

Bob has regained his sense of purpose, his sense of judgment, and his sense of self. With his experience as an inmate, Bob is much better equipped to contribute to his community in a positive fashion with full understanding of the extreme cost of deviating from legal conduct. Indeed, "[s]tudies have repeatedly shown that older offenders at sentencing are at lower risk for reoffending, and the Commission's research confirms these findings." U.S. Sentencing

Commission, Recidivism Among Federal Offenders: A Comprehensive Overview (March 2016), p. 23 ("Offenders sentenced when younger than twenty-one had a 71.1 percent rearrest rate, compared to 14.0 percent of offenders who are sentenced after age sixty."). The U.S. Sentencing Commission has repeatedly found that older defendants can be expected to have a lower risk of recidivism than most. *Id*. ("A federal offender's age at time of release into the community was also closely associated with differences in recidivism rates. Offenders released prior to age 21 had the highest rearrest rate, 67.6 percent, while offenders over sixty years old at the time of release had a recidivism rate of 16.0 percent.").

In addition to the deterrent effect of age and of losing his business, Bob has resolved not to pursue any similar type of business should he be released with years left in his life. In fact, Bob intends to employ his significant skills as a craftsman and artist to begin a jewelry business. He has spent many hours while incarcerated at the MDC designing one-of-a-kind pieces of jewelry, many of the pieces incorporating precious stones and historically-significant coins. To date, Bob has over twenty-five unique designs, several of which are attached here. *See* Bandfield Jewelry Design Sketches, attached as Exhibits 27-29.

Bob's motive to begin a jewelry business and move his life forward in a productive, creative manner has recently taken on a new purpose with the news that his daughter, Bonnie— ████████████████████████████████████████████████████████. Bonnie, who is an artist like her father, sometimes struggles to make ends meet for her family and, ██████████████████████████████████████████, often gives away the only resources she has to others she views as more desperately in need. After receiving this news, Bob realized a calling: to begin a jewelry business with his daughter where they will design and hand-craft original, one-of-a-kind pieces together—Bob in his classical style

(*see* Exs. 27-29), and Bonnie in her sleek, contemporary style. Bob views the jewelry business as a form of redemption and stability for both himself and his daughter. Indeed, Bob's idea of moving his life forward while assisting his daughter—and being able to work side by side—has now become a dream of his. Of course, regardless of the business venture, Bob very much hopes to support his daughter in whatever way he is able.

Bob respectfully submits that his remorse is true and his acceptance complete. The toll that these events have already taken on him personally is incalculable. In light of his age, the deterrent effects described herein, and his desire to move forward with the creative forces in his life, Bob posits no risk of recidivism. Thus, a sentence of time served or no longer than five years inclusive thereof would be sufficient to serve the purposes of sentencing, but not greater than necessary.

## III. Bob Requests a Court Recommendation for RDAP and Assignment to FCI Sheridan Should the Court Impose a Sentence Greater Than Time Served

Notwithstanding all of the preceding arguments and factual assertions contending that a sentence of time served is warranted here, Bob recognizes that a further term of incarceration may be in his future and he intends to use that period to better himself in any way that he can—including through the management of his stress-related drinking. While Bob has not previously participated in treatment to address his drinking, the considerable stress and depression brought on by his criminal case and the fear of what may happen when and if he is released warrants treatment to develop coping skills.

Based on Bob's history of stress and depression-related drinking, Bob believes that he would benefit from an intensive substance abuse program during any further period of incarceration. Accordingly, Bob respectfully requests that he be permitted to participate in a

residential treatment program ("RDAP") and, if eligible, receive the benefits provided for under 18 U.S.C. § 3621(e)(2).

Should the Court impose a sentence of further incarceration, Bob requests that the Court recommend that the Bureau of Prisons assign Bob to the Federal Correctional Institution in Sheridan, Oregon ("FCI Sheridan") so that he can be close to his family. FCI Sheridan participates in RDAP and offers a satellite camp for non-violent offenders like Bob. Serving the remainder of his sentence near his family would be of great comfort to Bob, particularly given the possibility that he could spend his last years in prison. Accordingly, Bob respectfully requests that the Court recommend FCI Sheridan should it impose more time to be served.

## CONCLUSION

In light of the foregoing and considering the factors set forth in 18 U.S.C. § 3553(a), a sentence significantly below the Guidelines is just and adequate punishment for Bob Bandfield. As Bob's nephew Brad learned when his uncle taught him to work with wood to build houses, "[t]here is nothing you do wrong that you can't fix; we all make mistakes and much of life is about fixing mistakes . . . do the best you can." Letter of Brad Bischel, attached as Exhibit 12. Bob Bandfield asks that the Court grant him the opportunity to fix his mistakes and do the best that he can to contribute to his family and his community; he respectfully requests a sentence of time served or, alternatively, a sentence of no longer than five years inclusive of time served.

Dated: New York, New York
      January 13, 2017

                MORVILLO LLP

By: _____
                Eugene Ingoglia
                Savannah Stevenson
                500 Fifth Avenue, 43rd Floor
                New York, New York 10110
                Tel: (212) 796-6330