

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

WMP/JMK                              *271 Cadman Plaza East*
F. #2013R00505                       *Brooklyn, New York 11201*

February 2, 2017

**By Hand and ECF**

The Honorable I. Leo Glasser
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Robert Bandfield
               Criminal Docket No. 14-476 (S-2) (ILG)

Dear Judge Glasser:

        The government respectfully submits this letter in response to the defendant Robert Bandfield's sentencing memorandum, dated January 13, 2017 ("Def. Mem."). In that submission, the defendant argues that a sentence far below his advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of imprisonment is appropriate in this case. The defendant's request is based primarily on: (i) the Guidelines' alleged overstatement of his criminal conduct; (ii) his role in the offense; and (iii) his personal history and characteristics. For the reasons set forth below, the government recommends that a sentence at or just below the advisory Guidelines range of 240 months' imprisonment is warranted here. The defendant is scheduled to be sentenced before the Court on February 6, 2017.

I.      The Offense Conduct

      A.      The Defendants and Other Relevant Entities

        Bandfield, a U.S. citizen who lived and worked in Belize City, Belize, founded and controlled IPC Management Services, LLC, IPC Corporate Services Inc., and IPC Corporate Services LLC (collectively, "IPC Corp"). (Docket Entry No. 96, Superseding Indictment "SI" ¶¶ 1, 5). Bandfield marketed IPC Corp as offshore management companies that provided, inter alia, the following services: (a) offshore company formation; (b) nominee services; (c) trust formation; (d) licensed trustee services; (e) full banking services; (f) offshore credit cards; and (g) offshore brokerage (securities) accounts. (Id.). Bandfield also claimed to have created three offshore brokerage firms: Legacy Global Markets S.A. ("Legacy" or "LGM"), Titan International Securities Inc. ("Titan") and Unicorn International Securities LLC ("Unicorn"). (SI ¶¶ 2-4).

Hon. I. Leo Glasser
February 2, 2017
Page 2

Bandfield's co-defendant, Gregg Mulholland, also known as "Stamps" and "Charlie Wolf," a dual citizen of the U.S. and Canada and a resident of California during the relevant period, was one of IPC Corp's largest clients.  (SI ¶ 6).  In approximately late 2010/early 2011, Mulholland began moving his cash and a substantial amount of his securities to Legacy from Gibraltar Global Securities, Inc. ("Gibraltar"), a Bahamas-based broker-dealer that was under regulatory scrutiny by Bahamian authorities, regulators in British Columbia, and the U.S. Securities and Exchange Commission ("SEC").  Mulholland began using IPC Corp's services when he migrated his money and securities to Legacy.  In early 2012, Mulholland purchased Legacy for approximately $1 million through a trust that Bandfield had created for him to conceal his ownership interest in the brokerage firm.  From approximately February 2012 through September 2014, Mulholland secretly owned and controlled Legacy.  (Id.).

B.      Overview of the Scheme

The defendants Bandfield and Mulholland, together with others, devised and engaged in three inter-related conspiracies: (a) securities fraud – defrauding investors and potential investors in various U.S. publicly-traded companies through, inter alia, the fraudulent concealment of the true beneficial ownership interests in the various U.S. publicly-traded companies, and the engineering of artificial price movements and trading volume in the stocks of the various U.S. publicly-traded companies; (b) tax fraud – defrauding the United States by impeding, impairing, obstructing and defeating the lawful governmental functions of the Internal Revenue Service ("IRS") in the ascertainment, computation, assessment, and collection of revenue, specifically federal income taxes; and (c) money laundering – laundering money by facilitating financial transactions to and from the United States, which transactions involved proceeds of fraud in the sale of securities.  (SI ¶ 20).  Specifically, Mulholland and his group of stock manipulators (the "Mulholland Group") fraudulently manipulated the stock of more than forty U.S. publicly-traded companies through the use of Bandfield's shell structures and offshore brokerage firms and then transferred, through attorney escrow accounts associated with five offshore law firms established by a cooperating witness ("CW-1"), the fraudulent proceeds into, inter alia, accounts controlled by the Mulholland Group in the U.S. and Canada.  (SI ¶¶ 21-22).[1]

C.      The Undercover Operation

Beginning in January 2013, Bandfield and co-conspirators revealed to a law enforcement agent posing as a stock promoter engaged in fraudulent trading activity (the "Undercover Agent" or "UCE") the fraudulent structure and scheme that Bandfield had fashioned to enable IPC Corp's clients, including Mulholland, to evade U.S. securities and tax laws.  (SI ¶ 23-31).  Specifically, co-defendant Andrew Godfrey, who was Bandfield's right-hand man, informed the Undercover Agent that IPC Corp could establish a corporate structure that concealed the Undercover Agent's ownership interest in his brokerage account at Titan, which would provide the Undercover Agent with the desired protection he sought from the SEC and the IRS.  (SI ¶¶ 24-

---

[1]  It bears noting that Mulholland was just one of more than 100 of Bandfield's clients.

Hon. I. Leo Glasser
February 2, 2017
Page 3

25).  In this fraudulent structure designed to conceal the Undercover Agent's control and ownership, IPC Corp would open the Undercover Agent's brokerage account at Titan in the name of an international business corporation ("IBC").  (SI ¶ 25).  That IBC would be owned by a limited liability company ("LLC") in the name of a nominee, usually an IPC Corp employee designated by IPC Corp, and the Undercover Agent's name would not be associated with either the IBC or the LLC.  (Id.).

Almost a year later, on November 6, 2013, the Undercover Agent met with Bandfield and Godfrey at IPC Corp's office in Belize.  (SI ¶ 27).  That meeting was recorded.  (See Government Exhibit ("GX") 1; GX 1-A (transcript)).  During the meeting, Bandfield and Godfrey explained, in great detail, how IPC Corp assisted U.S. citizens like the Undercover Agent in evading U.S. laws and regulations, including the IRS's reporting requirements, by establishing sham IBCs and LLCs:

BANDFIELD:     Yeah.  That's really good.  And just quickly, yeah, because, uh, you know, of all the new laws… and they're changing a lot of securities firms won't deal with Americans at all. And a lot of banks are actually closing out because, uh, Obama's new HIRE Act.

***

BANDFIELD:     Yeah, he's not good. And…and… and puts all… a huge financial burden on all these companies [Unintelligible ("U/I")] say we just don't deal with them.  So we do have this structure like Andrew is talking about where… We will open an account, say, at Titan under the L…  Under the IBC, International Business Company, Belize's one.  And we have nominees that can sit on these companies, but a Belizean cannot sit on a Belize IBC.  So, Andrew can't own a Belize IBC 'cause they wanna tax him too.

UCE:              Uh-hum.

BANDFIELD:     And if we put it on an IBC, they don't know what's happening. So, what we do is, we have the ownership of the IBC being an LLC out of Nevis and he can own a Nevis company.  So he might own a Nevis company that owns this company, and we all go to Titan and we… They say, "Who owns this company?" And we say, "That's his Nevis, a, company" "Who's that one?" We say Andrew and they say "Alright, no problem" and the account is opened up right away. And that's how we are getting around it. And… Andrew really does own it.

***

Hon. I. Leo Glasser
February 2, 2017
Page 4

BANDFIELD:    Yes. So Shane, uh… a person we know here. Actually does, really does own that company.

UCE:    O.K.

BANDFIELD:    So, we're not lying to anybody. [Laughs]

UCE:    Right.

BANDFIELD:    He owns it.

UCE:    Right.

BANDFIELD:    Now, uh… We, then, uh… stepped in and… and we make sure that we have control of Shane, which we do. And, uh… if monies are to be moved around you check with us, and make sure it goes wherever you want the stock. It used to be traded. We trade it, or move, we take care of that.

                                        ***

BANDFIELD:    We can take him off in an instant, put someone else on.

UCE:    Uh-hum.

BANDFIELD:    We know who ultimately is behind it. But legally, he owns it.

UCE:    Legally there is a place for that at that point in time; he is the actual owner of it.

BANDFIELD:    He is the owner of it. He actually owns ninety-nine percent of it. We keep one share of, which I always keep under one of my companies.

UCE:    Uh-hum.

BANDFIELD:    Because the laws for an LLC says that if you're gonna change anything, you need approval of all the owners. So, I never… I never agree to anything. [Laughs]

Hon. I. Leo Glasser
February 2, 2017
Page 5

| | |
|---|---|
| UCE: | Uh-hum. |
| BANDFIELD: | So I always keep one of my fingers in there. |
| UCE: | Good, good!  O.K. |
| BANDFIELD: | So, at least you know, that… that… You know, you don't own the company. Nonetheless… |
| UCE: | Which is good! |
| BANDFIELD: | Yeah, you don't. It's... you know, people wanna own everything and control everything, like on a trust we don't wanna do it for you even... if you wanna get in there, and control it, own it, we… we don't wanna work with you because it's gonna hurt you on the long run. A trust, for example, is set up so that nobody can touch it. But if you own it, they can say, "Give it back." You know, "We want it back here." If you control it, they can say, "Fine, send it over here." Either, creditors or, or, or, I... IRS or, uhm... uhm...or anybody can make you, uh, give it back. But, if someone is after you for some monies, doesn't mean they can take it from Andrew. |

***

| | |
|---|---|
| UCE: | Yeah and, and that would be… Obviously [UI] this what [UI]… what I wanted to discuss. Um… I plan to do, uh… significant business offshore at this point. I'm in the securities promotion business, and investor awareness business. I get issued lots of stocks. |
| BANDFIELD: | Oh, perfect. O.K. |
| UCE: | O.K.? |
| BANDFIELD: | So… Yeah. |
| UCE: | Lots of stock. And, uhm… which will generate… I basically, I can get into my, my business, if you wanted to hear about … more about it, but… |
| BANDFIELD: | I understand already. |

Hon. I. Leo Glasser
February 2, 2017
Page 6

UCE:                     You know the business. O.K.

BANDFIELD:               Yeah, we, Titan, we created LGM, we created it.

UCE:                     Oh, O.K.

BANDFIELD:               Three four other securities firms we created. I created them. [Laughs]

UCE:                     So…

BANDFIELD:               So, I understand what's going on. We understand the marketing and all this. And… we understand that… a… a lot of stock can go to, you know, whomever did services for entities. So, it's perfect. The reason is perfect is because, uh, if we gonna bring in, and I'm not trying to sell this to you now, but this is good for you to understand, 'cause you asked about a trust.

(See GX 1 at 5:33-10:25; GX 1-A at 14-19).

        Later in the meeting, Bandfield explained to the Undercover Agent that he needed to replace his IBCs regularly to evade detection of his fraudulent securities trading:

UCE:                     I have a million questions, but I'll just listen and then ask you.

BANDFIELD:               O.K.

UCE:                     Unless you want me to… interrupt you.

BANDFIELD:               No, I'll [UI] tell you some of the things too.  If you do a lot of trading, what… what people…?  Some of the mistakes they make on this, the IBCs are cheap [UI] and in the end you, and you're down to a thousand dollars [UI] in our company, the first one is fifteen hundred, the second one [UI] you had an LLC, so it's two thousand, but from here on [UI] is a thousand dollars each. O.K.?

UCE:                     Uh-hum.

BANDFIELD:               Now, but, people that are in securities here, which we have a lot, make a simple little mistake, and they… they don't want spend any more money on the company, I'm not selling anyway now, by the way.

Hon. I. Leo Glasser
February 2, 2017
Page 7

                [Voices overlap]

UCE:           I [UI] all the way from New York and not spend money.

BANDFIELD:    [UI] stock in there before you know we got fifteen or twenty different things, and it pops up on the register that this company has gotten, you know, trading in all these stocks…

GODFREY:    And the same person signing.

BANDFIELD:    The same person signing, the same company, and that tends to look a little strange now, I don't know what their volume is, but…

UCE:           Lots of volume!

BANDFIELD:    O.K.

UCE:           Lots of deals… that is my… O.K. This is my business, it's stock promotion.

BANDFIELD:    I understand that.

UCE:           So, it's about volume and many different deals.

BANDFIELD:    Yeah.  So, getting on here, um… So, if you're intending to get a lot of this stock for your work in the… in setting them up, then, I would recommend that you don't go dumping,[2] you know, a whole bunch into this one company, Lion Mercantile. The LLC, you never want to get rid of that LLC. Keep that, because that's the expensive one to set up, and simple to maintain. But every now and then throw one of these away and get a new one.

UCE:           The IBCs.

BANDFIELD:    Or have a couple or three IBCs.

UCE:           Uh-hum.

---

    [2] Lion Mercantile is the name of the Undercover Agent's IBC.

Hon. I. Leo Glasser
February 2, 2017
Page 8

| | |
|---|---|
| BANDFIELD: | Once it's been used for… you dump the thing. You know, you make enough to pay the thousand dollars for a new one. |
| UCE: | Uh-hum. |
| BANDFIELD: | And now we're not loading this up, and loading it up in the US. Because, remember, when they trade in the US, they're trading with a broker in the US. Titan is not, you know, in the end doing the trade, they… they're licensed as an international broker. But to trade in the United States they have to go to a broker there that is tied in with NASDAQ… |
| UCE: | Right. |
| BANDFIELD: | … under the OTC… The same as if they are trading in Canada, they… they need to set up a broker up there that is licensed to trade Canadian stocks too. |
| UCE: | Right. |
| BANDFIELD: | If they're trading European stocks or something, then they have to go to Germany or [UI] have you whatever market that is over there. |
| UCE: | Yes. |
| BANDFIELD: | O.K. So, so… what happens when they start making all these trades, and it all ends up, because there is always one single company it becomes … quite a big red spot. |

(See GX 1 at 15:00-17:18; GX 1-A at 26-29).

Bandfield also bragged that he had incorporated more than 5,000 sham companies. (See GX 1 at 47:18-47:45; GX 1-A at 66) ("we've incorporated over five thousand companies"). Additionally, Bandfield suggested the means by which the Undercover Agent could circumvent the SEC's reporting requirements by concealing his beneficial ownership of more than five percent of a public company's stock through nominee accounts:

| | |
|---|---|
| UCE: | … Shareholder all the way. Uh-hum… Because I wanna have more than… And this is another question I gonna have, I gonna have more than the five percent in some companies, it's gonna trigger filings. |

Hon. I. Leo Glasser
February 2, 2017
Page 9

BANDFIELD:      See, that's… O.K. I'll go back on that now. That's the other thing is, uh… give Lion four percent; give XYZ company two percent.

UCE:      Right.

BANDFIELD:      And we… we might, and if you could just start keeping the record of this, Lion may trade three percent with LGM or with Titan the other two percent why go through LGM? We might put another four percent over here through a third securities firm.

UCE:      Right.

BANDFIELD:      So, keep them in different securities, because when they trade that stock, [it's] traded under Titan.

UCE:      Uh-hum.

BANDFIELD:      You know the next one here trades under LGM, they won't trade under Lion Mercantile.

UCE:      Uh-hum.

BANDFIELD:      So, if you all of sudden dump twenty percent into Titan, and now we got Titan trading twenty percent of the stock we run into problems, they have to make sure that they are always below the five percent.

UCE:      Right.

BANDFIELD:      But if it is all under one company the six percent, they got problems.

UCE:      Uh-hum, uh-hum.

BANDFIELD:      O.K. But… but if you had four companies here and they are all at two, that's O.K., you know, they can work with that.

UCE:      Right.

BANDFIELD:      O.K. So…

Hon. I. Leo Glasser
February 2, 2017
Page 10

UCE:            Makes sense.

BANDFIELD:      O.K. So, when you're really…

                [Voices overlap]

UCE:            And that would be different I… IBCs [UI]…

BANDFIELD:      [UI], don't… don't put over five percent.  Why… why… why report that?

UCE:            So, I need to create at least another four IBCs.

(See GX at 17:26-18:39; GX 1-A at 30-31).

          Bandfield also explained to the Undercover Agent that IPC Corp would sign any stock purchase agreements that the Undercover Agent needed him to sign, and further stated that the Undercover Agent could evade the IRS's reporting requirements by having a nominee sign IRS Forms W-8BEN[3] for the Undercover Agent's IBC:

UCE:            if I'm gonna get ten million in shares from some third party, uhm… how does
                that get… who does the stock purchase… do I have to do a stock purchase
                agreement… rather than me, does Lion Mercantile… [UI] company?

                                        ***

GODFREY:        We do the stock purchase agreements … we do the corporate resolutions….

BANDFIELD:      We'll sign the stock purchase agreements and write the corporate
                resolutions….

                [Voices overlap]

GODFREY:        We'll do [UI]…

---

[3]  An IRS Form W-8BEN is a form which notifies the IRS that a foreign individual is the beneficial owner of funds that are subject to tax withholding.

Hon. I. Leo Glasser
February 2, 2017
Page 11


         [Voices overlap]

BANDFIELD:    Uh… we'll [UI] right?

GODFREY:    Right, right, that's it.

BANDFIELD:    Yeah. Lion now is receiving it. They would receive it, and they would sign that.  So you just get it down to him [UI]. You just get it down to us, and Shane in this case, would sign for Lion Mercantile.  John… Shane… uh… Shane… Shane is gonna sign on this one here.

UCE:    Oh, O.K.

BANDFIELD:    Yeah. Not gonna… You're not involved in it. This company is involved in it.

UCE:    Right.

BANDFIELD:    O.K., so Shane will sign the document, and if you need a W-8BEN. He'll fill that out too and sign for it.

UCE:    That's a good point too, the W… So that would say that this is owned by the foreign or whoever…

BANDFIELD:    Well it is owned by them.

UCE:    Yeah, whoever that is.

BANDFIELD:    Yeah.

UCE:    Uhm…

BANDFIELD:    And we set up your accounts at LGM and Titan… you take…make sure we spread it out properly…

UCE:    Oh, beautiful.

(See GX 1 at 1:05:00-1:05:55; GX 1-A at 93-94).

Hon. I. Leo Glasser
February 2, 2017
Page 12

A few months later, on March 4, 2014, the Undercover Agent met again with Bandfield and Godfrey at IPC Corp's office in Belize.  That meeting was also recorded.  (GX 2; GX 2-A (transcript)).  During that meeting, Bandfield explained, <u>inter alia</u>, the IBC and LLC structure and the brokerage accounts that he had set up for the Undercover Agent at various affiliated brokerage firms, including Titan and Legacy.  (<u>See</u> GX 2 at 7:55-9:32; 11:20-12:33; GX 2-A at 12-15; 18-22).  He further explained that the "slick" IBC and LLC structure was specifically designed to counter U.S. laws and advised the Undercover Agent that the designated nominees, including a security guard and courier, would sign any stock purchase agreements on behalf of the IBCs at the Undercover Agent's direction.  (<u>See</u>, <u>e.g.</u>, GX 2 at 59:50-1:00:17; GX 2-A at 82-86).  In order to eliminate any paper trail of the Undercover Agent's payment to Bandfield for the IBCs, Bandfield stated that he would return the Undercover Agent's payment for the IBCs that he had made through the internet and had the Undercover Agent pay him in cash in person instead.  (<u>See</u> GX 2 at 1:02:00-1:04:13; GX 2-A at 89-92).  Bandfield also cautioned the Undercover Agent to be careful regarding the way in which he contacted IPC Corp.  (<u>Id.</u>) ("we just have to be very careful on, on how we're communicating back and forth, it's the only little glitch there").

D.    The Mulholland Group and Other Corrupt Clients

Between March 21, 2014 and May 30, 2014, law enforcement authorities conducted five judicially-authorized wiretaps of telephone lines for IPC Corp, Titan and Legacy.  (SI ¶ 33).  The wiretaps, together with the fruits of grand jury subpoenas, materials received from regulators and emails obtained through judicially-authorized search warrants, demonstrated that Bandfield was engaged in a scheme with more than 100 clients, including the Mulholland Group, to evade U.S. securities and tax laws and conceal their fraudulent activity and illegal proceeds through IPC Corp's fraudulent IBC and LLC structure.  (SI ¶¶ 33-34).  As with the Undercover Agent, the investigation revealed that Bandfield's structure enabled IPC Corp's clients to conceal their fraudulent trading activities at brokerage firms, such as Legacy and Titan, through the use of nominees and then transfer the proceeds of their fraudulent trading activity through attorney escrow accounts and unmarked debit cards.  (SI ¶¶ 35-36).  The use of the nominee accounts at the brokerage firms provided U.S. clients with the additional benefit of evading the payment of taxes on their fraudulent trading proceeds.  (<u>Id.</u>).

Beginning in 2011, the Mulholland Group utilized IPC Corp's fraudulent IBC and LLC structure to open brokerage accounts in the names of the IBCs at offshore brokerage firms such as Legacy, Titan and Unicorn.  Through those brokerage accounts, the Mulholland Group fraudulently manipulated the stock of more than forty U.S. publicly-traded companies.  Mulholland was the leader of the Mulholland Group, and coordinated the co-conspirators' efforts on each stock deal.  The Mulholland Group was comprised of individuals who worked in concert on each deal to identify the stock to manipulate; gain control of the company's shares; transfer the shares to various IBCs to hide the Mulholland Group's ownership interest and control; promote the stock to U.S. investors through fraudulent press releases, promotional emails and mailings; and then manipulate the price of the stock through coordinated trading using various offshore brokerage firms.  Once the Mulholland Group successfully "pumped and dumped" a company's

Hon. I. Leo Glasser
February 2, 2017
Page 13

stock, Mulholland directed CW-1, an attorney, to transfer the fraudulent proceeds to accounts in the U.S., Canada, and overseas through escrow accounts of five offshore law firms that CW-1 controlled. CW-1 created four of the five offshore law firms at Mulholland's request. In order to further conceal the Mulholland Group's stock manipulation schemes, in addition to purchasing Legacy, Mulholland created and utilized two additional offshore brokerage firms – Clearwater Securities and IntraWorld Securities. The Mulholland Group also routinely utilized burner phones, aliases and Skype to avoid detection by law enforcement. From approximately 2011 to 2014, the Mulholland Group laundered at least $250 million through CW-1's attorney escrow accounts.

Two of the Mulholland Group's "deals" – Vision Plasma Systems, Inc. ("Vision Plasma" or "VLNX") and Cynk Technology Corp. ("CYNK" or "Introbuzz") – are set forth in the superseding indictment. (SI ¶¶ 37, 40-46). Specifically, in June 2011, approximately 84 million shares of Vision Plasma were issued to nine IBCs created by IPC Corp for Mulholland. Thus, the Mulholland Group beneficially owned and controlled at least 84 percent of the free trading shares of VLNX, which was concealed from the investing public in violation of SEC rules and regulations. (SI ¶ 41). A year later, in August 2012, a promotional campaign was orchestrated to manipulate VLNX stock. (SI ¶ 42). Prior to August 16, 2012, there was no trading activity in VLNX. (Id.). On August 16, 2012, the daily trading volume was 308 million shares and the stock price, which opened at $0.14, increased to an intraday high of $0.39 before closing at $0.30. (Id.). That same day, the nine IBCs beneficially owned and controlled by the Mulholland Group sold more than 83 million shares of VLNX, primarily through Legacy, which was secretly owned by Mulholland, resulting in approximately $21 million in proceeds. (Id.).

Additionally, the Mulholland Group also fraudulently manipulated the price and volume of CYNK's stock. Between April 2012 and September 2012, the Mulholland Group wire transferred $1,524,000 from an account controlled by the Mulholland Group to Introbuzz's account at Bank of America. (SI ¶ 44). In June 2012, approximately 75 percent of Introbuzz's initial public offering of stock was purchased by associates of the Mulholland Group. (Id.). Throughout 2013, the associates of the Mulholland Group who had purchased shares through the initial public offering of CYNK stock sold their CYNK shares to three IBCs controlled by the Mulholland Group. (SI ¶ 45). Mulholland had paid IPC Corp for the three IBCs that ended up owning the vast majority of CYNK's free trading shares. (SI ¶ 44). By May 2014, the Mulholland Group was ready to commence the manipulation of CYNK's stock. (SI ¶ 46). On or about May 15, 2014, after no trading for 24 days, the stock closed at $0.06 per share following trading of 1,900 shares. (Id.). From approximately June 17, 2014 through July 10, 2014, despite CYNK having no revenue or assets, more than 2 million of its shares were traded, its share price increased from a closing price of $2.25 per share to a closing price of $13.90 per share, and CYNK was valued at more than $4 billion as a result of the fraudulent manipulation by the Mulholland Group. (Id.). A number of offshore brokerage firms, including Legacy and Titan, traded in CYNK stock. (Id.).

Hon. I. Leo Glasser
February 2, 2017
Page 14

II.     Relevant Procedural History

   A.     Initial Indictment and Bandfield's Arrest

         On September 5, 2014, a grand jury sitting in the Eastern District of New York returned an indictment that charged Bandfield (and others) with conspiracy to commit securities fraud (Count One); conspiracy to defraud the United States – tax fraud (Count Two); and money laundering conspiracy (Count Three).  (Docket Entry No. 1).  On September 9, 2014, Bandfield was arrested at the airport in Miami, Florida.

   B.     Mulholland's Arrest and the Superseding Indictments

         On June 23, 2015, Mulholland was arrested pursuant to a complaint at an airport in Phoenix, Arizona.[4]  On July 31, 2015, a grand jury sitting in the Eastern District of New York returned a superseding indictment that charged Bandfield and Mulholland (and others) with conspiracy to commit securities fraud (Count One); money laundering conspiracy (Count Three); securities fraud as to VLNX (Count Four); and securities fraud as to CYNK (Count Five).  (Docket Entry No. 32).  Additionally, Bandfield was charged with conspiracy to defraud the United States – tax fraud (Count Two).  On February 26, 2016, the grand jury returned a second superseding indictment against the defendants, which included minor changes to the initial superseding indictment.  (Docket Entry No. 96).

   C.     Bandfield and Mulholland's Guilty Pleas

         On May 9, 2016, Mulholland pleaded guilty to Count Three (money laundering conspiracy) of the second superseding indictment.  (Docket Entry No. 113).  On May 24, 2016, approximately two weeks prior to the start of trial, Bandfield pleaded guilty to Count Three (money laundering conspiracy) of the second superseding indictment.  (Docket Entry No. 119).

III.    The Sentencing Guidelines

         In its January 16, 2017 letter to the U.S. Probation Department ("Probation"), the government objected to Probation's calculation of the applicable Guidelines range of imprisonment.  In the plea agreement, the government calculated the offense level under the Guidelines as follows:

| | | |
|---|---|---:|
| Base Offense Level (§ 2S1.1(a)(2)) | | 8 |
| Plus: | Gain of More than $250,000,000 (§ 2B1.1(b)(1)(O)) | +28 |
| Plus: | Involved 10 or More Victims (§ 2B1.1(b)(2)(A)(i)) | +2 |

_____

   [4]  Mulholland had traveled from Vancouver, Canada to Phoenix, where he was waiting to board a plane bound for Mexico.

Hon. I. Leo Glasser
February 2, 2017
Page 15

| | |
|---|---|
| Plus:   Substantial Part of Scheme was Outside the U.S. (§ 2B1.1(b)(10)(B)) | +2 |
| Plus:   Organizer or Leader of 5 or More Participants (§ 3B1.1(a)) | +4 |
| Minus: Acceptance of Responsibility (§ 3E1.1) | -2 |
| Total: | 42 |

An offense level of 42, when applied to Criminal History Category I, carries a range of imprisonment of 240 months due to the applicable mandatory maximum sentence.  The defendant stipulated to this Guidelines calculation.

In the PSR and 1st PSR Addendum, Probation calculated the total offense level under the Guidelines as follows:

| | |
|---|---|
| Base Offense Level (§§ 2S1.1(a)(**1**); 2B1.1(a)(2)) (emphasis added) | 6 |
| Plus:   Gain of More than $250,000,000 (§ 2B1.1(b)(1)(O)) | +28 |
| Plus:   Involved 10 or More Victims (§ 2B1.1(b)(2)(A)(i)) | +2 |
| Plus:   Substantial Part of Scheme was Outside the U.S. (§ 2B1.1(b)(10)(B)) | +2 |
| Plus:   Defendant was Convicted under 18 U.S.C. § 1956 (§ 2S1.1(b)(2)(B)) | +2 |
| Plus:   Organizer or Leader of 5 or More Participants (§ 3B1.1(a)) | +4 |
| Minus: Acceptance of Responsibility (§ 3E1.1) | -3 |
| Total: | 41 |

In its January 16, 2017 objections to the PSR, the government objected to Probation's subtraction of a point due to timely acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(b).  In its second PSR addendum, Probation removed the additional point as contained in Paragraph 59 of the PSR, resulting in an adjusted offense level of 42 (as set forth in Paragraph 60 of the PSR).  2nd PSR Add.  Thus, although using slightly different Guidelines provisions, the government and Probation arrived at the same advisory Guidelines range of imprisonment, i.e., 240 months, due to the applicable mandatory maximum sentence.

For the reasons set forth below, Probation's use of U.S.S.G. § 2S1.1(a)(1) as the starting point for the base offense level is wrong.  In determining the base offense level, U.S.S.G. § 2S1.1(a) provides that the following sub-sections are appropriate:

(1)     The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of

Hon. I. Leo Glasser
February 2, 2017
Page 16

> §1B1.3 (Relevant Conduct)); and (B) **the offense level for that offense can be determined** (emphasis added); or
>
> (2)    8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise.

Probation determined in the PSR – and maintains in its second PSR addendum – that U.S.S.G. § 2S1.1(a)(1) was an appropriate starting point, whereas the government elected to use U.S.S.G. § 2S1.1(a)(2) in the plea agreement. See 1st PSR Add.; 2nd PSR Add.

The government maintains that Probation incorrectly used U.S.S.G. § 2S1.1(a)(1) as the starting point. Under the two-prong approach of U.S.S.G. § 2S1.1(a)(1), although there is no doubt that the defendant committed securities fraud, which is the underlying offense or specified unlawful activity of money laundering conspiracy (the count of conviction), the second prong – the offense level for that offense can be determined – has never been provided or determined by the government. The underlying securities fraud committed by the defendant and his co-conspirators involved more than 40 publicly-traded companies and determining the actual or intended loss associated with each of these companies would involve an immense amount of resources that is, put simply, not practicable. Although the application notes provide that the "court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined," the government submits that, under the circumstances of this case, the second prong of U.S.S.G. § 2S1.1(a)(1) was not satisfied, which then directs the court to apply U.S.S.G. § 2S1.1(a)(2) to determine the base offense level. Accordingly, the appropriate Guidelines calculation should begin with determining the base offense level pursuant to U.S.S.G. § 2S1.1(a)(2).

Unfortunately, it does not follow that the Guidelines calculation provided in the plea agreement is correct. Although the government contends it used the appropriate starting point in calculating the base offense level, it improperly relied on enhancements in U.S.S.G. § 2B1.1, rather than U.S.S.G. § 2S1.1, in arriving at the total offense level. The government submits that the following is the correct Guidelines calculation:

| | |
|---|---|
| Base Offense Level (§ 2S1.1(a)(2)) | 8 |
| Plus:   Value of Laundered Funds Exceeds $250,000,000 (§ 2B1.1(b)(1)(O)) | +28 |
| Plus:   Defendant was Convicted under 18 U.S.C. § 1956 (§ 2S1.1(b)(2)(B)) | +2 |
| Plus:   Offense involved Sophisticated Laundering (§ 2S1.1(b)(3)) | +2 |
| Plus:   Organizer or Leader of 5 or More Participants (§ 3B1.1(a)) | +4 |
| Minus: Acceptance of Responsibility (§ 3E1.1) | -2 |
| Total: | 42 |

Hon. I. Leo Glasser
February 2, 2017
Page 17

Based on the foregoing, the total offense level is 42, which is the same offense level set forth in the defendant's plea agreement, but arrived at it using the correct methodology.

IV.    A Sentence at or Just Below the Advisory Guidelines is Warranted

      A.    Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] ... to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns.  125 S. Ct. 738, 743 (2005); see 18 U.S.C. § 3553(a).  Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines ... to 'consider' them, along with the other factors listed in section 3553(a)."  United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).  Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum."  Id. at 113.

Later, in Gall v. United States, the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented."  Id. at 49-50 (citation and footnote omitted).

      B.    Application of Law

As explained in greater detail below, the government respectfully submits that the Court should impose a sentence at or just below the advisory Guidelines of 240 months' imprisonment because such a sentence is appropriate to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  (18 U.S.C. § 3553(a)(2)(A)).  A sentence at the advisory Guidelines or just below it will also further the aims of specific and general deterrence and will avoid unwarranted sentencing disparities among the defendant and his co-defendants.  (See id. §§ 3553(a)(2)(B), (a)(2)(C), (a)(6)).

Hon. I. Leo Glasser
February 2, 2017
Page 18

       1.     <u>Nature and Circumstances of the Offense</u>

      As set forth in detail above, the defendant was the architect of one of the largest market manipulation schemes ever charged in this district.  He set up a complex structure of shell companies concealed by other shell companies to enable U.S. and other citizens to violate their countries' laws, including U.S. securities, tax and money laundering laws.  As is evident from the recordings made by the Undercover Agent, as set forth above, the defendant was proud of his fraudulent structure and bragged about the layers he had built to shield his customers from U.S. law enforcement and regulators.

      <u>First</u>, the defendant argues that his "role was limited to incorporating companies and corporate structures (through his business, IPC Corp)" and that "he was not involved in nor was he aware of his co-defendants alleged pump and dump schemes." (Def. Mem. at 7).  The defendant also argues that he "has limited knowledge of securities in general." (Def. Mem. at 11).  In light of the overwhelming evidence to the contrary, this argument calls into question the defendant's acceptance of responsibility, despite his numerous assertions that he does not seek to minimize his role.  For example, it is clear from the few excerpts of the defendant's discussions with the Undercover Agent that he was made aware of the Undercover Agent's desire to engage in pump and dump schemes and his purported background in the securities industry.  In fact, upon learning the Undercover Agent's fraudulent reasons for opening shell companies through IPC Corp, the defendant's reaction to that was "I understand already" and "three, four other securities firms we created.  I created them. [Laughs]." (<u>See</u> <u>supra</u> at 6).  A little later, the defendant advises the Undercover Agent: "So, if you're intending to get a lot of this stock for your work in the… in setting them up, then, I would recommend that you don't go dumping, you know, a whole bunch into this one [IBC].  The LLC, you never want to get rid of that LLC.  Keep that, because that's the expensive one to set up, and simple to maintain.  But every now and then throw one of these away and get a new one…. what happens when they start making all these trades … because there is always one single company it becomes … quite a big red spot." (<u>See</u> <u>supra</u> at 7-8; <u>see also</u> GX 3 – consensually recorded call between the defendant and the Undercover Agent on December 11, 2013).

      The defendant's knowledge and awareness of his fraudulent customers were not limited to his dealings with the Undercover Agent.  For example, the defendant's intercepted conversations with co-defendant Brian De Wit, Legacy's President and primary broker, reveal the defendant's knowledge about evading securities laws and his influence over the brokerage firm that was secretly owned by Mulholland and used by the Mulholland Group and a number of IPC Corp's clients to commit securities fraud.  (<u>See</u> GX 4).

      Additionally, the defendant's intercepted conversations with his customers further confirm that the defendant's role was not limited to incorporating companies and that he knew about and assisted his customers' fraudulent stock manipulation schemes.  For example, during an intercepted call on April 29, 2014 with one of his close customers, the defendant stated: "right now most of our work is securities, surprisingly enough.  We see a lot of IPOs and a lot of penny stock,

Hon. I. Leo Glasser
February 2, 2017
Page 19

OTC stock, pink sheets and all that.  We trade a lot of it here through companies we set up.
Probably 99 percent of our business or 98 percent right now is this kind of stock."  (See GX 5)
(emphasis added).  Similarly, during an intercepted call on May 2, 2014 with another one of his
customers, the defendant stated: "it's pretty substantial . . . he's kind of all over the world and he
has a bunch of clients under him.  We created a securities firm just so he could trade his own
securities."[5]  (See GX 6 (emphasis added); see also GX 7 (email exchange between the defendant
and the large IPC Corp client that reveals the close nature of their relationship); GX 8 (email
exchange that demonstrates the defendant's role in preparing stock transfer documents and
transferring stock to brokerage firms in connection with a stock that was fraudulently
manipulated); GX 9 (letter from the defendant to a transfer agent cancelling a stock certificate and
reissuing them in the names of five shell companies); GX 10 (email exchange between the
defendant and a transfer agent concerning the transfer of stock)).

Second, the defendant argues that he "did not participate in any scheme to
manipulate the stocks of Cannabis-Rx, Inc. ("CANA"), VLNX, CYNK or any other stock."  (Def.
Mem. at 8).  In light of the facts above, such an assertion has no merit.  Fraudulent stock
manipulation involves multiple steps, beginning with concealing the true ownership of the stock
manipulators and ending with the transferring of the fraudulent proceeds to the stock manipulators.
Even the defendant concedes that he was responsible for concealing the true ownership of the stock
manipulators.  It then follows that the defendant cannot argue that he was not part of a stock
manipulation scheme.

But perhaps most notably, the defendant's arguments are surprising and again
demonstrate a true lack of acceptance of responsibility in light of the strong evidence that
demonstrates the defendant's direct involvement with the CANA manipulation scheme.  For
example, on February 6, 2014, an associate of the large IPC Corp client referenced above sent an
email to the defendant and stated, in relevant part: "Thanks Bob – I have emailed her already and
I still have the [stock] certs [certificates] to Amita here as I have another cert to send re LCOR –
now CANA, which I will sent you."  (See GX 11).  The following month, on March 31, 2014, a
stock transfer agency representative sent an email to the defendant with the subject line "Cannabis-
RX Inc. DRS Transfer," attached three account statements and stated, in relevant part: "Hi Bob, I
have received your DWAC requests on behalf of [three IBCs].  However, the broker is seeking the
transfer via DRS, which has less transfer requirements than the DWAC . . . I am enclosing the
statements for the three shareholders containing the account number, which you can provide to
your broker and ask them to set up the DRS separately for each account."  (See GX 12).[6]  These

---

[5] The "he" referenced during this excerpt was one of IPC Corp's largest clients, one of the
most notorious stock manipulators ever, and perhaps the only customer larger than Mulholland.

[6] "DWAC" stands for Deposit and Withdrawal at Custodian and allows transfers to be
done directly with the issuer's transfer agent.  "DRS" stands for Direct Registration System and

Hon. I. Leo Glasser
February 2, 2017
Page 20

emails are particularly illuminating when put in context with the fact that between March 27, 2014 and April 16, 2014, co-defendant De Wit, whose relationship with the defendant has been described above, and one of IPC Corp's clients engaged in a series of orchestrated transactions which resulted in CANA's stock price plummeting from $13.77 per share on March 27, 2014 to $0.50 per share on April 16, 2014.  (SI ¶ 39).  On March 28, 2014 alone, DE WIT received at least five telephone calls from the client with specific instructions to fraudulently orchestrate the trading of CANA's stock.  (Id.).  That day, CANA's stock, which had not traded since July 2, 2013, had a trading volume of 189,800 shares and the share price plummeted from the previous day's closing price of $13.77 per share to a closing price of $1.90 per share.  (Id.).

   Third, the defendant argues that neither he nor IPC Corp gave any tax advice and "recognized that tax reporting is the responsibility of individual clients …."  (Def. Mem. at 11).  This argument again ignores the overwhelming evidence to the contrary.  The defendant could barely contain his glee while he described the sophisticated manner in which his fraudulent corporate structure would enable the Undercover Agent to evade U.S. tax laws, specifically mentioning the HIRE Act, the IRS and Form W-8BENs.  (See supra at 3, 5, 10-12).  Additionally, on February 26, 2010, the defendant sent an email to his wife, who was IPC Corp's account administrator, wherein he demonstrated an extensive knowledge of U.S. tax laws and foreign tax exclusions and which he was relaying for the benefit of one of IPC Corp's clients.  (See GX 13).  As another example, on November 6, 2013, the defendant sent an email to one of his clients attaching a completed IRS Form W-8BEN in the name of an IBC set up by the defendant and that was signed by co-defendant Andrew Godfrey.  (See GX 14).  As yet another example, on May 22, 2014, in the context of setting up IBCs, the defendant sent an email to CW-1 and stated, in relevant part: "Also – FATCA comes into play at the banks on July 1.  Any signatory or owner of a company – if US – will be reported to the IRS.  Banks are only supposed to report if the account has over $50k, but they will just report all so as to not jeopardize their License."  (See GX 15).

   Fourth, the defendant argues that he is less culpable than some of his important clients because he made less money than them through the scheme.  Notably, he contends that "the fees he earned were solely in connection with incorporating companies and not related to securities trading or profit sharing from his co-defendants' securities fraud schemes."  (Def. Mem. at 10).  The defendant is wrong.  Contrary to his assertions, the defendant earned referral fees from Legacy and Titan.  With respect to Legacy, CW-1 informed the government that Bandfield formed the brokerage firm and referred IPC Corp's clients to them in exchange for, at least early on, a 50/50 split of commissions.  This is perhaps best illustrated by an email from De Wit to the defendant sent on December 12, 2011 regarding fees or commissions.  In this email, De Wit stated, in relevant part:

---

provides registered owners with the option of holding their assets on the books and records of the transfer agent in book-entry form.

Hon. I. Leo Glasser
February 2, 2017
Page 21

> I had mentioned to the guys that we should consider doing a regular referral/commission to IPC. I know that you and I discussed with regards to SC. The issue with IPC, as you will recall, is that it's still tagged as 50% to Andy, which is something that we will need to address in early in the new year. We are going to propose that IPC get a 20% fee, so that LGM and Andy will have to give up 10% each (currently, 50/50 split). We will need to tread lightly here (LGM that is) as we did a major restructuring of splits during our last meeting in Houston with Andy coming out with a major reduction…. In summary, yes we have no problem with a 20% referral, but we need to get Andy onside as Mark, Frank, Terry, etc. don't want to give up the 20% from its share.

(See GX 16).

2.      History and Characteristics of the Defendant

The defendant argues that he deserves a sentence of time served or no more than five years in large part because (1) he accepted responsibility for his conduct, (2) he has cooperated with Canadian law enforcement, and (3) his personal history and characteristics are indicative of a generous, caring older man who has led a positive life. (Def. Mem. 17-21).

First, as demonstrated above, the defendant's acceptance of responsibility is as minimal as can be before it triggers a motion by the government that he should be stripped of his acceptance of responsibility points under the Guidelines. The defendant claims that he demonstrated to the Court that he "unequivocally takes responsibility for his actions" by pleading guilty, but conveniently ignores to mention that he pleaded guilty a mere two weeks before trial despite facing overwhelming evidence, which included video recordings of the defendant bragging about his crimes. Additionally, it can hardly be stated that he has "unequivocally" taken responsibility for his actions in light of the claims in his sentencing submission which directly contradict evidence that had been marked and provided to the defendant as exhibits for trial.

Second, any attempts to argue that the defendant has cooperated with law enforcement agents should be rejected. The defendant has never proffered with the government in this case. But regardless, the notion that the defendant has "assist[ed] enforcement bodies" because he testified in a Canadian court in 2013 as an expert witness in an off-shore tax avoidance case, while he was at the center of a massive tax avoidance scheme, is absurd.

Third, the defendant's personal history and characteristics are not indicative of a generous, caring older man who has led a positive life, as argued by the defendant, but is indicative of a mastermind who devised an ingenious scheme to defraud the U.S. government and the U.S. financial markets and who has thus far demonstrated no remorse for the true victims of his fraud who have suffered millions of dollars of actual loss. Indeed, the best example of remorse that the

Hon. I. Leo Glasser
February 2, 2017
Page 22

defendant referenced in his submission was a letter from one of his former employees, and it states that the defendant told the employee that "he is very sorry for what has taken place." (Def. Mem. at 19). Put simply, this apology is not remorse for his crimes and certainly not an apology to the victims of his fraud.

Fourth, neither the defendant's age nor his personal health warrant a lenient sentence. The defendant is a fit and healthy 72-year-old man, and the only ailments that the defendant can cite to are hearing loss and bouts of depression. While the defendant's age will certainly make a long period of incarceration more difficult than if he were younger, the factors here, especially when compared to the other aggravating factors, are not such that weigh in favor of a lenient sentence.

Finally, any attempt to compare the defendant's conditions at the Metropolitan Detention Center (MDC") to the conditions for the female inmates at the MDC should be summarily rejected, especially when there have been no complaints by the defendant prior to his sentencing submission.

In sum, the defendant's history and characteristics weigh heavily in favor of a sentence at or just below the applicable advisory Guidelines range.

3.      Seriousness of the Offense and Deterrence

As demonstrated above, the defendant's role as the creator of this fraudulent, offshore corporate structure that caused investors to lose millions of dollars and the U.S. government to lose millions in tax revenue cannot be underscored. In light of the seriousness of the offenses perpetrated by the defendant and his co-conspirators, a sentence at or just below the advisory Guidelines range of imprisonment of 240 months is not just appropriate, but warranted. See 18 U.S.C. §§ 3553(a)(1), (2)(A).

There can be no doubt that the defendant committed a serious offense. In fact, it is an offense that is so broad in its scope and impact that there are few cases that are comparable. The defendant, together with his co-defendants, caused losses far in excess of $250 million from more victims than the government can realistically count.

The Court's sentence should also further the aims of general and specific deterrence. U.S.S.G. § 3553(a)(2)(B), (C). Here, both are at issue. The defendant has demonstrated a lack of appreciation for the impact of his actions and a lack of acceptance of responsibility, and as such, he is likely to engage in the same or similar schemes. Thus, the need for specific deterrence is present. Additionally, the need for general deterrence in this case in incredibly high. Given that sophisticated market manipulation schemes are difficult to detect and prosecute, particularly those schemes that function largely offshore, there is greater need for general deterrence. This is particularly true as we have seen the rise of offshore fraud havens where the perpetrators believe they are beyond the reach of the law. In reality, the instant case

Hon. I. Leo Glasser
February 2, 2017
Page 23

would have been incredibly difficult to prosecute, if not for the incredible work of the FBI, the IRS and the Undercover Agent. But the fact remains that there is a trend in the direction of the use of offshore entities to commit securities and tax fraud, and this case can send a strong message that there will be serious consequences for those who are caught. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

4.    Need to Avoid Unwarranted Sentencing Disparities

The defendant also argues for a sentence far below the advisory Guidelines range to avoid unwarranted sentencing disparities with similarly-situated defendants. (Def. Mem. at 25-29). The defendant's arguments are flawed and should be rejected.

As an initial matter, co-defendant Mulholland, who pleaded guilty before the defendant, agreed to recommend to the Court in his plea agreement that he receive a 12-year sentence. As noted in prior filings with the Court, the government submits that the defendant is more culpable than Mulholland. Although Mulholland earned more from the charged conspiracy than the defendant, it was the defendant's offshore structure that made those gains possible for Mulholland and his more than 100 other clients. Importantly, it was the defendant's structure that caused the millions of dollars in losses to investors, which went far beyond the impact caused by Mulholland. The defendant lies at the center of this massive conspiracy and he should be held accountable for his actions.

Additionally, a closer look at the cases cited by the defendant does not come close in comparison to the seriousness of this crime and the impact of this case. For example, the first case cited by the defendant is United States v. Parris, 05-CR-636 (FB). Parris involved the manipulation of a single stock and the Guidelines loss argued by the government was $4.9 million, not the more than $250 million in this case. The defendant's reliance on United States v. Abdallah, 09-CR-717 (JFB), is similarly unavailing. Abdallah again involved the manipulation of a single stock and the Guidelines loss argued by the government, which was a combination of actual and

Hon. I. Leo Glasser
February 2, 2017
Page 24

intended loss, was $794,072.18.  In comparison, the intended loss for CYNK alone is more than $4 billion.  Finally, the third EDNY case cited by the defendant is United States v. Branfenbrener, et al., 10-CR-459 (SJ).  The facts in Branfenbrener are so far removed and so innocuous compared to the facts at hand that they do not merit further analysis other than to point out that the Guidelines range in Branfenbrener was 51-65 months' imprisonment, not the 240 months here.

Put simply, there have been few market manipulation cases that have been as egregious and detrimental to the integrity of the financial markets as the instant case.  When combined with the related tax fraud and laundering of more than $250 million in fraudulent proceeds, this case stands as one of the most significant cases ever brought in this or any other district involving such crimes.

V.     Conclusion

Based on the foregoing, the government respectfully submits that the Court impose a sentence at or just below the advisory Guidelines range of 240 months' imprisonment.

Because the exhibits contain information about the identities of unindicted co-conspirators and other personal identifiable information, they are being filed under seal.  United States v. Amodeo, 71 F.3d 1044, 1050-51 (2d Cir. 1995) (need to protect the integrity of an ongoing investigation, including the safety of witnesses and law enforcement personnel, and privacy interests of third parties may be compelling reasons justifying sealing); United States v. Haller, 837 F.2d 84, 87-88 (2d Cir. 1988) (need to maintain grand jury secrecy may be compelling reason justifying sealing).

Respectfully submitted,

ROBERT L. CAPERS
United States Attorney
Eastern District of New York

By:     _____/s/_____
        Jacquelyn M. Kasulis
        Winston M. Paes
        Michael T. Keilty
        Assistant U.S. Attorneys
        (718) 254-6103 (Kasulis)

Enclosures (filed under seal)

Cc:     Clerk of the Court (ILG) (By ECF) (w/o enclosures)
        Eugene Ingoglia, Esq. (By ECF and Email) (w/ enclosures)
        Roberta Houlton, U.S.P.O. (By Email) (w/ enclosures)